IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SCHULTZ TRANSFER SYSTEMS, INC., individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC,<br><br>    Defendant. | Civil No. 1:19-cv-00558-LMM |

## DECLARATION OF NICK IZQUIERDO

I, Nick Izquierdo, declare as follows:

1.    I am the President of the Fuelman business at FleetCor Technologies, Inc. ("FleetCor").  In that capacity, and based upon an investigation into these matters, I have personal knowledge of the matters set forth herein, and if called upon as a witness I could competently testify thereto.

2.    Schultz Transfer Systems, Inc. ("Plaintiff") first became a Fuelman client in September, 2014.  At that time, FleetCor sent Plaintiff a copy of the then-applicable Terms and Conditions of its Fuelman Fleet Card Client Agreement (copy attached as Exhibit A).  FleetCor sent this material to Plaintiff at the physical address Plaintiff provided to FleetCor: 7880 Chapel Hill Court East; Franklin WI 53132.

3. Since then, FleetCor has updated the Terms and Conditions of its Fuelman Fleet Card Client Agreement applicable three times: in November 2014, May 2016, and January 2018.

4. For each update, FleetCor mailed notice of the new Terms and Conditions via U.S. mail to its clients at the addresses they provided.

5. Notice of the new Terms and Conditions of its Fuelman Fleet Card Client Agreements was sent via U.S. mail to Plaintiff at the mailing address Plaintiff provided to FleetCor: PO Box 320702; Franklin, WI 53132

6. Specifically:

    a) In November 2014, FleetCor mailed notice of the November 2014 Terms and Conditions to its clients, including Plaintiff. A true and correct copy of the November 2014 Terms and Conditions is attached as Exhibit B.

    b) In May 2016, FleetCor mailed notice of the May 2016 Terms and Conditions to its clients, including Plaintiff. A true and correct copy of the May 2016 Terms and Conditions is attached as Exhibit C.

    c) In February 2018, FleetCor mailed notice of the January 2018 Terms and Conditions to its clients, including Plaintiff. A true and correct copy of the January 2018 Terms and Conditions is attached as Exhibit D.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of March, 2019.

_____
Nick Izquierdo

# EXHIBIT A



**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**

**FUELMAN FLEET CARD CLIENT AGREEMENT**

**TERMS AND CONDITIONS**

**1   Definitions.**

1.1  *Account.* "Account" shall mean the internal Fuelman account established for Client.

1.2  *Agreement.* "Agreement" shall mean this agreement comprised of the Application (if any), the Approval Letter (if any) and this document containing the Terms and Conditions.

1.3  *Agreement Date.* "Agreement Date" shall mean the date on which Fuelman accepts the Client's Application and issues one or more Cards for Client's Account.

1.4  *Application.* "Application" shall mean the application completed by Client in applying for the Account through Fuelman.

1.5  *Approval Letter.* "Approval Letter" shall mean the letter, if any, sent by Fuelman to Client that approves the Application and establishes the Account under these Terms and Conditions.

1.6  *Bank Account.* "Bank Account" shall mean any bank account that Client has designated on the Application or by written notice to Fuelman for electronic funds transfer, automated clearinghouse or other electronic transfer of money to pay amounts due for Client's Account.

1.7  *Billing Cycle.* "Billing Cycle" shall mean the period of time set forth in the Approval Letter or any subsequent notification for which Transactions will be accepted and a Statement for the Account will be provided.

1.8  *Card or Cards.* "Card" or "Cards" shall mean the Fuelman fleet card or cards issued to Client.

1.9  *Cardholder.* "Cardholder" shall mean the person presenting the Card to the Merchant to be used to purchase Fuel and/or Maintenance.

1.10  *Client.* "Client" shall mean the business entity identified in the Application.

1.11  *Client's Representative.* "Client's Representative" shall mean the person(s) identified as Client's representative on the Application.

1.12  *Driver ID.* "Driver ID" shall mean the personal identification number issued by Fuelman to the Client for use with a Card to authorize a particular Transaction.

1.13  *Due Date.* "Due Date" shall mean the date upon which payment from Client is due to Fuelman as stated on Fuelman's Statement to Client.

1.14  *FleetCor.* "FleetCor" shall mean FleetCor Technologies Operating Company, LLC, the company which owns the Accounts and in whose favor all Obligations, as defined in Section 10.3, of Client under this Agreement flow.

1.15  *Fuelman.* "Fuelman" shall mean Fuelman, the division of FleetCor administering the Card(s) and Account.

1.16  *Fuel.* "Fuel" shall mean any combustible material dispensed by volume that is purchased with a Card.

1.17  *Guaranteed Obligations.* "Guaranteed Obligations" shall have the meaning set forth in Section 10.4.

1.18  *Guarantor(s).* "Guarantor" shall mean the person(s) identified on the Application or a separate guaranty document, if any, that guarantees Client will comply with this Agreement and pay all amounts owed to Fuelman.

1.19  *Maintenance.* "Maintenance" shall mean any non-Fuel product or service for a vehicle that is purchased with a Card (e.g., oil, wiper blades, fluids, towing, roadside assistance, parts, supplies, tires, oil changes, brakes, glass, exhaust systems, transmissions, and repair services).

1.20  *Merchant.* "Merchant" shall mean a third party that operates retail locations providing Fuel and/or Maintenance in the Fuelman network.

1.21  *Merchant Location.* "Merchant Location" shall mean a Merchant's Fuel and/or Maintenance site that is participating in the Fuelman network, such that a Card may be used to purchase Fuel and/or Maintenance at such site.

1.22  *Miscellaneous.* "Miscellaneous" shall mean any non-vehicle related product or service that is purchased with a Card (e.g., food, drink, magazines, cigarettes, lottery tickets).

1.23  *Principal.* "Principal" shall mean the person identified on the Application, if any, who applies for the Account as a co-maker with the Client.

1.24  *Reporting.* "Reporting" shall mean related products or services that are purchased to manage the vehicle fleet (e.g., paper report delivery, fax report delivery).

1.25  *Statement.* "Statement" shall mean the billing statement provided at the end of each Billing Cycle.

1.26  *Terms and Conditions.* "Terms and Conditions" shall mean the terms and conditions contained in this Agreement and any other electronic or paper document presented to the Client by or on behalf of Fuelman in connection with this Agreement (e.g. the physical card, driver instructions, site guides, reports, billing/statement inserts, Application, and web site). In the event of a conflict between any such other document and this Agreement, this Agreement will control unless specifically provided otherwise in the other document.

1.27  *Transaction.* "Transaction" shall mean any individual purchase with a Card.

**2   General.**

2.1  *Agreement for Account and Services.* Client and, if applicable, Principal or Guarantor, shall submit an Application to signify Client's application for an Account with Fuelman. If Fuelman accepts such Application, Fuelman shall send an Approval Letter and these Terms and Conditions to Client's Representative along with Cards and Driver IDs issued for the Account. Upon Client's first use of a Card, Client will be deemed to have accepted the Approval Letter and these Terms and Conditions and Client and Fuelman shall be deemed to have entered into this Agreement. If a Guarantor also submits the Application or a separate guaranty then Client and Guarantor shall both be responsible for all payments owed by Client hereunder and for compliance by Client with these Terms and Conditions. If a Principal jointly submits the Application with Client, then Client and Principal are jointly and severally responsible for all payments owed by Client hereunder and for compliance with these Terms and Conditions

2.2  *Entire Agreement.* These Terms and Conditions, together with the Application (if any) and the Approval Letter (if any), are the exclusive statement of the terms and conditions with respect to their subject matter as of the Agreement Date and supersede all prior agreements, negotiations, representations and proposals, whether written or oral. Deviations from the Agreement are not valid unless confirmed in writing by an authorized representative of Fuelman.

**3   Account Administration and Card Issuance.**

3.1  *Establishment of Client Account.* Upon issuance of the Cards, Fuelman will establish an Account for Client that will be used to pay for Fuel, Maintenance and Miscellaneous items purchased through the use of the Cards at Merchant Locations. For purpose of determining Client's domicile, Client acknowledges and agrees that its domicile shall be the state reflected in the Client's mailing address as reflected on the Client's Statement.

3.2  *Government Regulation.* Neither Client nor any Guarantor of the Account shall (a) be or become at any time, and are not currently, subject to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Fuelman from making any advance or extension of credit to Client or any Guarantor of the Account or from otherwise conducting business with Client or any Guarantor of the Account, or (b) fail to provide documentary and other evidence of Client's identity or the identity of any Guarantor of the Account or person to whom Client gives a Card, as may be requested by Fuelman at any time to enable Fuelman to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

3.3  *Credit Limit.* Upon Fuelman's approval of the Client's Application, Fuelman will establish an aggregate spending limit for all the Cards issued to Client under the Account (the "Credit Limit") based on Fuelman's evaluation of the Client's creditworthiness. Fuelman reserves the right to increase or decrease this Credit Limit at any time with or without providing notice to Client. Fuelman may decide, at its own discretion, to decline or approve any transactions made after the Client exceeds the Account Credit Limit, or to lock the Account until the balance due is paid in full. Fuelman reserves the right to charge an Over Limit Fee of up to fifty dollars ($50.00) per Over Limit transaction authorized.

3.4  *Initial Cards.* Upon Fuelman's approval of Client's Application, Fuelman will issue one or more Cards and Driver ID numbers to Client. Client shall be responsible for distributing the Cards and Driver IDs to its employees or agents.

3.5  *Additional Cards.* If, at some time after the initial issuance of Cards to Client, Client desires one or more additional Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service. Fuelman reserves the right to charge a fee of up to five dollars ($5.00) for creating and delivering each additional Card.

3.6  *Replacement Cards.* If Client desires one or more replacement Cards, including, but not limited to replacing lost or damaged Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service. Fuelman reserves the right to charge a fee of up to five dollars ($5.00) for creating and delivering each replacement Card.

3.7  *Administration of Cards.* Client shall be solely responsible for the use, maintenance, administration, and security of the Cards and Driver IDs within Client's business, including, but not limited to, distributing Cards to, and collecting Cards from, its employees and agents. Notwithstanding any other provision in this Agreement, Client is responsible for any loss or misuse of Cards by its employees and agents. See Section 16 for more information regarding Client responsibilities.

3.8  *Administration of Account.* Fuelman shall be responsible for collecting and reporting all Transactions by date, vehicle, Merchant Location, and driver based upon data received by Fuelman. In addition, Fuelman shall be responsible for maintaining the database for the Client with all Card numbers, vehicle data, driver data, and purchase control data. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) a month or a minimum of fifteen dollars ($15.00) per Billing Cycle for account administration.

3.9  *Card Fees.* Fuelman reserves the right to charge a service fee of up to ten dollars ($10.00) per Card per month to support the use of the Card.

3.10  *Property.* All Cards remain the property of Fuelman and shall be surrendered immediately by Client to Fuelman upon Fuelman's request or if Client or Fuelman cancels the Card or Account as permitted herein.

3.11  *Inactive Cards.* Fuelman reserves the right to charge a fee of up to three dollars and fifty cents ($3.50) per Billing Cycle for Cards that are inactive for seventy-five (75) or more days.

3.12  *Cancellation of Cards.* If, at any time, for any reason, Client desires to cancel any particular Card, but not the Account, Client's Representative must notify Fuelman via the online application or in writing of such cancellation. Client's liability for purchases made using the canceled Card shall end at midnight of the day that Fuelman receives notice of such Card cancellation.

3.13  *Suspension of Cards.* Fuelman, at its sole discretion, may suspend or terminate the use of any Card at any time for any reason, including, but not limited to, inactivity, unusual activity, or suspected loss, theft, fraud, or in compliance with the USA Patriot Act. However, nothing in this Agreement shall obligate Fuelman to monitor the use of any Card, and, as described in this Agreement, Client is solely responsible for the use of any outstanding Cards.

3.14  *Suspension of Account.* Fuelman, at its sole discretion, may suspend or terminate the use of an Account at any time for any reason, including, but not limited to, inactivity, unusual activity, change in creditworthiness, late payment (excessive days beyond terms), aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) over the Credit Limit or in compliance with the USA Patriot Act. Fuelman reserves the right to charge up to a fifty dollar ($50.00) fee for Account reinstatement each time a previously suspended Account is reinstated.

3.15  *Non-Transferability; Revocability.* All Cards and any and all rights and privileges to which its holders are entitled are not transferable and may be revoked for any reason, including but not limited to, a breach of any of the Terms and conditions of this Agreement, without prior notice at any time and with no liability to Fuelman, at which time any credit extended hereunder shall be revoked and all sums owed by Client to Fuelman pursuant hereto shall become immediately due and payable.

**4   Services Provided.**

4.1  *General Services.* Fuelman shall provide the following services to Client under this Agreement:

4.1.1  Issue to Client the Cards upon Fuelman's approval of the Application.

4.1.2  Maintain a network of Merchant Locations for Fuel and Maintenance where Client may make purchases with Cards pursuant to this Agreement.

4.1.3  Provide an online directory to identify accepting Merchant Locations.

4.1.4  Maintain an authorization control system to verify that a Card being presented for payment is valid/active and that the Driver ID being used is valid/active for that particular Card. In addition, individual Card-level spending limits can be established by the Client for each product category (e.g., Fuel, Maintenance supplies, Maintenance services, Miscellaneous).

4.1.5  Issue management reports and billing Statements to Client showing details of all posted Card Transactions (as detailed in Section 11.2) during the Billing Cycle.

4.2  *Referrals.* Fuelman reserves the right to deliver informational material in reference to ancillary fleet management related products and services provided by other vendors to the Client. In no case is Fuelman making any representation about the quality or value of any particular product or service.

4.3  *Ancillary Products and Services.* Fuelman reserves the right to make certain ancillary fleet management related products and services (e.g., emergency roadside assistance) that are delivered by other vendors/companies available to the Client for purchase on Cards. For the purpose of reporting the Transactions, these ancillary products and services are considered Maintenance. The act of requesting the ancillary product or service with a valid Card and Driver ID, establishes approval for Fuelman to charge and collect the corresponding balance incurred by these ancillary products and services.

4.3.1  *Roadside Assistance for Unattended Vehicles.* Through an association with a third party, Fuelman may offer roadside assistance for vehicles, including towing services. The services may not be available for unattended vehicles. The personnel of any such third party provider are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by such third party, or for any other liability or damage which arises from the action or negligence of the personnel of the third party, its agents or its employees.

4.3.2  *Additional Services.* Client may be eligible for additional services from time to time. If Client is eligible for an additional service, Fuelman may enroll Account in the service. The terms and fees applicable to such service will be disclosed prior to enrollment. Client will have the opportunity to opt-out of enrollment in such service.

4.4  *Inability to Operate.* Fuelman shall have no responsibility for any person(s) or machine(s) rejection of or refusal to honor a Card. Client agrees there shall be no liability to Fuelman or any other company or entity, if for any reason any Merchant or Merchant Location should fail to allow the purchase of Fuel or Maintenance, fail to authorize Transaction(s) or fail to operate in any other manner, even though a Card is valid.

4.5  *WARRANTY DISCLAIMER.* FUELMAN DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. ALL FUELMAN ACCOUNTS, PRODUCTS, AND SERVICES ARE PROVIDED ON AN AS-IS BASIS.

**5   Purchases.**

5.1  *Use of Cards.* Client may use the Cards at any participating Merchant Location for the purchase of Fuel, Maintenance, or Miscellaneous items. To use a Card the Client should follow the directions for purchase established at the particular Merchant Location.

5.2  *Title.* As between Client and Fuelman, title to Fuel purchased with the Card passes from Fuelman to Client when the Cardholder dispenses Fuel (when fuel leaves the fuel dispensing nozzle), except as otherwise provided by applicable law. Title to any non-Fuel product or service purchased with the Card passes directly from the Merchant to Client when the Cardholder receives such non-Fuel product and/or service. Fuelman takes no title to Maintenance or Miscellaneous items.

5.3  *Verification of Merchant Locations.* Client acknowledges that not all retail locations selling Fuel and Maintenance accept Fuelman's Cards. If Client is uncertain as to whether a location is able to accept the Cards, Client should visit the online site locator at www.fuelman.com or contact Fuelman's 24x365 Authorization Center at 800-877-9013.

**6   Safety.**

6.1  *Safe Fueling Operation.* Client shall instruct all persons to whom Client provides a Card for purchasing Fuel in safe and proper fueling procedures. Client will ensure that everyone using a Card issued in the name of Client is instructed in applicable safety measures.

6.2  *Safety Laws and Notices.* Client shall comply, and Client shall cause its employees and agents to comply, with all applicable local, state, and federal laws and regulations pertaining to the dispensing and use of Fuel at Merchant Locations as well as all safety notices posted by Merchants.

**7   Representations and Warranties.** Client represents and warrants to Fuelman as of the date of the Application and on the date of each extension of credit under this Agreement that:

7.1.1  Client is duly organized, validly existing and in good standing under the laws of the state of its formation. Client has the power and authority to own its properties and to carry on its business as presently conducted and to execute and deliver, and enter and perform its obligations under this Agreement.

7.1.2  The execution, delivery and performance of this Agreement have been duly authorized by all necessary organizational action. This Agreement has been duly executed and delivered by Client and Guarantor, and constitutes the legal, valid and binding obligations of each such party, enforceable against such parties in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

7.1.3  The execution, delivery and performance of this Agreement by Client and Guarantor will not violate any applicable law, rule or regulation or the charter, by-laws or other organizational documents of such parties or any judgment, order or ruling of any governmental authority.

7.1.4  The financial and other information furnished by Client and Guarantor to Fuelman in the Application, or otherwise, is true, correct and complete in all material respects.

7.1.5  Cards issued to Client will be used only by Client's employees and agents and will not be distributed or resold to other companies without the express written consent of Fuelman.

7.1.6  CLIENT WILL USE THE CARDS SOLELY FOR COMMERCIAL PURPOSES AND SHALL STRICTLY PROHIBIT ANY PERSONAL USE BY THE USERS OF ITS CARDS.

**8   Conditions To Extension Of Credit.** Any extension of credit under this Agreement shall be subject to, and conditioned upon, satisfaction of the following requirements:

8.1.1  Fuelman's receipt of a duly executed counterpart of the Application by Client and, if requested, the Guarantor, in form and substance acceptable to Fuelman in its sole discretion;

8.1.2  All representations and warranties set forth in this Agreement are true and correct;

8.1.3  No event shall have occurred and be continuing, or would result from the extension of credit hereunder, that constitutes or would constitute (with notice or the lapse of time or both) an Event of Default (defined below);

8.1.4  Outstanding amounts due, including any applicable fees as described in this Agreement, are paid by Due Date. Any amount not paid by the Due Date is subject to Late Fees (Section 10.7) and Finance Charges (Section 10.9).

8.1.5  After giving effect to any requested extension of credit, the aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) shall not exceed Client's Credit Limit, as determined by Fuelman from time to time in its sole discretion; and,

8.1.6  Receipt of any required Reserve Amount (as defined below) necessary to open the Client's Account.

**9   Pricing.**

9.1  *Methodology.* Fuelman establishes competitive local market Fuel and Maintenance Transaction prices for the Fuelman Fleet Card program depending on a variety of factors (e.g., product costs, purchase volume, market conditions). Transaction pricing can be Merchant Retail-Based, Merchant National Account-Based, Fuelman Cost-Based or a combination thereof. The pricing methodology can vary by product type and is disclosed to Client in the Application, Approval Letter, and/or subsequent written notification. Additional charges/fees and/or discounts may apply based on the Client's agreed-upon program.

9.2  *Merchant Retail-Based Pricing.* Client price for each Fuel or Maintenance Transaction is equal to the prevailing Merchant Location's retail price plus or minus a fixed adjustment factor but never below Fuelman cost. In the event there is no established retail price (e.g., unattended fueling sites, mobile refueling), the retail price will be established by Fuelman.

9.3  *Merchant National Account-Based Pricing.* Client price for each Fuel or Maintenance Transaction is equal to the Merchant's prevailing national account price.

9.4  *Fuelman Cost-Based Pricing.* Client price for each Fuel or Maintenance Transaction is equal to Fuelman's delivered cost plus a mark-up. Fuelman's cost is dependent on a variety of factors and can include any or all of the following components: wholesale cost; merchant freight; dealer adjustment; network operation costs, merchant commission; and applicable taxes. Under no circumstance will Client's price be below Fuelman's cost.

9.5  *Special Network Pricing.* Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or two dollars fifty cents ($2.50) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.

9.6  *Level 2 Pricing.* Fuelman reserves the right to invoke Level 2 Pricing in several scenarios. Level 2 Pricing may be invoked when Amount Due, including fees and charges are not paid by the Due Date; Client's Credit Score, as reported by a credit reporting agency utilized by Fuelman in its discretion, drops by fifty-one (51) points or more in a 3 month period; and/or Client's Credit Score is below a certain risk threshold. This risk threshold is four hundred seventy-six (476) for commercial credit scores and six hundred and sixty (660) for individual credit scores. Level 2 Pricing may also be applied to certain industries based upon the risk factors of said industry, which pricing shall be reflected in Client's Statement. The Level 2 Pricing is an incremental charge above Client's current pricing. The maximum increase is ten cents ($0.10) per gallon purchased. Level 2 Pricing remains in effect until the next Billing Cycle following when all amounts owed on the Account are paid in full and/or Client's Credit Score is higher than the risk threshold for a 3 month period. This decision is made solely by FleetCor based on information provided by the credit reporting agency along with the Account's payment history. The credit reporting agency does not participate in the decision. Client questions concerning their commercial and/or consumer credit scores should be directed to the applicable reporting agencies directly. D&B can be contacted at 800-234-3867 or by mail to Dun and Bradstreet Corporation, 103 JFK Parkway, Short Hills, NJ 07078. Equifax can be contacted at 800-727-8495 or at sbfe@equifax.com. Experian may be contacted at 888-397-3742 or online at www.experian.com/reportaccess.

**10   Billing & Payments.**

10.1  *Billing.* Billing frequency is agreed upon with the Client during the Application and Account setup process. Client shall be responsible for all credit extended on the Account. This is not a revolving credit account. The total amount shown on each Account Statement is due and payable in full by the Due Date shown on the Statement. Unless otherwise agreed upon, the standard Due Date is new (10) days after the date the Account Statement is created, regardless of the delivery method. Regardless of the delivery method selected, it shall be the obligation of the Client to notify Fuelman within five (5) business days of the end of each Billing Cycle if Client does not receive a Statement. If the Client does not receive a Statement and thus payment is not completed by the Due Date, Client is responsible for any Late Fees or Finance Charges.

10.2  *Extended Terms Programs.* Upon Client's request and subject to Fuelman approval, terms can be extended at an additional charge.

10.3  *Payment.* Client hereby unconditionally promises to pay Fuelman, in lawful money of the United States of America and in accordance with this Agreement, all outstanding obligations (as defined below) which may, from time to time, be owing to Fuelman by Client. As used herein, "Obligations" shall mean all outstanding sums owing to Fuelman by Client, including, without limitation, reimbursement for petroleum products obtained through Fuelman, payments for any products or services obtained using the Card(s), and interest, penalties, fees, report delivery, reporting, account charges, service charges, costs and expenses (including attorneys' fees) and all other obligations under this Agreement or otherwise. Client must pay all outstanding Obligations on the statement by the Due Date to avoid Late Fees and Finance Charges. Failure by Client to pay all amounts by the Due Date shall be a breach of the Terms and Conditions of this Agreement. Conforming payments received by 7:00 a.m. Eastern Time on a business day (Monday through Friday of each week, excluding banking holidays) will be credited to your Account as of the date received. Otherwise, payments will be credited to your Account as of the next business day. If, on the day of your billing statement reflects a Due Date which falls on a day which is not a business day, your payment must be received by 7:00 a.m. Eastern Time on the preceding business day. If we do not receive your payment for the Amount Due by the Due Date, you may not be able to make any further purchases until such time that you pay the entire outstanding balance on the Account. We may change our billing and debiting cycle at any time by reflecting the change on your billing statement

10.4  *Guaranty.* Guarantor hereby unconditionally and irrevocably guarantees to Fuelman and its successors, endorsees, transferees and assigns, the punctual payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations, now or hereafter owing, whether for principal, interest, premiums, fees, expenses or otherwise (collectively, the "Guaranteed Obligations"). Any and all payments by the Guarantor hereunder shall be made free and clear of and without deduction for any set-off, counterclaim, or withholding. Guarantor acknowledges and agrees that this is a guaranty of payment when due, and not of collection, and Guarantor agrees that his obligations under this Agreement shall not be discharged until the payment and performance, in full, of the Guaranteed Obligations. Guarantor shall be regarded, and shall be in the same position, as Client with respect to the Guaranteed Obligations. Guarantor expressly waives all rights he may now or in the future have under any statute, or at common law, or at law or in equity, or otherwise, to compel Fuelman to proceed in respect of the Guaranteed Obligations against Client or any other party before proceeding against, or as a condition to proceeding against, Guarantor. Guarantor acknowledges and agrees that any delay or failure by Fuelman to exact strict compliance with the Guaranteed Obligations does not limit or prohibit Fuelman from enforcing its rights under this Agreement and further that Guarantor's liability under this Agreement shall not be eliminated or reduced by any such failure to act by Fuelman or delay on the part of Fuelman. Guarantor further expressly waives and agrees not to assert or take advantage of any defense based upon the failure of Fuelman in respect of the Guaranteed Obligations against Client or any other party for the payment and Guaranteed Obligations. Guarantor agrees that any notice or directive given at any time by any person to Fuelman which is inconsistent with the waivers in the preceding two sentences shall be null and void and may be ignored by Fuelman. Guarantor further hereby waives diligence, presentment and demand (whether for non-payment or protest) or notice of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations (including, without limitation, composition, amount of, or the terms of, the Guaranteed Obligations), notice of material adverse change in Client's financial condition or any other fact which might materially increase the risk to Guarantor with respect to any of the Guaranteed Obligations or all other demands whatsoever and waives the benefit of all

provisions of law which are or might be in conflict with the terms of this Agreement. Guarantor represents, warrants and agrees that Guarantor's obligations under this Agreement are not and shall not be subject to any counterclaims, offsets or defenses of any kind against Fuelman or Client now existing or which may arise in the future. The Guarantor further agrees that the Guaranteed Obligations may be amended, modified, increased, extended or renewed, in whole or in part, without notice to or further assent from Guarantor, and that Guarantor will remain bound upon its guaranty notwithstanding any amendment, modification, increase, extension or renewal of any guaranteed Obligation. The foregoing waivers are of the essence of the transaction contemplated by this Agreement and, but for the guaranty waivers herein and such waivers, Fuelman would decline to make the financial accommodations to Client under this Agreement. Each Guarantor is liable on a joint and several basis with Client and each other Guarantor.

10.4.1 Account Principal Responsibility. Each Principal for this Account, if any, as shown on the Application, is personally and unconditionally, jointly and severally liable with Client, as principal and not as surety or guarantor, for the payment and performance when due of all obligations owed on the Account, regardless of who made purchases using the Cards, and the Principal agrees to pay such amounts according to the terms of this Agreement. Principal is responsible under this Agreement for all use of all of the Cards issued on the Account to the fullest extent permitted by law.

10.5 Payment Methods. The following terms shall apply to each of following payment methods.

10.5.1 Client Check. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by valid check equal to the accumulated balance of the Account for the previous Billing Cycle. The client is required to note the Account number or Statement (BG) number on the check. If the matching Statement Remit To coupon is not included with payment, Fuelman reserves the right to charge an Exception Handling Fee of ten dollars ($10.00) for processing the payment. Fuelman reserves the right to charge a Check Processing Fee of fifteen dollars ($15.00) per check payment. If insufficient funds are available in the Account to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.

10.5.2 Client Initiated Online Payment. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by online method equal to the accumulated balance of the Account for the previous Billing Cycle. If insufficient funds are available on the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.

10.5.3 Pay by Phone. By the Due Date, Fuelman will initiate, at Client's request, payment by phone either through Customer Service Representative or Interactive Voice Response (IVR) system. Fuelman reserves the right to charge a fee up to thirty dollars ($30.00) for processing each Pay by Phone payment using either methods.

10.5.4 Fuelman Initiated Credit Card Charge. Prior to the Due Date specified on Fuelman's Statement to Client, Fuelman will initiate a charge to the Client's credit card on file to pay the accumulated balance of the Account from the previous Billing Cycle. Fuelman may also charge the credit card to pay the amount charged to the Account any time the balance of the Account reaches the Credit Limit. The exact time that the credit card will be charged for the amount due on the Account may vary, depending on the processing cycle. If insufficient funds are available on the credit card to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will be prevented from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and charge cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a credit card convenience fee of up to three percent (3%) of the payment amount.

10.5.5 Fuelman Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment.

10.5.5.1 Debits to Bank Account. On the Due Date identified on the Client's Statement, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous Billing Cycle. For daily billed Client, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous business day. Fuelman may also debit the Bank Account to pay the amount charged to the Account any time the balance of the Account reaches the Credit Limit. The exact time that the Bank Account will be debited for the amount charged to the Account may vary, depending on the processing capabilities of the bank at which the Bank Account exists. If insufficient funds are available in the Bank Account to pay the Account balance at the time a debit is initiated, Fuelman may prevent the Client from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and debiting cycle at any time by providing written notice to Client. Fuelman reserves the right to charge an administration fee of up to twenty five dollars ($25.00) per debit of the Client's Bank Account.

10.5.5.2 Change in Bank Account. To change the Bank Account, Client's Representative must provide a written request of such change to Fuelman. The request should include the following information for the new account: bank name (the bank must be a member of the National Automated Clearinghouse Association (NACHA); branch address; branch number; bank routing number; and account number. The request should also contain a voided check from the new account. It will take approximately ten or more days for Fuelman to change the account. During this time, Client agrees to cooperate with Fuelman to provide additional information necessary to make the change and to execute a test of the change.

10.5.6 Client Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment. Prior to the Due Date, Client will initiate a credit to Fuelman's bank account to pay the accumulated balance of the Client Account from the previous Billing Cycle after notifying and obtaining approval from a Fuelman Customer Service representative to do so. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) for processing each Client initiated EFT/ACH.

10.5.7 On Account. Fuelman may offer Client the ability to pay in advance for its Fuel purchases. The Account will be debited for each purchase. The Account will be replenished by EFT with the amount equal to the prior week's Statement amount. Fuelman may charge a fee up to twenty-five dollars ($25.00) for the Client's replenishing of the Account. A Dormancy Fee of thirty dollars ($30.00) per Billing Cycle may be charged after one hundred eighty days (180) of inactivity, where allowed by applicable law. Residual Account credit balances will be returned upon written request. Escheatment laws, where applicable, will be followed.

10.6 Applying Payments. Fuelman uses a "balance-forward" based accounting system. Therefore, all payments made by Client to Fuelman will be applied accordingly against the outstanding amount due at the time the payment is received. Subject to applicable law, we will apply and allocate payments and credits among balances owed by Client (whether for purchases, fees, interest, or otherwise) in any order and manner determined by Fuelman in its sole discretion. Client agrees that Fuelman has the unconditional right to exercise this discretion in a way that is most favorable or convenient for Fuelman.

10.7 Late Payments. All payments made by Client to Fuelman that are not received by the Due Date are considered late. Fuelman reserves the right to charge up to 8.99% of the New Balance (defined below) with a minimum of seventy five dollars ($75.00) and a maximum of one thousand dollars ($1000.00) for each late payment, not to exceed the maximum rate allowable by applicable law. To determine the New Balance for the purposes of late fees, Fuelman starts with the Amount Due on the invoice for which the payment is late. Any purchases and other debits posted to the Account through the end date of the current (next succeeding) billing statement may be added to this. Appropriate finance charges or interest charges and fees are added and other applicable adjustments made.

10.8 Annual Percentage Rate. The Annual Percentage Rate for purchases is thirty two percent (32%), which corresponds to the daily periodic rate of 0.0877%, or the maximum amount allowed by applicable law, whichever is less. The daily periodic rate is the annual percentage rate divided by three hundred sixty-five (365).

10.9 Finance Charges. If Client's Statement is paid in full every Billing Cycle by the applicable Due Date, the Account will not incur Finance Charges. Finance Charges begin to accrue for each purchase as of the date the purchase is added to the Account. If payment in full of the Amount Due shown on the Statement for a Billing Cycle is credited to Client's Account by the Due Date shown on that respective Statement, then Finance Charges will not accrue for purchases from the date on which payment in full of that Amount Due is credited to Client's Account, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement). In addition, Finance Charges will not accrue for purchases during a Billing Cycle if the Amount Due shown on the Statement for the prior Billing Cycle is zero ($0) or a credit balance, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement).

10.9.1 Periodic Finance Charges are calculated in two steps as follows: First, for each day of the Billing Cycle, Fuelman multiplies the daily balance by the applicable daily periodic rate.

10.9.2 Second, for each day of the prior Billing Cycle, Fuelman multiplies the daily balance for purchases made in that Billing Cycle by the same daily periodic rate. However, Fuelman does not do this second step if it received payment in full of the Amount Due on Client's previous billing Statement by the date the payment was due or if a periodic finance charge was already billed on that balance.

10.9.3 For finance charge calculation purposes, the Billing Cycle begins on the day after the Closing Date of the Statement and includes the following Closing Date. The number of days in the Billing Cycle may vary.

10.9.4 The daily balance is calculated by taking the beginning balance every day (which may include unpaid Finance Charges from previous Billing Cycles), adding any new transactions and any new fees, subtracting any credits or payments posted as of that day, and any other adjustments. Daily Periodic Finance Charges will be rounded to the nearest cent. Unless Fuelman elects to use a later date, a new Transaction is added to the balance as of the Transaction date shown on Client's billing report. A credit balance is treated as a balance of zero.

10.10 Returned Payment. If a check, credit card charge, or EFT/ACH is returned or denied, Fuelman reserves the right to charge the lesser of fifty dollars ($50.00) Returned Payment Fee or the maximum amount allowable by applicable law for each occurrence. At our option, we will assess this fee the first time your check or payment is not honored even it is honored upon resubmission. Fuelman may also charge the applicable Late Fees and Finance Charges incurred if balance is not received by Due Date due to returned payment.

10.11 Reserve Amount. Fuelman will notify Client of any reserve amount (the "Reserve Amount") necessary to open the Client's Account. The Reserve Amount will be paid to Fuelman by Client prior to using the Cards. Client shall continue paying Fuelman any amounts on any periodic Fuelman Statement by the Due Date. This Reserve Amount will be held by Fuelman and may be returned to Client only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and the Account has been closed. In the Event of Default (defined below), the Reserve Amount will be applied to the Account as a payment on the Account. Any interest earned on the reserve balance in the Account will accrue to Fuelman.

As part of our credit reviews, Client may be required to provide a Reserve Amount to Fuelman to secure the full and faithful performance of all of Client's obligations. If required, Client understands that the credit line will be equal to an amount that is up to 80% of the Reserve Amount. Client understands that the credit line will not be activated for use until Fuelman has received confirmation from its bank that the security deposit funds are available for use. In the event Client defaults or otherwise fails to perform any obligation owed to Fuelman, Client authorizes Fuelman to use, without notice or demand, the Reserve Amount to satisfy any such default or obligation. Client represents that the Reserve Amount is made in the ordinary course of Client's business, and that the Reserve Amount is not a transfer made on account of any antecedent debt. No trust relationship is created between Fuelman and Client as a result of Client's payment and Fuelman's acceptance of the security deposit. Client authorizes Fuelman to commingle the Reserve Amount with other Fuelman funds. After receiving a written request from Client, Fuelman may, but is not obligated to, reevaluate the necessity and the amount of the Reserve Amount. Upon evidence of satisfactory improvement in Client's financial condition, Fuelman may determine, in its sole discretion, to return the Reserve Amount. Fuelman may also require an increase in the Reserve Amount at any time from time to time in order to continue the credit relationship between the parties. Fuelman will return the Reserve Amount to Client upon termination of the Account only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and full performance by Client its obligations to Fuelman.

11 Reporting.

11.1 Statements. Fuelman shall furnish Client with a Statement at the end of each Billing Cycle.

11.1.1 Information. The Statement will include the following information:

11.1.1.1 The Account number and other relevant billing information.

11.1.1.2 The previous unpaid charges.

11.1.1.3 The previous statement balance.

11.1.1.4 Any payments posted to the Account.

11.1.1.5 New charges and adjustments.

11.1.1.6 Amount Due.

11.2 Standard Fleet Management Report. Fuelman shall produce a standard fleet management report at the end of each Billing Cycle.

11.2.1 Information. The standard fleet management report will include the following information:

11.2.1.1 The applicable fleet customer number. A single Client's Account can have multiple fleets (customer numbers) within it.

11.2.1.2 Any rebates, discounts, report delivery, reporting, account charges, Finance Charges, interest, fees, and other charges posted to the Account.

11.2.1.3 Detail on each Transaction posted to the Client's Account during the Billing Cycle, including date, Merchant Location, vehicle based on the Card used, employee/driver based on the Driver ID used, product description based on the product type, quantity purchased, total purchase amount, and total applicable taxes.

11.3 Delivery Methods. Fuelman offers several different methods for delivering Statements and the standard fleet management report:

11.3.1 Via US Mail. Fuelman reserves the right to charge up to ten dollars ($10.00) for each mail delivery of each report. Client with failed fax and email deliveries will be charged the mail delivery rate for any resubmission of the reports via mail, performed at Fuelman's discretion.

11.3.2 Via Facsimile. Fuelman reserves the right to charge up to five dollars ($5.00) for each fax delivery of each report. Mailed resubmissions will be charged at the mail delivery rate described in Section 11.3.1.

11.3.3 Via eMail. Mailed resubmissions will be charged at the mail delivery rate described in Section 11.3.1.

11.4 Optional Fleet Management Reports. Fuelman produces a variety of optional fleet management reports, including YTD summaries, Maintenance-specific reports, driver-specific reports, and tax reports. Fuelman reserves the right to charge Client a fee of up to fifteen dollars ($15.00) for delivering each of these optional reports or up to one hundred dollars ($100.00) per quarter.

11.5 Tax Exempt Processing & Reporting. Qualified tax exempt Clients may be eligible to purchase Fuel from Fuelman tax-free at the point-of-sale. Fuelman reserves the right to charge a processing fee of up to one percent (1%) of the total purchases for this service except where prohibited by applicable law.

11.6 Multiple Report Copies. Fuelman will provide multiple copies of mailed reports upon request. Fuelman may charge up to five dollars ($5.00) per report copy.

12 Change In Terms And Conditions. Fuelman may change the Terms and Conditions of this Agreement at any time by giving Client written notice of such amendment. Guarantor agrees to be bound by any such changes, if written notice is given to Client. Such changes will go into effect as outlined in the change notice. If permitted by applicable law, such changes will apply to existing balances as well as future purchases and balances. Any modification of or amendment to this Agreement will be delivered to Client through U.S. mail at the address Client provided to and periodically provides updates to Fuelman. All initial amendment notifications will be sent to Client in advance of the effective date thereof or earlier as required by law. Client shall be deemed to have accepted such amendments by continued use, after the effective date of the amendment, of any of the Card(s) issued to Client. Notwithstanding any of the foregoing provisions of this Section, Fuelman retains the right to change credit limits for the Account or to suspend, cancel, or terminate the Account or any Card without prior written notice and Client and Guarantor acknowledge and agree that Fuelman may take such actions without notice.

13 Events Of Default. The occurrence of any of the following shall constitute an "Event of Default" hereunder:

13.1.1 Client shall fail to pay any principal, interest, or other amount payable in respect of any Obligation when due;

13.1.2 Client shall fail to observe or perform any other covenant contained in this Agreement;

13.1.3 Any representation or warranty made by Client or Guarantor herein or in the Application proves untrue in any material respect as of the date of the making or furnishing thereof;

13.1.4 Either Client or Guarantor shall (i) make an assignment for the benefit of its creditors; (ii) admit in writing its inability to pay its debts as they become due; (iii) file a petition under any applicable insolvency, debtor relief or reorganization statute, including without limitation, the United States Bankruptcy Code; (iv) be subject to an involuntary petition under any applicable insolvency, debtor relief, or reorganization statute; (v) appoint or consent to the appointment of any receiver, conservator, liquidating agent, or committee in any insolvency, readjustment of debts, marshaling of assets or liabilities, or similar proceedings of, or relating to Client or Guarantor, or any substantial portion of their assets; or (vi) take any corporate action for the purpose of effecting any of the foregoing; or

13.1.5 Guarantor shall terminate or contest the validity or enforceability of Guarantor's guaranty hereunder or Guarantor's guaranty hereunder shall be determined to be invalid or unenforceable for any reason.

14 Remedies Upon Event Of Default. Without limiting any other rights or remedies of Fuelman provided for elsewhere in this Agreement, or by applicable law, or in equity, or otherwise, upon or at any time after the occurrence of any Event of Default, Fuelman shall have and may exercise, at its election, from time to time, any and all rights and remedies available at law, in equity, or otherwise, including, without limitation, (i) declaring the entire unpaid balance of the Obligations hereunder or any part thereof immediately due and payable, whereupon it shall be due and payable; and (ii) demanding payment from the Guarantor.

15 Dispute Resolution.

15.1 Disputed Transactions. To dispute any Transaction on Client's Statement, Client must notify Fuelman in writing as set forth below within fifteen (15) days of the date of Client's Statement. Fuelman will promptly investigate the matter and respond to Client within sixty (60) days after receiving written notice. Notice should be sent to: FUELMAN, P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service. Fuelman shall not be responsible for and Client shall waive any discrepancies or disputes that Client does not report to Fuelman in writing within fifteen (15) days after the date of Client's Statement.

15.2 Disputed Transaction Notices. Client may report any dispute to Fuelman by telephone. However, telephone notice will not preserve Client's rights or otherwise serve as effective notice under this Agreement. Client must put in writing any dispute regarding a Transaction on Client's Statement. Client's letter must include the following information: name; Account number; date of the Statement; dollar amount and identification of the Transaction(s) in question; and any possible explanation of the error.

15.3 Dispute Resolution. The parties agree that they will work in good faith to resolve any disputes arising under this Agreement. If the dispute cannot be resolved by the parties, then at Fuelman's sole discretion, the dispute will be resolved by Binding Arbitration in Atlanta, Georgia in compliance with the American Arbitration Association's commercial arbitration rules or by litigation in accordance with Section 25.1. The foregoing does not prohibit either party from seeking injunctive relief without first complying with this Section. Client will reimburse Fuelman for all of its costs and expenses (including collections and attorney's fees and costs) incurred in connection with enforcing any of Fuelman's rights under this Agreement. To accommodate the right to arbitrate, Client agrees that Client will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with Fuelman.

16 Security, Loss, Theft Or Unauthorized Use Of Card.

16.1 General Security. Each Card can be programmed to only allow Fuel or both Fuel & Maintenance services such as oil changes, vehicle washes, etc. Typically each Transaction is authorized with the Card number, product code, quantity and driver's Driver ID across the proprietary Fuelman network to ensure that the purchase is authorized and limited to the product and quantity (e.g. gallons of Fuel or dollars of Maintenance) that have been pre-approved. This system also helps prevent unauthorized Driver IDs and stolen Cards from being used to make purchases. The product and quantity controls are subject to each Merchant Location's POS Authorization Limitations described in Section 16.9.

16.2 Fuelman's Liability. In the event an unauthorized Transaction occurs, subject to the limitations and client responsibilities explained in this Section 16, and in the event that the Account has been issued fewer than ten (10) Cards, Fuelman will assume full responsibility for those purchases. If the Account has been issued ten (10) or more Cards, Client assumes all liability and responsibility for unauthorized Transactions or Account activity.

16.3 Client's Responsibility. It is the responsibility of Client to ensure proper security controls are kept in place to protect the Cards and Driver IDs and that only authorized employees or agents of Client use them to make purchases. It is also the Client's responsibility to lock any inactive, misplaced, or stolen Cards and Driver IDs immediately. Fuelman is not responsible for fraudulent Transactions made on unlocked Cards with valid Driver IDs. Client should use the online account application to lock Cards and Driver IDs instantly. Alternatively, the Client can contact Fuelman Customer Service during regular business hours via phone call with the requested change, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. All Transactions in which a valid/unlocked Card number was used in conjunction with a valid/active Driver ID will be considered to be authorized Transactions on which Client is fully responsible for payment. It is also the Client's responsibility to review the standard fleet management reports and optional eMail exception alerts to identify potential purchasing discrepancies. Client should instruct its Cardholders to keep any record of their Driver ID separate from the vehicle's Card.

16.4 Lost or Stolen Cards. Client shall report all lost or stolen Cards to Fuelman immediately via phone call to Fuelman Customer Service identifying the Card number and such other details concerning the loss or theft of the Cards as are known by Client, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. Client shall be liable for all Transactions made by lost or stolen Cards. Client and Guarantor(s) agree to and acknowledge full liability for any losses resulting from any failure to report the loss or theft of Card(s) in accordance with the terms hereof.

16.5 Terminated Drivers. It is the Client's responsibility to lock a terminated driver's Driver ID as explained in Section 16.3.

16.6 Miscellaneous Product Purchase Limitations. In addition to the vehicle-related product categories (Fuel, Maintenance supplies, and Maintenance services) a Card can be allowed to purchase non-vehicle related items under the Miscellaneous product category. If a Client does not want to allow non-vehicle related purchases, Client should set each Card's Miscellaneous product category spending limit to zero dollars ($0). Fuelman assumes no responsibility for any unauthorized Miscellaneous purchases.

16.7 Tax Reporting Limitations. Fuelman calculates applicable taxes for Fuel. Applicable taxes for Maintenance and other non-Fuel purchases are dependent on the information provided to Fuelman by the applicable Merchant Location.

16.8 Merchant Limitations. The personnel (if any) at a Merchant Location are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by any of the Merchants or any other liability or damage which arises from the action or negligence of the personnel of any of the Merchants, their agents or their employees.

16.9 POS Authorization Limitations. Authorization controls are provided as a convenience to the Client and are not guaranteed to prevent unauthorized purchases. Specifically, depending on the particular point-of-sale (POS) equipment and Fuel dispenser controls being used by a particular Merchant Location, the product type and spending limit may not be enforceable prior to completing the Transaction. In these situations the Transaction will still be considered to be authorized, but will be identified as an exception on the Client's standard fleet management report and reported via email if desired by Client.

16.10 Claims. All claims for defective Fuel or Maintenance must be made to the Merchant operating the Merchant Location where such Fuel or Maintenance was purchased. Any claim for defective Fuel or Maintenance is waived by Client unless made in writing to Merchant, with a copy to Fuelman, within fifteen (15) days from the date of the purchase of the alleged defective Fuel or Maintenance giving rise to the claim. Fuelman will not accept any claims for defective Miscellaneous.

17 Term and Termination.

17.1 Term. The term of the Account shall be one (1) year from the date the Cards are issued to Client unless either party terminates the Account as provided in this Agreement. Thereafter, Fuelman will automatically renew Client's Account for additional one (1) year periods unless either Fuelman or Client gives the other party notice of intent not to renew at least thirty (30) days before its scheduled expiration date. At the outset of any such one year renewal period, Fuelman, at its discretion, may issue replacement Cards to Client.

17.2 Termination by Client. Client may terminate Client's Account and its use of the Cards for any reason by providing written notice of such termination to Fuelman. Client remains obligated to pay for any and all transactions, balances, fees, and other amounts incurred up until midnight of the day Fuelman receives notice of such termination.

17.3 Termination by Fuelman. Fuelman may terminate Client's Account and its use of the Cards for any reason, including but not limited to, inactivity, failure to promptly pay any amounts due Fuelman, failure to use the Cards exclusively for business purposes, or Fuelman's decision to terminate the Fuelman Program. Fuelman will notify Client's Representative at the time of termination that the Client's Account or Card(s) will be terminated along with the reason(s) for such termination.

18 Change In Ownership. Client must notify Fuelman immediately in the event of any sale of a majority ownership of its equity, any sale of a majority of its assets, any merger, reorganization or other transaction which results in a change of ownership of Client. Fuelman may terminate the Account in its sole discretion upon any change of ownership.

19 Contacts And Notices.

19.1 Fleet Contact. The "Fleet Contact" listed on the Application is authorized to provide Fuelman with the information necessary to establish Client's Account records and Cards, including, but not limited to vehicle, driver and card user related information. Fuelman is authorized to send all Account information and Client's Cards to the Fleet Contact's attention.

19.2 Accounts Payable Contact. The "Accounts Payable Contact" listed on the Application is authorized to provide Fuelman with payment information about payments on the Account. This contact may be the same person as the Fleet Contact and will be Fuelman's primary contact in the event that the Account becomes delinquent or exceeds the assigned Credit Limit.

19.3 Notices. Except as specified otherwise in this Agreement, all notices, requests, demand, or other communications required to be made pursuant to this Agreement shall be in writing and shall be given by mail by first class, certified or registered mail, postage prepaid, or by the sending by facsimile (with confirmation by mail to be provided by the party giving notice) or by reputable overnight delivery service (such as FEDEX or UPS) or by personal delivery to the recipient party, to the address indicated below for Fuelman and in the Application for Client. Fuelman may provide any such notice to Client by including the notice in the Statement provided to Client. A notice will be deemed received on the actual date of receipt. Fuelman's address for notices is: FUELMAN, P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service.

20 Maximum Lawful Rate. In no event shall any Finance Charges or other rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Client and Guarantor, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment

stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Client is and shall be liable only for the payment of such maximum amount as allowed by law, and payment received from Client in excess of such legal maximum amount, whenever received, shall be applied to reduce the principal balance of the Obligations hereunder to the extent of such excess.

21  **Credit Reporting Agencies.** Client and Guarantor(s) authorize Fuelman to report to any commercial credit reporting agency, Client's or Guarantor's performance under this Agreement, including but not limited to Dunn & Bradstreet, Experian Business or Equifax Credit Information Services. If the Account is personally guaranteed, Fuelman reserves the right to report Account information to consumer credit reporting agencies, including but not limited to Equifax Credit Information Services, Experian and TransUnion. Client and Guarantor have the right to notify the consumer reporting agencies not to use its respective credit report in connection with a credit transaction it did not initiate.  To do so, contact Equifax Credit Information Services, P.O. Box 740123, Atlanta, GA 30374-0123; Experian, P.O. Box 919 Allen, TX 75013; and TransUnion, P.O. Box 97328, Jackson, MS 39288-7328; or Client and Guarantor may notify all three agencies by calling 1-888-567-8688.

22  **Limitation of Liability.** FUELMAN WILL HAVE NO LIABILITY FOR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR INCIDENTAL DAMAGES OF ANY KIND, INCLUDING CLAIMS FOR LOSS OF PROFITS, WHETHER RESULTING DIRECTLY OR INDIRECTLY TO CLIENT, GUARANTOR, OR THIRD PARTIES, AND WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, EVEN IF SUCH DAMAGES WERE FORESEEABLE OR RESULT FROM A BREACH OF THIS AGREEMENT. IN THE EVENT A COURT IN A FINAL, NON-APPEALABLE AWARD FINDS FUELMAN LIABLE FOR ANY DIRECT DAMAGES, FUELMAN'S LIABILITY IN THE AGGREGATE FOR SUCH DIRECT DAMAGES WILL NOT EXCEED THE AMOUNT PAID OR PAYABLE BY CLIENT TO FUELMAN FOR THE MONTH PRECEDING THE DATE ON WHICH THE CLAIM AROSE.

23  **Indemnification.** To the maximum extent allowed by law, Client (the "Indemnitor") will indemnify and hold harmless Fuelman and its affiliates, directors, officers, employees, and agents (the "Indemnitees") from and against any and all third party claims, losses, damages, suits, fees, judgments, costs, and expenses (collectively referred to as "Claims"), including attorneys' fees incurred in responding to such Claims, that the Indemnitees may suffer or incur arising out of or in connection with (a) the Indemnitor's (or its employees' or agents') negligence, willful misconduct, or breach of any representation, warranty or other obligation under this Agreement; or (b) any personal injury (including death), damage to property, or environmental clean-up and related costs, resulting from the Indemnitor's or its employees' or agent's acts or omissions.  The Indemnitees will give prompt notice of any Claim to the Indemnitor, who will defend the Indemnitees at the Indemnitees' request.

24  **Nondisclosure.** Fuelman may provide to Client access to confidential and proprietary information regarding Fuelman's business, business plans, pricing and reimbursement policies, and other issues ("Confidential Information."). Client will keep all Confidential Information in strict confidence and not disclose or use the Confidential Information during the term of this Agreement and for five (5) years thereafter, provided that for any Confidential Information deemed to be a "trade secret," Client shall protect and not disclose or use such Confidential Information for so long as such Confidential Information is will not disclose its terms except as permitted by Fuelman.  Client will inform its employees and agents as to the confidential and proprietary nature of the Confidential Information to which they may be exposed and take all necessary actions to ensure that such employees and agents keep such information strictly confidential.  Client will return any Confidential Information upon request from Fuelman.  Client agrees that any disclosure of Confidential Information would cause irreparable harm for which monetary damages may not be a sufficient remedy, so Fuelman will be entitled to seek all remedies and damages available at law and in equity, including but not limited to injunctive relief, without the posting of a bond.

25  **Miscellaneous Provisions.**

25.1  Governing Law; Waiver of Jury Trial; Binding Arbitration.  This Agreement will be governed by Louisiana law, without regard to its conflicts of laws principles.  Many Account maintenance, treasury and accounting functions are performed by Fuelman in Louisiana, where it has a substantial presence. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.  A party may, without the other's consent, elect MANDATORY, BINDING ARBITRATION for any claim, dispute, or controversy between or among such parties relating to an Account, a Card, a prior Account, or the relationship of such parties, including without limitation claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision, and no matter what legal theory such claims are based on or what remedy (damages, or injunctive or declaratory relief) such claims seek. To accommodate the right to arbitrate, Client agrees that it will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with Fuelman.  The party filing for arbitration must choose one of the following two arbitration firms and follow its rules and procedures for initiating (including paying the filing fee) and pursuing arbitration before a single neutral arbitrator: American Arbitration Association, or JAMS.  All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. Any arbitration hearing that Client attends will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to Client's mailing address as reflected on the Client's Statement, or at some other place to which the parties agree in writing.

25.2  Assignment.  Client will not assign, including by operation of law, this Agreement or any right or obligation under this Agreement without the prior written consent of Fuelman.  This Agreement, and any and all rights and obligations associated with the Agreement, may be assigned by Fuelman upon notice to Client.  All of Fuelman's rights under this Agreement and subsequent amendments shall also apply to any assignee of this Agreement.  This Agreement is binding on the parties to this Agreement and their respective successors and permitted assigns.

25.3  Relationship of Parties.  Nothing in this Agreement will be construed to create a joint venture, partnership, employment, or agency relationship between the parties for any purpose.

25.4  Force Majeure.  Except for payment obligations, neither party is liable for delays or failures in performance of any obligations under this Agreement due to a cause beyond its reasonable control.

25.5  No Waiver.  No delay or omission by either party to exercise any right under this Agreement will impair or be construed as a waiver of such right.  A waiver by any party of any breach or obligation will not be construed to be a waiver of any other breach or obligation.  The party waiving its rights must sign all waivers.  No waiver of any default, expressed or implied, made by either party hereto shall be binding upon the party making such waiver in the event of a subsequent default.

25.6  Severability.  If any provision of this Agreement is declared invalid, illegal, or unenforceable, the validity of the remaining provisions will not be affected.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of this Agreement.

25.7  Interpretation.  This Agreement will not be presumptively interpreted for or against any party by reason of that party having drafted or negotiated, or failed to draft or negotiate, all or any portion of any provision of this Agreement.  The captions and headings included in this Agreement have been inserted for convenience only and may not be used in connection with the interpretation of this Agreement. Each party intends that this Agreement will not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the parties to this Agreement.

# EXHIBIT B

**Fuelman**

**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**
**FUELMAN FLEET CARD CLIENT AGREEMENT**
**TERMS AND CONDITIONS**

1 **Definitions.**
1.1 Account. "Account" shall mean the internal Fuelman account established for Client.
1.2 Agreement. "Agreement" shall mean this agreement comprised of the Application (if any), the Approval Letter (if any) and this document containing the Terms and Conditions.
1.3 Agreement Date. "Agreement Date" shall mean the date on which Fuelman accepts the Client's Application and issues one or more Cards for Client's Account.
1.4 Application. "Application" shall mean the application completed by Client in applying for the Account through Fuelman.
1.5 Approval Letter. "Approval Letter" shall mean the letter, if any, sent by Fuelman to Client that approves the Application and establishes the Account under these Terms and Conditions.
1.6 Bank Account. "Bank Account" shall mean any bank account that Client has designated on the Application or by written notice to Fuelman for electronic funds transfer, automated clearinghouse or other electronic transfer of money to pay amounts due for Client's Account.
1.7 Billing Cycle. "Billing Cycle" shall mean the period of time set forth in the Approval Letter or any subsequent notification for which Transactions will be accepted and a Statement for the Account will be provided.
1.8 Card or Cards. "Card" or "Cards" shall mean the Fuelman fleet card or cards issued to Client.
1.9 Cardholder. "Cardholder" shall mean the person presenting the Card to the Merchant to be used to purchase Fuel and/or Maintenance.
1.10 Client. "Client" shall mean the business entity identified in the Application.
1.11 Client's Representative. "Client's Representative" shall mean the person(s) identified as Client's representative on the Application.
1.12 Driver ID. "Driver ID" shall mean the personal identification number issued to the Client by Fuelman for use with a Card to authorize a particular Transaction.
1.13 Due Date. "Due Date" shall mean the date upon which payment from Client is due to Fuelman as stated on Fuelman's Statement to Client.
1.14 FleetCor. "FleetCor" shall mean FleetCor Technologies Operating Company, LLC, the company which owns the Accounts and in whose favor all Obligations, as defined in Section 10.3, of Client under this Agreement flow.
1.15 Fuelman. "Fuelman" shall mean Fuelman, the division of FleetCor administering the Card(s) and Account.
1.16 Fuel. "Fuel" shall mean any combustible material dispensed by volume that is purchased with a Card.
1.17 Guaranteed Obligations. "Guaranteed Obligations" shall have the meaning set forth in Section 10.4.
1.18 Guarantor(s). "Guarantor" shall mean the person(s) identified on the Application or a separate guaranty document, if any, that guarantees Client will comply with this Agreement and pay all amounts owed to Fuelman.
1.19 Maintenance. "Maintenance" shall mean any non-Fuel product or service for a vehicle that is purchased with a Card (e.g., oil, wiper blades, fluids, towing, roadside assistance, parts, supplies, tires, oil changes, brakes, glass, exhaust systems, transmissions, and repair services).
1.20 Merchant. "Merchant" shall mean a third party that operates retail locations providing Fuel and/or Maintenance in the Fuelman network.
1.21 Merchant Location. "Merchant Location" shall mean a Merchant's Fuel and/or Maintenance site that is participating in the Fuelman network, such that a Card may be used to purchase Fuel and/or Maintenance at such site.
1.22 Miscellaneous. "Miscellaneous" shall mean any non-vehicle related product or service that is purchased with a Card (e.g., food, drink, magazines, cigarettes, lottery tickets).
1.23 Principal. "Principal" shall mean the person identified on the Application, if any, who applies for the Account as a co-maker with the Client
1.24 Reporting. "Reporting" shall mean related products or services that are purchased to manage the vehicle fleet (e.g., paper report delivery, fax report delivery).
1.25 Statement. "Statement" shall mean the billing statement provided at the end of each Billing Cycle.
1.26 Terms and Conditions. "Terms and Conditions" shall mean the terms and conditions contained in the Agreement and any other electronic or paper document presented to the Client by or on behalf of Fuelman in connection with this Agreement (e.g. the physical card, driver instructions, site guides, reports, billing/statement inserts, Application, and web site). In the event of a conflict between any such other document and this Agreement, this Agreement will control unless specifically provided otherwise in the other document.
1.27 Transaction. "Transaction" shall mean any individual purchase with a Card.

2 **General.**
2.1 Agreement for Account and Card Services. Client and, if applicable, Principal or Guarantor, shall submit an Application to signify Client's application for an Account with Fuelman. If Fuelman accepts such Application, Fuelman shall send an Approval Letter and these Terms and Conditions to Client's Representative along with Cards and Driver IDs issued for the Account. Upon Client's first use of a Card, Client will be deemed to have accepted the Approval Letter and these Terms and Conditions and Client and Fuelman shall be deemed to have entered into this Agreement. If a Guarantor also submits the Application or a separate guaranty then Client and Guarantor shall both be responsible for all payments owed by Client hereunder and for compliance by Client with these Terms and Conditions. If a Principal jointly submits the Application with Client, then Client and Principal are jointly and severally responsible for all payments owed by Client hereunder and for compliance with these Terms and Conditions
2.2 Entire Agreement. These Terms and Conditions, together with the Application (if any) and the Approval Letter (if any), are the exclusive statement of the terms and conditions with respect to their subject matter as of the Agreement Date and supersede all prior agreements, negotiations, representations and proposals, whether written or oral. Deviations from the Agreement are not valid unless confirmed in writing by an authorized representative of Fuelman.

3 **Account Administration and Card Issuance.**
3.1 Establishment of Client Account. Upon issuance of the Cards, Fuelman will establish an Account for Client that will be used to pay for Fuel, Maintenance and Miscellaneous items purchased through the use of the Cards at Merchant Locations. For purpose of determining Client's domicile, Client acknowledges and agrees that its domicile shall be the state reflected in the Client's mailing address as reflected on the Client's Statement.
3.2 Government Regulation. Neither Client nor any Guarantor of the Account shall (a) be or become at any time, and are not currently, subject to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Fuelman from making any advance or extension of credit to Client or any Guarantor of the Account or from otherwise conducting business with Client or any Guarantor of the Account, or (b) fail to provide documentary and other evidence of Client's identity or the identity of any Guarantor of the Account or person to whom Client gives a Card, as may be requested by Fuelman at any time to enable Fuelman to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.
3.3 Spend Limit. Upon Fuelman's approval of the Client's Application, Fuelman will establish an aggregate spending limit for all the Cards issued to Client under the Account (the "Spend Limit") based on Fuelman's evaluation of the Client's creditworthiness. Fuelman reserves the right to increase or decrease this Spend Limit at any time with or without providing notice to Client. Fuelman may decide, at its own discretion, to decline or approve any transactions made after the Client exceeds the Account Spend Limit, or to lock the Account until the balance due is paid in full. Fuelman reserves the right to charge an Over Limit Fee of up to fifty dollars ($50.00) per Over Limit transaction authorized.
3.4 Initial Cards. Upon Fuelman's approval of Client's Application, Fuelman will issue one or more Cards and Driver ID numbers to Client. Client shall be responsible for distributing the Cards and Driver IDs to its employees or agents.
3.5 Additional Cards. If, at some time after the initial issuance of Cards to Client, Client desires one or more additional Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service. Fuelman reserves the right to charge a fee of up to five dollars ($5.00) for creating and delivering each additional Card.
3.6 Replacement Cards. If Client desires one or more replacement Cards, including, but not limited to replacing lost or damaged Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service. Fuelman reserves the right to charge a fee of up to five dollars ($5.00) for creating and delivering each replacement Card.
3.7 Administration of Cards. Client shall be solely responsible for the use, maintenance, administration, and security of the Cards and Driver IDs within Client's business, including, but not limited to, distributing Cards to, and collecting Cards from, its employees and agents. Notwithstanding any other provision in this Agreement, Client is responsible for any loss or misuse of Cards by its employees and agents. See Section 16 for more information regarding Client responsibilities.
3.8 Administration of Account. Fuelman shall be responsible for collecting and reporting all Transactions by date, vehicle, Merchant Location, and driver based upon data received by Fuelman. In addition, Fuelman shall be responsible for maintaining the database for the Client with all Card numbers, vehicle data, driver data, and purchase control data. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) a month or a minimum of fifteen dollars ($15.00) per Billing Cycle for account administration.
3.9 Card Fees. Fuelman reserves the right to charge a service fee of up to ten dollars ($10.00) per Card per month to support the use of the Card.
3.10 Property. All Cards remain the property of Fuelman and shall be surrendered immediately by Client to Fuelman upon Fuelman's request or if Client or Fuelman cancels the Card or Account as permitted herein.
3.11 Inactive Cards. Fuelman reserves the right to charge a fee of up to three dollars and fifty cents ($3.50) per Billing Cycle for Cards that are inactive for seventy-five (75) or more days.
3.12 Cancellation of Cards. If, at any time, for any reason, Client desires to cancel any particular Card, but not the Account, Client's Representative must notify Fuelman via the online application or in writing of such cancellation. Client's liability for purchases made using the canceled Card shall end at midnight of the day that Fuelman receives notice of such Card cancellation.
3.13 Suspension of Cards. Fuelman, at its sole discretion, may suspend or terminate the use of any Card at any time for any reason, including, but not limited to, inactivity, unusual activity, or suspected loss, theft, fraud, or in compliance with the USA Patriot Act. However, nothing in this Agreement shall obligate Fuelman to monitor the use of any Card, and, as described in this Agreement, Client is solely responsible for the use of any outstanding Cards.
3.14 Suspension of Account. Fuelman, at its sole discretion, may suspend or terminate the use of an Account at any time for any reason, including, but not limited to, inactivity, unusual activity, change in creditworthiness, late payment (excessive days beyond terms), aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) over the Spend Limit or in compliance with the USA Patriot Act. Fuelman reserves the right to charge up to a fifty dollar ($50.00) fee for Account reinstatement each time a previously suspended Account is reinstated.
3.15 Non-Transferability; Revocability. All Cards and any and all rights and privileges to which its holders are entitled are not transferable and may be revoked for any reason, including but not limited to, a breach of any of the Terms and Conditions of this Agreement, without prior notice at any time and with no liability to Fuelman, at which time any credit extended hereunder shall be revoked and all sums owed by Client to Fuelman pursuant hereto shall become immediately due and payable.

4 **Services Provided.**
4.1 General Services. Fuelman shall provide the following services to Client under this Agreement:
4.1.1 Issue to Client the Cards upon Fuelman's approval of the Application.
4.1.2 Maintain a network of Merchant Locations for Fuel and Maintenance where Client may make purchases with Cards pursuant to this Agreement.
4.1.3 Provide an online directory to identify accepting Merchant Locations.
4.1.4 Maintain an authorization control system to verify that a Card being presented for payment is valid/active and that the Driver ID being used is valid/active for that particular Card. In addition, individual Card-level spending limits can be established by the Client for each product category (e.g., Fuel, Maintenance supplies, Maintenance services, Miscellaneous).
4.1.5 Issue management reports and billing Statements to Client showing details of all posted Card Transactions (as detailed in Section 11.2) during the Billing Cycle.
4.2 Referrals. Fuelman reserves the right to deliver informational material in reference to ancillary fleet management related products and services provided by other vendors to the Client. In no case is Fuelman making any representation about the quality or value of any particular product or service.
4.3 Ancillary Products and Services. Fuelman reserves the right to make certain ancillary fleet management related products and services (e.g., emergency roadside assistance) that are delivered by other vendors/companies available to the Client for purchase on Cards. For the purpose of reporting the Transactions, these ancillary products and services are considered Maintenance. The act of requesting the ancillary product or service with a valid Card and Driver ID, establishes approval for Fuelman to charge and collect the corresponding balance incurred by these ancillary products and services.
4.3.1 Roadside Assistance for Unattended Vehicles. Through an association with a third party, Fuelman may offer roadside assistance for vehicles, including towing services. The services may not be available for unattended vehicles. The personnel of any such third party provider are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by such third party, or for any other liability or damage which arises from the action or negligence of the personnel of the third party, its agents or its employees.
4.3.2 Additional Services. Client may be eligible for additional services from time to time. If Client is eligible for an additional service, Fuelman may enroll Account in the service. The terms and fees applicable to such service will be disclosed prior to enrollment. Client will have the opportunity to opt-out of enrollment in such service.
4.4 Inability to Operate. Fuelman shall have no responsibility for any person(s) or machine(s) rejection of or refusal to honor a Card. Client agrees there shall be no liability to Fuelman or any other company or entity, if for any reason any Merchant or Merchant Location should fail to allow the purchase of Fuel or Maintenance, fail to authorize Transaction(s) or fail to operate in any other manner, even though a Card is valid.
4.5 WARRANTY DISCLAIMER. FUELMAN DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. ALL FUELMAN ACCOUNTS, PRODUCTS, AND SERVICES ARE PROVIDED ON AN AS-IS BASIS.

5 **Purchases.**
5.1 Use of Cards. Client may use the Cards at any participating Merchant Location for the purchase of Fuel, Maintenance, or Miscellaneous items. To use a Card the Client should follow the directions for purchase established at the particular Merchant Location.
5.2 Title. As between Client and Fuelman, title to Fuel purchased with the Card passes from Fuelman to Client when the Cardholder dispenses Fuel (when fuel leaves the fuel dispensing nozzle), except as otherwise provided by applicable law. Title to any non-Fuel product or service purchased with the Card passes directly from the Merchant to Client when the Cardholder receives such non-Fuel product and/or service. Fuelman takes no title to Maintenance or Miscellaneous items.
5.3 Verification of Merchant Locations. Client acknowledges that not all retail locations selling Fuel and Maintenance accept Fuelman's Cards. If Client is uncertain as to whether a location is able to accept the Cards, Client should visit the online site locator at www.fuelman.com or contact Fuelman's 24x365 Authorization Center at 800-877-9013.

6 **Safety.**
6.1 Safe Fueling Operation. Client shall instruct all persons to whom Client provides a Card for purchasing Fuel in safe and proper fueling procedures. Client will ensure that everyone using a Card issued in the name of Client is instructed in applicable safety measures.
6.2 Safety Laws and Notices. Client shall comply, and Client shall cause its employees and agents to comply, with all applicable local, state, and federal laws and regulations pertaining to the dispensing and use of Fuel at Merchant Locations as well as all safety notices posted by Merchants.

7 **Representations and Warranties.** Client represents and warrants to Fuelman as of the date of the Application and on the date of each extension of credit under this Agreement that:
7.1.1 Client is duly organized, validly existing and in good standing under the laws of the state of its formation. Client has the power and authority to own its properties and to carry on its business as presently conducted and to execute and deliver, and enter and perform its obligations under this Agreement.
7.1.2 The execution, delivery and performance of this Agreement have been duly authorized by all necessary organizational action. This Agreement has been duly executed and delivered by Client and Guarantor, and constitutes the legal, valid and binding obligations of each such party, enforceable against such parties in accordance with this Agreement, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.
7.1.3 The execution, delivery and performance of this Agreement by Client and Guarantor will not violate any applicable law, rule or regulation or the charter, by-laws or other organizational documents of such parties or any judgment, order or ruling of any governmental authority.
7.1.4 The financial and other information furnished by Client and Guarantor to Fuelman in the Application, or otherwise, is true, correct and complete in all material respects.
7.1.5 Cards issued to Client will be used only by Client's employees and agents and will not be distributed or resold to other companies without the express written consent of Fuelman.
7.1.6 CLIENT WILL USE THE CARDS SOLELY FOR COMMERCIAL PURPOSES AND SHALL STRICTLY PROHIBIT ANY PERSONAL USE BY THE USERS OF ITS CARDS.

8 **Conditions To Extension Of Credit.** Any extension of credit under this Agreement shall be subject to, and conditioned upon, satisfaction of the following requirements:
8.1.1 Fuelman's receipt of a duly executed counterpart of the Application by Client and, if requested, the Guarantor, in form and substance acceptable to Fuelman in its sole discretion;
8.1.2 All representations and warranties set forth in this Agreement are true and correct;
8.1.3 No event shall have occurred and be continuing, or would result from the extension of credit hereunder, that constitutes or would constitute (with notice or the lapse of time or both) an Event of Default (defined below);
8.1.4 Outstanding amounts due, including any applicable fees as described in this Agreement, are paid by Due Date. Any amount not paid by the Due Date is subject to Late Fees (Section 10.7) and Finance Charges (Section 10.9).
8.1.5 After giving effect to any requested extension of credit, the aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) shall not exceed Client's Spend Limit, as determined by Fuelman from time to time in its sole discretion; and,
8.1.6 Receipt of any required Reserve Amount (as defined below) necessary to open the Client's Account.

9 **Pricing.**
9.1 Methodology. Fuelman establishes competitive local market Fuel and Maintenance Transaction prices for the Fuelman Fleet Card program depending on a variety of factors (e.g., product costs, purchase volume, market conditions). Transaction pricing can be Merchant Retail-Based, Merchant National Account-Based, Fuelman Cost-Based or a combination thereof. The pricing methodology can vary by product type and is disclosed to Client in the Application, Approval Letter, and/or subsequent written notification. Additional charges/fees and/or discounts may apply based on the Client's agreed-upon program.
9.2 Merchant Retail-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to the prevailing Merchant Location's retail price plus or minus a fixed adjustment factor but never below Fuelman cost. In the event there is no established retail price (e.g., unattended fueling sites, mobile refueling), the retail price will be established by Fuelman.
9.3 Merchant National Account-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to the Merchant's prevailing national account price.
9.4 Fuelman Cost-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to Fuelman's delivered cost plus a mark-up. Fuelman's cost is dependent on a variety of factors and can include any or all of the following components: wholesale cost; merchant freight; dealer adjustment; network operation costs, merchant commission; and applicable taxes. Under no circumstance will Client's price be below Fuelman's cost.
9.5 Special Network Pricing. Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or two dollars fifty cents ($2.50) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.
9.6 Universal Pricing. Client price for each Fuel or Maintenance Transaction is equal to an index price established by surveying a subset of transactions in the fueling area. This index can vary from posted retail price and may include a mark-up, but will never be below Fuelman cost. The markup and index calculation basis may vary by region and can change at any time.
9.7 Level 2 Pricing. Fuelman reserves the right to invoke Level 2 Pricing in several scenarios. Level 2 Pricing may be invoked when Amount Due, including fees and charges are not paid by the Due Date; Client's Credit Score, as reported by a credit reporting agency utilized by Fuelman in its discretion, drops by fifty-one (51) points or more in a rolling 3 month period; and/or Client's Credit Score is below a certain risk threshold. This risk threshold is five hundred and twenty (520) for commercial credit scores and six hundred and sixty (660) for individual credit scores. Level 2 Pricing may also be applied to Clients who operate in the trucking or transportation industries, which pricing shall be reflected in Client's Statement. The Level 2 Pricing is an incremental charge above Client's current pricing. The maximum increase is ten cents ($0.10) per gallon purchased. Level 2 Pricing remains in effect until the next Billing Cycle following when all amounts owed on the Account are paid in full and/or Client's Credit Score is higher than the risk threshold for a rolling 3 month period. This decision is made solely by FleetCor based on information provided by the credit reporting agency along with the Account's payment history. The credit reporting agency does not participate in the decision. Client questions concerning their commercial and/or consumer credit scores should be directed to the applicable reporting agencies directly. D&B may be contacted at 800-234-3867 or by mail to Dun and Bradstreet Corporation, 103 JFK Parkway, Short Hills, NJ 07078. Equifax may be contacted at 800-727-8495 or at sbfe@equifax.com. Experian may be contacted at 888-397-3742 or online at www.experian.com/reportaccess.
9.8 Minimum Program Administration Fee. Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may charge a Minimum Program Administration Fee of up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.
9.9 Rebate/Volume Discount. Fuelman may provide rebate or volume discount off retail price for fuel and nonfuel purchases under certain customer pricing. Such rebate or volume discount could be at transaction level or as separate credit. The rebate program, if applicable to the Client, is only available if the Account is open, in good standing, and is not in default of the payment terms provided within these card client agreement terms and conditions. Please refer to the account pricing documentation for specifics regarding the rebate program detail. Aviation purchases, bulk fuel purchases, international fuel purchases, transactions at non-qualifying gasoline merchants, and any account in default of the payment terms provided within these card client agreement terms and conditions are excluded from the rebate program. Fuelman reserves the right to charge a Rebate Program Fee of up to ten dollars ($10) per card per billing cycle. Fuelman also reserve the right to change or terminate the rebate program at any time and in any manner with prior notice. Changes may include, among other things, changing the benefits, imposing additional restrictions, or terminating the program. In addition, reserve the right to remove any account from the rebate program in the event of any fraud or abuse. Participation in the rebate program will be suspended if the account is suspended. Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may change, suspend, or terminate this rebate program without notice.

10 **Billing & Payments.**
10.1 Billing. Billing cycle is agreed upon with the Client during the Application and Account setup process. Client shall be responsible for all credit extended on the Account. This is not a revolving credit account. The total amount shown on each Account Statement is due and payable in full by the Due Date shown on the Statement. Unless otherwise agreed upon, the standard Due Date is ten (10) days after the date the Account Statement is created, regardless of the delivery method. Regardless of the delivery method selected, it shall be the obligation of the Client to notify Fuelman within five (5) business days of the end of each Billing Cycle if Client does not receive a Statement. If the Client does not receive a Statement and thus payment is not completed by the Due Date, Client is responsible for any Late Fees or Finance Charges.
10.2 Extended Terms Programs. Upon Client's request and subject to Fuelman approval, terms can be extended at an additional charge.
10.3 Payment. Client hereby unconditionally promises to pay Fuelman, in lawful money of the United States of America and in accordance with this Agreement, all outstanding Obligations (as defined below) which may, from time to time, be owing to Fuelman by Client. As used herein, "Obligations" shall mean all outstanding sums owing to Fuelman by Client, including, without limitation, reimbursement for petroleum products obtained through Fuelman, payments for any products or services obtained using the Card(s), and late interest, penalties, fees, report delivery, reporting, account charges, service charges, costs and expenses (including attorneys' fees) and all other obligations under this Agreement or otherwise. Client must pay all outstanding Obligations on the statement by the Due Date to avoid Late Fees and Finance Charges. Failure by Client to pay all amounts by the Due Date shall be a breach of the Terms and Conditions of this Agreement. Conforming payments received by 7:00 a.m. Eastern Time on a business day (Monday through Friday of each week, excluding banking holidays) will be credited to your Account as of the date received. Otherwise, payments will be credited to your Account as of the next business day. In the event your billing statement reflects a Due Date which falls on a day which is not a business day, your payment must be received by 7:00 a.m. Eastern Time on the preceding business day. If we do not receive your payment for the Amount Due by the Due Date, you may not be able to make any further purchases until such time that you pay the entire outstanding balance on the Account. We may change our billing and debiting cycle at any time by reflecting the change on your billing statement
10.4 Guaranty. Guarantor hereby unconditionally and irrevocably guarantees to Fuelman and its successors, endorsees, transferees and assigns, the punctual payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations, now or hereafter owing, whether for principal, late interest, premiums, fees, expenses or otherwise (collectively, the "Guaranteed Obligations"). Any and all payments by the Guarantor hereunder shall be made free and clear of and without deduction for any set-off, counterclaim, or withholding. Guarantor acknowledges and agrees that this is a guaranty of payment when due, and not of collection, and Guarantor agrees that his obligations under this Agreement shall not be discharged until the payment and performance, in full, of the Guaranteed Obligations. Guarantor shall be regarded, and shall be in the same position, as Client with respect to the Guaranteed Obligations. Guarantor expressly waives all rights he may now or in the future have under any statute, or at common law, or at law or in equity, or otherwise, to compel Fuelman to proceed in respect of the Guaranteed Obligations against Client or any other party before proceeding against, or as a condition to proceeding against, Guarantor. Guarantor acknowledges and agrees that any delay or failure by Fuelman to take any action regarding the Guaranteed Obligations does not limit or prohibit Fuelman from enforcing its rights under this Agreement and further that Guarantor's liability under this Agreement shall not be eliminated or reduced by any such failure or delay on the part of Fuelman. Guarantor further expressly waives and agrees not to assert or take advantage of any defense based upon the failure of Fuelman in respect of the Guaranteed Obligations against Client or any other party for the payment and Guaranteed Obligations. Guarantor agrees that any notice or directive given at any time by any person to Fuelman which is inconsistent with the waivers in the preceding two sentences shall be null and void and may be ignored by Fuelman. Guarantor further hereby waives diligence, presentment and demand (whether for non-payment or protest) or notice of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations (including, without limitation, composition, the amount of, or the terms of, the Guaranteed Obligations), notice of material adverse change in Client's financial condition or any other fact which might materially increase the risk to Guarantor with respect to any of the Guaranteed Obligations or all other demands whatsoever and waives the benefit of all provisions of law which are or might be in conflict with the terms of this Agreement. Guarantor represents, warrants and agrees that Guarantor's obligations under this Agreement are not and shall not be subject to any counterclaims, offsets or defenses of any kind against Fuelman or Client now existing or which may arise in the future. The Guarantor further agrees that the Guaranteed Obligations may be amended, modified, increased, extended or renewed, in whole or in part, without notice to or further assent from Guarantor, and that Guarantor will remain bound upon its guaranty notwithstanding any amendment, modification, increase, extension or renewal of any guaranteed Obligation. The foregoing waivers are of the essence of the transaction contemplated by this Agreement and, but for the guaranty contained herein and such waivers, Fuelman would decline to make the financial accommodations to Client under this Agreement. Each Guarantor is liable on a joint and several basis with Client and each other Guarantor.
10.4.1 Account Principal Responsibility. Each Principal for this Account, if any, as shown on the Application, is personally and unconditionally, jointly and severally liable with Client, as principal and not as surety or guarantor, for the payment and performance when due of all obligations owed on the Account, regardless of who made purchases using the Cards, and the Principal agrees to pay such amounts according to the terms of this Agreement. Principal is responsible under this Agreement for all use of all of the Cards issued on the Account to the fullest extent permitted by law.
10.5 Payment Methods. The following terms shall apply to each of following payment methods.
10.5.1 Client Check. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by valid check equal to the accumulated balance of the Account for the previous Billing Cycle. The client is required to note the Account number or Statement (BG) number on the check. If the matching Statement Remit To coupon is not included with payment, Fuelman reserves the right to charge an Exception Handling Fee of ten dollars ($10.00) for processing the payment. Fuelman reserves the right to charge a Check Processing Fee of fifteen dollars ($15.00) per check payment. If insufficient funds are available in the Account to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.
10.5.2 Client Initiated Online Payment. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by online method equal to the accumulated balance of the Account for the previous Billing Cycle. If insufficient funds are available on the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.
10.5.3 Pay by Phone. By the Due Date, Fuelman will initiate, at Client's request, payment by phone either through Customer Service Representative or Interactive Voice Response (IVR) system. Fuelman reserves the right to charge a fee up to thirty dollars ($30.00) for processing each Pay by Phone payment using either methods.
10.5.4 Fuelman Initiated Credit Card Charge. Prior to the Due Date specified on Fuelman's Statement to Client, Fuelman will initiate a charge to the Client's credit card on file to pay the accumulated balance of the Account from the previous Billing Cycle. Fuelman may also charge the credit card to pay the amount charged to the Account any time the balance of the Account reaches the Spend Limit. The exact time that the credit card will be charged for the amount due on the Account may vary, depending on the processing cycle. If insufficient funds are available on the credit card to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will be prevented from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and charge cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a credit card convenience fee up to three percent (3%) of the payment amount.
10.5.5 Fuelman Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment.
10.5.5.1 Debits to Bank Account. On the Due Date identified on the Client's Statement, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous Billing Cycle. For daily billed Client, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous business day. Fuelman may also debit the Bank Account to pay the amount charged to the Account any time the balance of the Account reaches the Spend Limit. The exact time that the Bank Account will be debited for the amount charged to the Account may vary, depending on the processing capabilities of the bank at which the Bank Account exists. If insufficient funds are available in the Bank Account to pay the Account balance at the time a debit is initiated, Fuelman may prevent the Client from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and debiting cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a bank handling fee of up to twenty five dollars ($25.00) per debit of the Client's Bank Account.
10.5.5.2 Change in Bank Account. To change the Bank Account, Client's Representative must provide a written request of such change to Fuelman. The request should include the following information for the new account: bank name (the bank must be a member of the National Automated Clearinghouse Association (NACHA); branch address; branch number; bank routing number; and account number. The request should also contain a voided check from the new account. It will take approximately ten or more days for Fuelman to change the account. During this time, Client agrees to cooperate with Fuelman to provide additional information necessary to make the change and to execute a test of the change.
10.5.6 Client Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment. Prior to the Due Date, Client will initiate a credit to Fuelman's bank account to pay the accumulated balance of the Client Account from the previous Billing Cycle after notifying and obtaining approval from a Fuelman Customer Service representative to do so. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) for processing each Client initiated EFT/ACH.
10.5.7 On Account. Fuelman may offer Client the ability to pay in advance for its Fuel purchases. The Account will be debited for each purchase. The Account will be replenished by EFT with the amount equal to the prior week's Statement amount. Fuelman may charge a fee up to twenty-five dollars ($25.00) for the Client's replenishing of the Account. A Dormancy Fee of thirty dollars ($30.00) per Billing Cycle may be charged after one hundred eighty days (180) days of inactivity, where allowed by applicable law. Residual Account credit balances will be returned upon written request. Escheatment laws, where applicable, will be followed.
10.6 Applying Payments. Fuelman uses a "balance-forward" based accounting system. Therefore, all payments made by Client to Fuelman will be applied accordingly against the outstanding amount due at the time the payment is received. Subject to applicable law, we will apply and allocate payments and credits among balances owed by Client (whether for purchases, fees, late interest, or otherwise) in any order and manner determined by Fuelman in its sole discretion. Client agrees that Fuelman has the unconditional right to exercise this discretion in a way that is most favorable or convenient to Fuelman.
10.7 Late Payments. All payments made by Client to Fuelman that are not received by the Due Date are considered

late. Fuelman reserves the right to charge 9.99% of the New Balance (defined below) with a minimum of seventy five dollars ($75.00) for each late payment, not to exceed the maximum rate allowable by applicable law. To determine the New Balance for the purposes of late fees, Fuelman starts with the Amount Due on the statement for which the payment is late. Any purchases and other debits posted to the Account through the end date of the current (next succeeding) billing statement may be added to this. Appropriate finance charges or late interest charges and fees are added and other applicable adjustments made.

10.8 <u>Annual Percentage Rate</u>. The Annual Percentage Rate for purchases is thirty two percent (32%), which corresponds to the daily periodic rate of 0.0877%, or the maximum rate allowed by applicable law, whichever is less. The daily periodic rate is the annual percentage rate divided by three hundred sixty-five (365).

10.9 <u>Finance Charges</u>. If Client's Statement is paid in full every Billing Cycle by the applicable Due Date, the Account will not incur Finance Charges. Finance Charges begin to accrue for each purchase as of the date the purchase is added to the Account. If payment in full of the Amount Due shown on the Statement for a Billing Cycle is credited to Client's Account by the Due Date shown on that respective Statement, then Finance Charges will not accrue for purchases from the date on which payment in full of that Amount Due is credited to Client's Account, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (late interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement). In addition, Finance Charges will not accrue for purchases during a Billing Cycle if the Amount Due shown on the Statement for the prior Billing Cycle is zero ($0) or a credit balance, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (late interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement).

10.9.1 Periodic Finance Charges are calculated in two steps as follows: First, for each day of the Billing Cycle, Fuelman multiplies the daily balance by the applicable daily periodic rate.

10.9.2 Second, for each day of the prior Billing Cycle, Fuelman multiplies the daily balance for purchases made in that Billing Cycle by the same daily periodic rate. However, Fuelman does not do this second step if it received payment in full of the Amount Due on Client's previous billing Statement by the date the payment was due or if a periodic finance charge was already billed on that balance.

10.9.3 For finance charge calculation purposes, the Billing Cycle begins on the day after the Closing Date of the Statement and includes the following Closing Date. The number of days in the Billing Cycle may vary.

10.9.4 The daily balance is calculated by taking the beginning balance every day (which may include unpaid Finance Charges from previous Billing Cycles), adding any new Transactions and any new fees, subtracting any credits or payments posted as of that day, and any other adjustments. Daily Periodic Finance Charges will be rounded to the nearest cent. Unless Fuelman elects to use a later date, a new Transaction is added to the balance as of the Transaction date shown on Client's billing report. A credit balance is treated as a balance of zero.

10.10 <u>Returned Payment</u>. If a check, credit card charge, or EFT/ACH is returned or denied, Fuelman reserves the right to charge the lesser of fifty dollars ($50.00) Returned Payment Fee or the maximum amount allowable by applicable law for each occurrence. At our option, we will assess this fee the first time your check or payment is not honored even it is honored upon resubmission. Fuelman may also charge the applicable Late Fees and Finance Charges incurred if balance is not received by Due Date due to returned payment.

10.11 <u>Reserve Amount</u>. Fuelman will notify Client of any reserve amount (the "Reserve Amount") necessary to open the Client's Account. The Reserve Amount is to be paid to Fuelman by Client prior to being the Cards. Client shall continue paying Fuelman any amounts on any periodic Fuelman Statement by the Due Date. This Reserve Amount will be held by Fuelman and may be returned to Client only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and the Account has been closed. In the Event of Default (defined below), the Reserve Amount will be applied to the Account as a payment on the Account. Any interest earned on the reserve balance in the Account will accrue to Fuelman.

As part of our credit reviews, Client may be required to provide a Reserve Amount to Fuelman to secure the full and faithful performance of all of Client's obligations. If required, Client understands that the credit line will be equal to an amount that is up to 80% of the Reserve Amount. Client understands that the credit line will not be activated for use until Fuelman has received confirmation from its bank that the security deposit funds are available for use. In the event Client defaults or otherwise fails to perform any obligation owed to Fuelman, Client authorizes Fuelman to use, without notice or demand, the Reserve Amount to satisfy any such default or obligation. Client represents that the Reserve Amount is made in the ordinary course of Client's business, and that the Reserve Amount is not a transfer made on account of any antecedent debt. No trust relationship is created between Fuelman and Client as a result of the Client's payment and Fuelman's acceptance of the security deposit. Client authorizes Fuelman to commingle the Reserve Amount with other Fuelman funds. After receiving a written request from Client, Fuelman may, but is not obligated to, reevaluate the necessity and the amount of the Reserve Amount. Client will provide Fuelman financial information requested to conduct its evaluation. Upon evidence of satisfactory improvement in Client's financial condition, Fuelman may determine, in its sole discretion, to return the Reserve Amount. Fuelman may also require an increase in the Reserve Amount at any time from time to time in order to continue the credit relationship between the parties. Fuelman will return the Reserve Amount to Client upon termination of the Account only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and full performance by Client its obligations to Fuelman.

**11 Reporting.**
11.1 <u>Statements</u>. Fuelman shall furnish Client with a Statement at the end of each Billing Cycle.
11.1.1 <u>Information</u>. The Statement will include the following information:
11.1.1.1 The Account number and other relevant billing information.
11.1.1.2 The previous unpaid charges.
11.1.1.3 The previous statement balance.
11.1.1.4 Any payments posted to the Account.
11.1.1.5 New charges and adjustments.
11.1.1.6 Amount Due.
11.2 <u>Standard Fleet Management Report</u>. Fuelman shall produce a standard fleet management report at the end of each Billing Cycle.
11.2.1.1 <u>Information</u>. The standard fleet management report will include the following information: The applicable fleet customer number. A single Client's Account can have multiple fleets (customer numbers) within it.
11.2.1.2 Any rebates, discounts, report delivery, reporting, account charges, Finance Charges, late interest, fees, and other charges posted to the Account.
11.2.1.3 Detail on each Transaction posted to the Client's Account during the Billing Cycle, including date, Merchant Location, vehicle based on the Card used, employee/driver based on the Driver ID used, product description based on the product type, quantity purchased, total purchase amount, and total applicable taxes.
11.3 <u>Delivery Methods</u>. Fuelman offers several different methods for delivering Statements and the standard fleet management report:
11.3.1 Via U.S. Mail. Fuelman reserves the right to charge up to ten dollars ($10.00) for each mail delivery of each report. Client with failed fax and email deliveries will be charged the mail delivery rate for any resubmission of the reports via mail, performed at Fuelman's discretion.
11.3.2 Via Facsimile. Fuelman reserves the right to charge up to five dollars ($5.00) for each fax delivery of each report. Mailed resubmissions will be charged at the mail delivery rate described in Section 11.3.1.
11.3.3 Via eMail. Mailed resubmissions will be charged at the mail delivery rate described in Section 11.3.1.
11.4 <u>Optional Fleet Management Reports</u>. Fuelman produces a variety of optional fleet management reports, including YTD summaries, Maintenance-specific reports, driver-specific reports, and tax reports. Fuelman reserves the right to charge Client a fee of up to fifteen dollars ($15.00) for delivering each of these optional reports or up to one hundred dollars ($100.00) per quarter.
11.5 <u>Tax Exempt Processing & Reporting</u>. Qualified tax exempt Clients may be eligible to purchase Fuel from Fuelman tax-free at the point-of-sale. Fuelman reserves the right to charge a processing fee of up to one percent (1%) of the total purchases for this service except where prohibited by applicable law.
11.6 <u>Multiple Report Copies</u>. Fuelman will provide multiple copies of mailed reports upon request. Fuelman may charge up to five dollars ($5.00) per report copy.
**12 Change In Terms And Conditions.** Fuelman may change the Terms and Conditions of this Agreement at any time by giving Client written notice of such amendment. Guarantor agrees to be bound by any such changes, if written notice is given to Client. Such changes will go into effect as outlined in the change notice. If permitted by applicable law, such changes will apply to existing balances as well as future purchases and balances. Any modification of or amendment to this Agreement will be delivered to Client through U.S. mail at the address Client provided to Fuelman and periodically provides updates to Fuelman. All initial amendment notifications will be sent to Client in advance of the effective date thereof or earlier as required by law. Client shall be deemed to

have accepted any amendment if Client uses the Card or permits the Card to be used after the amendment becomes effective. Notwithstanding any of the provisions in this Section, Fuelman may at any time reserve the right to change Spend Limits for the Account or to suspend, cancel, or terminate the Account or any Card without prior written notice and Client and Guarantor acknowledge and agree that Fuelman may take such actions without notice.

**13 Events Of Default.** The occurrence of any of the following shall constitute an "Event of Default" hereunder:
13.1.1 Client shall fail to pay any principal, late interest, or other amount payable in respect of any Obligation when due;
13.1.2 Client shall fail to observe or perform any other covenant contained in this Agreement;
13.1.3 Any representation or warranty made by Client or Guarantor herein or in the Application proves untrue in any material respect as of the date of the making or furnishing thereof;
13.1.4 Either Client or Guarantor shall (i) make an assignment for the benefit of its creditors; (ii) admit in writing its inability to pay its debts as they become due; (iii) file a petition under any applicable insolvency, debtor relief or reorganization statute, including without limitation, the United States Bankruptcy Code; (iv) be subject to an involuntary petition under any applicable insolvency, debtor relief, or reorganization statute; (v) appoint or consent to the appointment of any receiver, conservator, liquidating agent, or committee in any insolvency, readjustment of debts, marshaling of assets or liabilities, or similar proceedings of, or relating to Client or Guarantor, or any substantial part of their assets; or (vi) take any corporate action for the purpose of effecting any of the foregoing; or
13.1.5 Guarantor shall terminate or contest the validity or enforceability of Guarantor's guaranty hereunder or Guarantor's guaranty hereunder shall be determined to be invalid or unenforceable for any reason.

**14 Remedies Upon Event Of Default.** Without limiting any other rights or remedies of Fuelman provided for elsewhere in this Agreement, or by applicable law, or in equity, or otherwise, upon or at any time after the occurrence of any Event of Default, Fuelman shall have and may exercise, at its election, from time to time, any and all rights and remedies available at law, in equity, or otherwise, including, without limitation, (i) declaring the entire unpaid balance of the Obligations hereunder or any part thereof immediately due and payable, whereupon it shall be due and payable; and (ii) demanding payment from the Guarantor.

**15 Dispute Resolution.**
15.1 <u>Disputed Transactions</u>. To dispute any Transaction on Client's Statement, Client must notify Fuelman in writing as set forth below within fifteen (15) days of the date of Client's Statement. Fuelman will promptly investigate the matter and respond to Client within sixty (60) days after receiving written notice. Notice should be sent to: FUELMAN, P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service. Fuelman shall not be responsible for and Client shall waive any discrepancies or disputes that Client does not report to Fuelman in writing within fifteen (15) days after the date of Client's Statement.
15.2 <u>Disputed Transaction Notices</u>. Client may report any dispute to Fuelman by telephone. However, telephone notice will not preserve Client's rights or otherwise serve as effective notice under this Agreement. Client must put in writing any dispute regarding a Transaction on Client's Statement. Client's letter must include the following information: name; Account number; date of the Statement; dollar amount and identification of the Transaction(s) in question; and any possible explanation of the error.
15.3 <u>Dispute Resolution</u>. The parties agree that they will work in good faith to resolve any disputes arising under this Agreement. If the dispute cannot be resolved by the parties, then at Fuelman's sole discretion, the dispute will be resolved by binding arbitration in Atlanta, Georgia in compliance with the American Arbitration Association's commercial arbitration rules or by litigation in accordance with Section 25.1. The foregoing does not prohibit either party from seeking injunctive relief without first complying with this Section. Client will reimburse Fuelman for all of its costs and expenses (including collections and attorney's fees and costs) incurred in connection with enforcing any of Fuelman's rights under this Agreement. To accommodate the right to arbitrate, Client agrees that Client will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with Fuelman.

**16 Security, Loss, Theft Or Unauthorized Use Of Card.**
16.1 <u>General Security</u>. Each Card can be programmed to only allow Fuel or both Fuel & Maintenance services such as oil changes, vehicle washes, etc. Typically each Transaction is authorized with the Card number, product code, quantity and driver's Driver ID above the proprietary Fuelman network to ensure that the purchase is authorized and limited to the product and quantity (e.g. gallons of Fuel or dollars of Maintenance) that have been pre-approved. This system also helps prevent unauthorized Driver IDs and stolen Cards from being used to make purchases. The product and quantity controls are subject to each Merchant Location's POS Authorization Limitations described in Section 16.9.
16.2 <u>Fuelman's Liability</u>. In the event an unauthorized Transaction occurs, subject to the limitations and other responsibilities explained in this Section 16, and in the event that the Account has been issued fewer than ten (10) Cards, Fuelman will assume full responsibility for those purchases. If the Account has been issued ten (10) or more Cards, Client assumes all liability and responsibility for unauthorized Transactions or Account activity.
16.3 <u>Client's Responsibility</u>. It is the responsibility of Client to ensure proper security controls are kept in place to protect the Cards and Driver IDs and that only authorized employees or agents of Client use them to make purchases. It is also the Client's responsibility to lock any inactive, misplaced, or stolen Cards and Driver IDs immediately. Fuelman is not responsible for fraudulent Transactions made on unlocked Cards with valid Driver IDs. Client should use the online account application to lock Cards and Driver IDs instantly. Alternatively, the Client can contact Fuelman Customer Service during regular business hours via phone call with the requested change, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. All Transactions in which a valid/unlocked Card number was used in conjunction with a valid/active Driver ID will be considered to be authorized Transactions in which Client is fully responsible for payment. Client's responsibility is to review the standard fleet management reports and optional eMail exception alerts to identify potential purchasing discrepancies. Client should instruct its Cardholders to keep any record of their Driver ID separate from the vehicle's Card.
16.4 <u>Lost or Stolen Cards</u>. Client shall report all lost or stolen Cards to Fuelman immediately via phone call to Fuelman Customer Service identifying the Card number and such other details concerning the loss or theft of the Cards as are known by Client, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. Client shall be liable for all Transactions made by lost or stolen Cards until 24 hours after the time Fuelman receives Client's notice of such lost or stolen Cards. Client and Guarantor(s) agree to and acknowledge full liability for any losses resulting from any failure to report the loss or theft of Card(s) in accordance with the terms hereof.
16.5 <u>Terminated Drivers</u>. It is the Client's responsibility to lock a terminated driver's Driver ID as explained in Section 16.3.
16.6 <u>Miscellaneous Product Purchase Limitations</u>. In addition to the vehicle-related product categories (Fuel, Maintenance supplies, and Maintenance services) a Card can be allowed to purchase non-vehicle related items under the Miscellaneous product category. If a Client does not want to allow non-vehicle related purchases, Client should set each Card's Miscellaneous product category spending limit to zero dollars ($0). Fuelman assumes no responsibility for any unauthorized Miscellaneous purchases.
16.7 <u>Tax Reporting Limitations</u>. Fuelman calculates applicable taxes for Fuel. Applicable taxes for Maintenance and other non-Fuel purchases are dependent on the information provided to Fuelman by the applicable Merchant Location.
16.8 <u>Merchant Limitations</u>. The personnel (if any) at a Merchant Location are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by any of the Merchants or any other liability or damage which arises from the action or negligence of the personnel of any of the Merchants, their agents or their employees.
16.9 <u>POS Authorization Limitations</u>. Authorization controls are provided as a convenience to the Client and are not guaranteed to prevent unauthorized purchases. Specifically, depending on the particular point-of-sale (POS) equipment and Fuel dispenser controls being used by a particular Merchant Location, the product type and spending limit may not be enforceable prior to completing the Transaction. In these situations Fuelman will still be considered to be authorized, but will be identified as an exception on the Client's standard fleet management report and reported via email if desired by Client.
16.10 <u>Claims</u>. All claims for defective Fuel or Maintenance must be made to the Merchant operating the Merchant Location where the Fuel or Maintenance was purchased. Any claim for defective Fuel or Maintenance is waived by Client unless made in writing to Merchant, with a copy to Fuelman, within fifteen (15) days from the date of the purchase of the alleged defective Fuel or Maintenance giving rise to the claim. Fuelman will not accept any claims for defective Miscellaneous.

**17 Term and Termination.**
17.1 <u>Term</u>. The term of the Account shall be one (1) year from the date the Cards are issued to Client unless either party terminates the Account as provided in this Agreement. Thereafter, Fuelman will automatically renew

Client's Account for an additional one (1) year period. Either party may notify the other party notice of its intention not to renew the Account at least ninety (90) days before the effective date of Account at the expiration of any such one year renewal period, Fuelman, at its discretion, may issue replacement Cards to Client.
17.2 <u>Termination by Client</u>. Client may terminate Client's Account and its use of the Cards for any reason by providing written notice of such termination to Fuelman. Client remains obligated to pay for any and all transactions, balances, fees, and other amounts incurred up until midnight of the day Fuelman receives notice of such termination.
17.3 <u>Termination by Fuelman</u>. Fuelman may terminate Client's Account and its use of the Cards for any reason, including but not limited to, inactivity, failure to promptly pay any amounts due Fuelman, failure to use the Cards exclusively for business purposes, or Fuelman's decision to terminate the Fuelman Program. Fuelman will notify Client's Representative at the time of termination that the Client's Account or Card(s) will be terminated along with the reason(s) for such termination.
**18 Change In Ownership.** Client must notify Fuelman immediately in the event of any sale of a majority ownership of its equity, any sale of a majority of its assets, any merger, reorganization or other transaction which results in a change of ownership of Client. Fuelman may terminate the Account in its sole discretion upon any change of ownership.
**19 Contacts And Notices.**
19.1 <u>Fleet Contact</u>. The "Fleet Contact" listed on the Application is authorized to provide Fuelman the information necessary to establish Client's Account records and Cards, including, but not limited to vehicle, driver and card user related information. Fuelman is authorized to send all Account information and Client's Cards to the Fleet Contact's attention.
19.2 <u>Accounts Payable Contact</u>. The "Accounts Payable Contact" listed on the Application is authorized to provide Fuelman with payment information about payments on the Account. This contact may be the same person as the Fleet Contact and will be Fuelman's primary contact in the event that the Account becomes delinquent or exceeds the assigned Spend Limit.
19.3 <u>Notices</u>. Except as specified otherwise in this Agreement, all notices, requests, demand, or other communications required to be made pursuant to this Agreement shall be in writing and shall be given by mail by first class, certified or registered mail, postage prepaid, or by the sending by facsimile (with confirmation by mail to be provided by the party giving notice) or by reputable overnight delivery service (such as FEDEX or UPS) or by personal delivery to the recipient party, to the address indicated below for Fuelman and in the Application for Client. Fuelman may provide any such notice to Client by including the notice in the Statement provided to Client. A notice will be deemed received on the actual date of receipt. Fuelman's address for notices is: FUELMAN, P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service.
**20 Maximum Lawful Rate.** In no event shall any Finance Charges or other rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Client and Fuelman, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; <u>provided</u>, <u>however</u>, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, <u>ipso facto</u>, as of the date of this Agreement, Client is and shall be liable only for the payment of such maximum amount as allowed by law, and payment received from Client in excess of such legal maximum amount, whenever received, shall be applied to reduce the principal balance of the Obligations hereunder to the extent of such excess.
**21 Credit Reporting Agencies.** Client and Guarantor(s) authorize Fuelman to report to any commercial credit reporting agency, Client's or Guarantor's performance under this Agreement, including but not limited to Dunn & Bradstreet, Experian Business or Equifax Credit Information Services. If the Account is personally guaranteed by Fuelman reserves the right to report Account information to consumer credit reporting agencies, including but not limited to Equifax Credit Information Services, Experian and TransUnion. Client and Guarantor have the right to notify the consumer reporting agencies not to use its respective credit report in connection with a credit transaction it did not initiate. To do so, contact Equifax Credit Information Services, P.O. Box 740123, Atlanta, GA 30374-0123; Experian, P.O. Box 919 Allen, TX 75013; and TransUnion, P.O. Box 97328, Jackson, MS 39288-7328; or Client and Guarantor may notify all three agencies by calling 1-888-567-8688.
**22 Limitation of Liability.** FUELMAN WILL HAVE NO LIABILITY FOR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR INCIDENTAL DAMAGES OF ANY KIND, INCLUDING CLAIMS FOR LOSS OF PROFITS, WHETHER RESULTING DIRECTLY OR INDIRECTLY TO CLIENT, GUARANTOR, OR THIRD PARTIES, AND WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, EVEN IF SUCH DAMAGES WERE FORESEEABLE OR RESULT FROM A BREACH OF THIS AGREEMENT. IN THE EVENT A COURT IN A FINAL, NON-APPEALABLE AWARD FINDS FUELMAN LIABLE FOR ANY DIRECT DAMAGES, FUELMAN'S LIABILITY IN THE AGGREGATE FOR SUCH DIRECT DAMAGES WILL NOT EXCEED THE AMOUNT PAID OR PAYABLE BY CLIENT TO FUELMAN FOR THE MONTH PRECEDING THE DATE ON WHICH THE CLAIM AROSE.
**23 Indemnification.** To the maximum extent allowed by law, Client (the "Indemnitor") will indemnify and hold harmless Fuelman and its affiliates, directors, officers, employees, and agents (the "Indemnitees") from and against any and all third party claims, losses, damages, suits, fees, judgments, costs, and expenses (collectively referred to as "Claims"), including attorneys' fees incurred in responding to such Claims, that the Indemnitees may suffer or incur arising out of or in connection with (a) the Indemnitor's (or its employees' or agents') negligence, willful misconduct, or breach of any representation, warranty or other obligation under this Agreement; or (b) any personal injury (including death), damage to property, or environmental clean-up and related costs, resulting from the Indemnitor's or its employees' or agent's acts or omissions. The Indemnitees will give prompt notice of any Claim to the Indemnitor, who will defend the Indemnitees at the Indemnitees' request.
**24 Nondisclosure.** Fuelman may provide to Client access to confidential and proprietary information regarding Fuelman's business, business plans, pricing and reimbursement policies, and other issues ("Confidential Information."). Client will keep all Confidential Information in strict confidence and not disclose or use the Confidential Information during the term of this Agreement and for five (5) years thereafter, provided that for any Confidential Information deemed to be a "trade secret," Client shall protect and not disclose or use such Confidential Information for so long as such Confidential Information is will not disclose its terms except as permitted by Fuelman. Client will inform its employees and agents as to the confidential and proprietary nature of the Confidential Information to which they may be exposed and take all necessary actions to ensure that such employees and agents keep such information strictly confidential. Client will return any Confidential Information upon request from Fuelman. Client agrees that any disclosure of Confidential Information would cause irreparable harm for which monetary damages may not be a sufficient remedy, so Fuelman will be entitled to seek all remedies and damages available at law and in equity, including but not limited to injunctive relief, without the posting of a bond.
**25 Miscellaneous Provisions.**
25.1 <u>Governing Law; Waiver of Jury Trial; Binding Arbitration</u>. This Agreement will be governed by Louisiana law, without regard to its conflicts of laws principles. Many Account maintenance, treasury and accounting functions are performed by Fuelman in Louisiana, where it has a substantial presence.
Arbitration. Client or FleetCor may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between or among such parties relating to the Cards or Account, a prior related account, or the relationship of such parties, including without limitation claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision, and no matter what legal theory such claims are based on or what remedy (damages, or injunctive or declaratory relief) such claims seek (a "Claim"). To accommodate the right to arbitrate, Client agrees that it will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with FleetCor. The party filing for arbitration must choose one of the following arbitration firms and follow its rules and procedures for initiating (including paying the filing fee) and pursuing arbitration before a single neutral arbitrator: American Arbitration Association, National Arbitration Forum, or JAMS. All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. Claims must be brought in the name of an individual person or entity and must proceed on an (non-class, non-representative) basis.
Claims Covered
What Claims are subject to arbitration? All Claims relating to your Cards or Account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence,

statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims. A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding by any other party. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.
Whose Claims are subject to arbitration? Not only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy.
What time frame applies to Claims subject to arbitration? Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration.
Broadest interpretation. Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the "FAA").
What about Claims filed in Small Claims Court? Claims filed in a small claims court are not subject to arbitration, so long as the matter remains in such court and advances only an individual (non-class, non-representative) Claim.
How Arbitration Works
How does a party initiate arbitration? The party filing an arbitration must choose one of the following three arbitration firms and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association, JAMS, and National Arbitration Forum. Any arbitration hearing that you attend will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to your then current billing address, or at some other place to which you and we agree in writing. You may obtain copies of the current rules of each of the three arbitration firms and forms and instructions for initiating arbitration by contacting them as follows:
American Arbitration Association, 335 Madison Avenue, Floor 10, New York, NY 10017-4605 Web site: www.adr.org
JAMS, 1920 Main Street, Suite 300, Irvine, CA 92610 Web site: www.jamsadr.com
National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405 Web site: www.arbitration-forum.com
At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Even if a party fails to exercise these rights at any particular time, or in connection with any particular Claims, that party can still require arbitration at a later time or in connection with any other Claims.
What procedures and law are applicable in arbitration? A single, neutral arbitrator will resolve Claims. The arbitrator will be either a lawyer with at least ten years of experience or a retired or former judge, selected in accordance with the rules of the arbitration firm. The arbitration will follow procedures and rules of the arbitration firm in effect on the date the arbitration is filed unless those procedures and rules are inconsistent with this Agreement, in which case this Agreement will prevail. Those procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect Client account information and other confidential information if requested to do so by you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, will honor claims of privilege recognized at law, and will have the power to award to a party any damages or other relief provided for under applicable law. You or we may choose to have a hearing and be represented by counsel. The arbitrator will make any award in writing and, if requested by you or us, will provide a brief statement of the reasons for the award. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute.
Who pays? Whoever files the arbitration pays the initial filing fee. If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm. If you have paid the initial filing fee and you prevail, we will reimburse you for that fee. All fees will be allocated as provided by the rules of the arbitration firm and applicable law. However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for requiring us to do so, or if you ask us and we determine there is good reason for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.
Who can be a party? Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court. Claims, including assigned Claims, of two or more persons may not be joined or consolidated in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.
When is an arbitration award final? The arbitrator's award is final and binding on the parties unless a party appeals it in writing to the arbitration firm within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration firm. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is final and binding on the parties after fifteen days has passed. A final and binding award is subject to judicial review and enforcement as provided by the FAA or other applicable law.
Survival and Severability of Terms
This arbitration provision shall survive: (i) termination or changes in the Agreement, the account, or the relationship between you and us concerning the account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of your account, or any amounts owed on your account, to any other person or entity. If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. Any different agreement regarding arbitration must be agreed to in writing.
25.2 <u>Assignment</u>. Client will not assign, including by operation of law, this Agreement or any rights or obligation under this Agreement without the prior written consent of Fuelman. This Agreement, and any and all rights and obligations associated with the Agreement, may be assigned by Fuelman upon notice to Client. All of Fuelman's rights under this Agreement and subsequent amendments shall also apply to any assignee of this Agreement. This Agreement is binding on the parties to this Agreement and their respective successors and permitted assigns.
25.3 <u>Relationship of Parties</u>. Nothing in this Agreement will be construed to create a joint venture, partnership, employment, or agency relationship between the parties for any purpose.
25.4 <u>Force Majeure</u>. Except for payment obligations, neither party is liable for delays or failures in performance of any obligations under this Agreement due to a cause beyond its reasonable control.
25.5 <u>No Waiver</u>. No delay or omission by either party to exercise any right under this Agreement will impair or be construed as a waiver of such right. A waiver by any party of any breach or obligation will not be construed to be a waiver of any other breach or obligation. The party waiving its rights must sign all waivers. No waiver of any default, expressed or implied, made by either party hereto shall be binding upon the party making such waiver in the event of a subsequent default.
25.6 <u>Severability</u>. If any provision of this Agreement is declared invalid, illegal, or unenforceable, the validity of the remaining provisions will not be affected. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of this Agreement.
25.7 <u>Interpretation</u>. This Agreement will not be presumptively interpreted for or against any party by reason of that party having drafted or negotiated, or failed to draft or negotiate, all or any portion of any provision of this Agreement. The captions and headings included in this Agreement have been inserted for convenience only and may not be used in connection with the interpretation of this Agreement. Each party intends that this Agreement will not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the parties to this Agreement.

(111414)                                                                                                                                                                                                                                                                                                            FC3044

# EXHIBIT C



**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**
**FUELMAN FLEET CARD CLIENT AGREEMENT**
**TERMS AND CONDITIONS**

**1  Definitions.**
1.1  Account. "Account" shall mean the internal Fuelman account established for Client.
1.2  Agreement. "Agreement" shall mean this agreement comprised of the Application (if any), the Approval Letter (if any) and this document containing the Terms and Conditions.
1.3  Agreement Date. "Agreement Date" shall mean the date on which Fuelman accepts the Client's Application and issues one or more Cards for Client's Account.
1.4  Application. "Application" shall mean the application completed by Client in applying for the Account through Fuelman.
1.5  Approval Letter. "Approval Letter" shall mean the letter, if any, sent by Fuelman to Client that approves the Application and establishes the Account under these Terms and Conditions.
1.6  Bank Account. "Bank Account" shall mean any bank account that Client has designated on the Application or by written notice to Fuelman for electronic funds transfer, automated clearinghouse or other electronic transfer of money to pay amounts due for Client's Account.
1.7  Billing Cycle. "Billing Cycle" shall mean the period of time set forth in the Approval Letter or any subsequent notification for which Transactions will be accepted and a Statement for the Account will be provided.
1.8  Card or Cards. "Card" or "Cards" shall mean the Fuelman fleet card or cards issued to Client.
1.9  Cardholder. "Cardholder" shall mean the person presenting the Card to the Merchant to be used to purchase Fuel and/or Maintenance.
1.10  Client. "Client" shall mean the business entity identified in the Application.
1.11  Client's Representative. "Client's Representative" shall mean the person(s) identified as Client's representative on the Application.
1.12  Driver ID. "Driver ID" shall mean the personal identification number issued to the Client by Fuelman for use with a Card to authorize a particular Transaction.
1.13  Due Date. "Due Date" shall mean the date upon which payment from Client is due to Fuelman as stated on Fuelman's Statement to Client.
1.14  FleetCor. "FleetCor" shall mean FleetCor Technologies Operating Company, LLC, the company which owns the Accounts and in whose favor all Obligations, as defined in Section 10.3, of Client under this Agreement flow.
1.15  Fuelman. "Fuelman" shall mean Fuelman, the division of FleetCor administering the Card(s) and Account.
1.16  Fuel. "Fuel" shall mean any combustible material dispensed by volume that is purchased with a Card.
1.17  Guaranteed Obligations. "Guaranteed Obligations" shall have the meaning set forth in Section 10.4.
1.18  Guarantor(s). "Guarantor" shall mean the person(s) identified on the Application or a separate guaranty document, if any, that guarantees Client will comply with this Agreement and pay all amounts owed to Fuelman.
1.19  Maintenance. "Maintenance" shall mean any non-Fuel product or service for a vehicle that is purchased with a Card (e.g., oil, wiper blades, fluids, towing, roadside assistance, parts, supplies, tires, oil changes, brakes, glass, exhaust systems, transmissions, and repair services).
1.20  Merchant. "Merchant" shall mean a third party that operates retail locations providing Fuel and/or Maintenance in the Fuelman network.
1.21  Merchant Location. "Merchant Location" shall mean a Merchant's Fuel and/or Maintenance site that is participating in the Fuelman network, such that a Card may be used to purchase Fuel and/or Maintenance at such site.
1.22  Miscellaneous. "Miscellaneous" shall mean any non-vehicle related product or service that is purchased with a Card (e.g., food, drink, magazines, cigarettes, lottery tickets).
1.23  Principal. "Principal" shall mean the person identified on the Application, if any, who applies for the Account as a co-maker with the Client.
1.24  Reporting. "Reporting" shall mean related products or services that are purchased to manage the vehicle fleet (e.g., paper report delivery, fax report delivery).
1.25  Statement. "Statement" shall mean the billing statement provided at the end of each Billing Cycle.
1.26  Terms and Conditions. "Terms and Conditions" shall mean the terms and conditions contained in the Agreement and any other electronic or paper document presented to the Client by or on behalf of Fuelman in connection with this Agreement (e.g. the physical card, driver instructions, site guides, reports, billing/statement inserts, Application, and web site). In the event of a conflict between any such other document and this Agreement, this Agreement will control unless specifically provided otherwise in the other document.
1.27  Transaction. "Transaction" shall mean any individual purchase with a Card.

**2  General.**
2.1  Agreement for Account and Services. Client and, if applicable, Principal or Guarantor, shall submit an Application to signify Client's application for an Account with Fuelman. If Fuelman accepts such Application, Fuelman shall send an Approval Letter and these Terms and Conditions to Client's Representative along with Cards and Driver IDs issued for the Account. Upon Client's first use of a Card, Client will be deemed to have accepted the Approval Letter and these Terms and Conditions and Client and Fuelman shall be deemed to have entered into this Agreement. If a Guarantor also submits the Application or a separate guaranty then Client and Guarantor shall both be responsible for all payments owed to Fuelman hereunder and for compliance by Client with these Terms and Conditions. If a Principal jointly submits the Application with Client, then Client and Principal are jointly and severally responsible for all payments owed by Client hereunder and for compliance with these Terms and Conditions.
2.2  Entire Agreement. These Terms and Conditions, together with the Application (if any) and the Approval Letter (if any), are the exclusive statement of the terms and conditions with respect to their subject matter as of the Agreement Date and supersede all prior agreements, negotiations, representations and proposals, whether written or oral. Deviations from this Agreement are not valid unless confirmed in writing by an authorized representative of Fuelman.

**3  Account Administration and Card Issuance.**
3.1  Establishment of Client Account. Upon issuance of the Cards, Fuelman will establish an Account for Client that will be used to pay for Fuel, Maintenance and Miscellaneous items purchased through the use of the Cards at Merchant Locations. For the purpose of determining Client's domicile, Client acknowledges and agrees that its domicile shall be the state reflected in the Client's mailing address as reflected on the Client's Statement.
3.2  Government Regulation. Neither Client nor any Guarantor of the Account shall (a) be or become at any time, and are not currently, subject to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Fuelman from making any advance or extension of credit to Client or any Guarantor of the Account or from otherwise conducting business with Client or any Guarantor of the Account, or (b) fail to provide documentary and other evidence of Client's identity or any Guarantor of the Account or person to whom Client gives a Card, as may be requested by Fuelman at any time to enable Fuelman to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.
3.3  Spend Limit. Upon Fuelman's approval of the Cards issued to Client under the Account (the "Spend Limit") based on Fuelman's evaluation of the Client's creditworthiness. Fuelman reserves the right to increase or decrease this Spend Limit at any time with or without providing notice to Client. Fuelman may decide, at its own discretion, to decline or approve any transactions made after the Client exceeds the Account Spend Limit, or to lock the Account until the balance due is paid in full. Fuelman reserves the right to charge an Over Limit Fee of up to fifty dollars ($50.00) per Over Limit transaction authorized.
3.4  Initial Cards. Upon Fuelman's approval of Client's Application, Fuelman will issue one or more Cards and Driver ID numbers to Client. Client shall be responsible for distributing the Cards and Driver IDs to its employees or agents.
3.5  Additional Cards. If, at some time after the initial issuance of Cards to Client, Client desires one or more additional Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer service. Fuelman reserves the right to charge a fee of up to five dollars ($5.00) for creating and delivering each additional Card.
3.6  Replacement Cards. If Client desires one or more replacement Cards, including, but not limited to replacing lost or damaged Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service. Fuelman reserves the right to charge a fee of up to five dollars ($5.00) for creating and

3.7  Administration of Cards. Client shall be solely responsible for Card distribution, Maintenance, management, security of the Cards and Driver IDs within Client's business, including, but not limited to, distributing Cards to and collecting Cards from, its employees and agents. Notwithstanding any other provision in this Agreement, Client is responsible for any loss or misuse of Cards by its employees and agents. See Section 16 for more information regarding Client responsibilities.
3.8  Administration of Account. Fuelman shall be responsible for collecting and reporting all Transactions by date, vehicle, Merchant Location, and driver based upon data received by Fuelman. In addition, Fuelman shall be responsible for maintaining the database for the Client with all Card numbers, vehicle data, driver data, and purchase control data. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) a month or a minimum of fifteen dollars ($15.00) per Billing Cycle for account administration.
3.9  Card Fees. Fuelman reserves the right to charge a service fee of up to ten dollars ($10.00) per Card per month to support the use of the Card.
3.10  Property. All Cards remain the property of Fuelman and shall be surrendered immediately by Client to Fuelman upon Fuelman's request or if Client or Fuelman cancels the Card or Account as permitted herein.
3.11  Inactive Cards. Fuelman reserves the right to charge a fee of up to three dollars and fifty cents ($3.50) per Billing Cycle for Cards that are inactive for seventy-five (75) or more days.
3.12  Cancellation of Cards. If, at any time, for any reason, Client desires to cancel any particular Card, but not the Account, Client's Representative must notify Fuelman via the online application or in writing of such cancellation. Client's liability for purchases made using the canceled Card shall end at midnight of the day that Fuelman receives notice of such Card cancellation.
3.13  Suspension of Cards. Fuelman, at its sole discretion, may suspend or terminate the use of any Card at any time for any reason, including, but not limited to, inactivity, unusual activity, or suspected loss, theft, fraud, or in compliance with the USA Patriot Act. However, nothing in this Agreement shall obligate Fuelman to monitor the use of any Card, and, as described in this Agreement, Client is solely responsible for the use of any outstanding Cards.
3.14  Suspension of Account. Fuelman, at its sole discretion, may suspend or terminate the use of an Account at any time for any reason, including, but not limited to, inactivity, unusual activity, change in creditworthiness, late payment (excessive days beyond terms), aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) over the Spend Limit or in compliance with the USA Patriot Act. Fuelman reserves the right to charge up to a fifty dollar ($50.00) fee for Account reinstatement each time a previously suspended Account is reinstated.
3.15  Non-Transferability; Revocability. All Cards and any and all rights and privileges to which its holders are entitled are not transferable and may be revoked for any reason, including but not limited to, a breach of any of the Terms and Conditions of this Agreement, without prior notice at any time and with no liability to Fuelman, at which time any credit extended hereunder shall be revoked and all sums owed by Client to Fuelman pursuant hereto shall become immediately due and payable.

**4  Services Provided.**
4.1  General Services. Fuelman shall provide the following services to Client under this Agreement:
4.1.1  Issue to Client the Cards upon Fuelman's approval of the Application.
4.1.2  Maintain a network of Merchant Locations for Fuel and Maintenance where Client may make purchases with Cards pursuant to this Agreement.
4.1.3  Provide an online directory to identify accepting Merchant Locations.
4.1.4  Maintain an authorization control system to verify that a Card being presented for payment is valid/active and that the Driver ID being used is valid/active for that particular Card. In addition, individual Card-level spending limits can be established by the Client for each product category (e.g., Fuel, Maintenance supplies, Maintenance services, Miscellaneous).
4.1.5  Issue management reports and billing Statements to Client showing details of all posted Card Transactions (as detailed in Section 11.2) during the Billing Cycle.
4.2  Referrals. Fuelman reserves the right to deliver informational material in reference to ancillary fleet management related products and services offered by other vendors to the Client. In no case is Fuelman making any representation about the quality or value of any particular product or service.
4.3  Ancillary Products and Services. Fuelman reserves the right to make certain ancillary fleet management related products and services (e.g., emergency roadside assistance) that are delivered by other vendors/companies available to the Client for purchase on Cards. For the purpose of reporting the Transactions, these ancillary products and services are considered Maintenance. The act of requesting the ancillary product or service with a valid Card and Driver ID, establishes approval for Fuelman to charge and collect the corresponding balance incurred by these ancillary products and services.
4.3.1  Roadside Assistance for Unattended Vehicles. Through an association with a third party, Fuelman may offer roadside assistance for vehicles, including towing services. The services may not be available for unattended vehicles. The personnel of any such third party provider are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by such third party, or for any other liability or damage which arises from the action or negligence of the personnel of the third party, its agents or its employees.
4.3.2  Additional Services. Client may be eligible for additional services from time to time. If Client is eligible for an additional service, Fuelman may enroll Account in the service. The terms and fees applicable to such service will be disclosed prior to enrollment. Client will have the opportunity to opt-out of enrollment in such service.
4.4  Inability to Operate. Fuelman shall have no responsibility for any person(s) or machine(s) rejection of or refusal to honor a Card. Client agrees there shall be no liability to Fuelman or any other company or entity, if for any reason any Merchant or Merchant Location should fail to allow the purchase of Fuel or Maintenance, fail to authorize Transaction(s) or fail to operate in any other manner, even though a Card is valid.
4.5  WARRANTY DISCLAIMER. FUELMAN DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. ALL FUELMAN ACCOUNTS, PRODUCTS, AND SERVICES ARE PROVIDED ON AN AS-IS BASIS.

**5  Purchases.**
5.1  Use of Cards. Client may use the Cards at any participating Merchant Location for the purchase of Fuel, Maintenance, or Miscellaneous items. To use a Card the Client should follow the directions for purchase established at the particular Merchant Location.
5.2  Title. As between Client and Fuelman, title to Fuel purchased with the Card passes from Fuelman to Client when the Cardholder dispenses Fuel (when fuel leaves the fuel dispensing nozzle), except as otherwise provided by applicable law. Title to any non-Fuel product or service purchased with the Card passes directly from the Merchant to Client when the Cardholder receives such non-Fuel product and/or service. Fuelman takes no title to Maintenance or Miscellaneous items.
5.3  Verification of Merchant Locations. Client acknowledges that not all retail locations selling Fuel and Maintenance accept Fuelman's Cards. If Client is uncertain as to whether a location is able to accept the Cards, Client should visit the online site locator at www.fuelman.com or contact Fuelman's 24x365 Authorization Center at 800-877-9013.

**6  Safety.**
6.1  Safe Fueling Operation. Client shall instruct all persons to whom Client provides a Card for purchasing Fuel in safe and proper fueling procedures. Client will ensure that everyone using a Card issued in the name of Client is instructed in applicable safety measures.
6.2  Safety Laws and Notices. Client shall comply, and Client shall cause its employees and agents to comply, with all applicable local, state, and federal laws and regulations pertaining to the dispensing and use of Fuel at Merchant Locations as well as all safety notices posted by Merchants.

**7  Representations and Warranties.** Client represents and warrants to Fuelman as of the date of the Application and on the date of each extension of credit under this Agreement that:
7.1.1  Client is duly organized, validly existing and in good standing under the laws of the state of its formation. Client has the power and authority to own its properties and to carry on its business as presently conducted and to execute and deliver, and enter and perform its obligations under this Agreement.
7.1.2  The execution, delivery and performance of this Agreement have been duly authorized by all necessary organizational action. This Agreement has been duly executed and delivered by Client and Guarantor, and constitutes the legal, valid and binding obligations of each such party, enforceable against such parties in accordance with their terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.
7.1.3  The execution, delivery and performance of this Agreement by Client and Guarantor will not violate any applicable law, rule or regulation or the charter, by-laws or other organizational documents of such parties or

7.1.4  All information furnished by Client to Fuelman in the Application, or otherwise, is true, correct and complete in all material respects.
7.1.5  Cards issued to Client will be used only by Client's employees and agents and will not be distributed or resold to other companies without the express written consent of Fuelman.
7.1.6  CLIENT WILL USE THE CARDS SOLELY FOR COMMERCIAL PURPOSES AND SHALL STRICTLY PROHIBIT ANY PERSONAL USE BY THE USERS OF ITS CARDS.

**8  Conditions To Extension Of Credit.** Any extension of credit under this Agreement shall be subject to, and conditioned upon, satisfaction of the following requirements:
8.1.1  Fuelman's receipt of a duly executed counterpart of the Application by Client and, if requested, the Guarantor, in form and substance acceptable to Fuelman in its sole discretion;
8.1.2  All representations and warranties set forth in this Agreement are true and correct;
8.1.3  No event shall have occurred and be continuing, or would result from the extension of credit hereunder, that constitutes or would constitute (with notice or the lapse of time or both) an Event of Default (defined below);
8.1.4  Outstanding amounts due, including any applicable fees as described in this Agreement, are paid by Due Date. Any amount not paid by the Due Date is subject to Late Fees (Section 10.7) and Finance Charges (Section 10.9).
8.1.5  After giving effect to any requested extension of credit, the aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) shall not exceed Client's Spend Limit, as determined by Fuelman from time to time in its sole discretion; and,
8.1.6  Receipt of any required Reserve Amount (as defined below) necessary to open the Client's Account.

**9  Pricing.**
9.1  Methodology. Fuelman establishes competitive local market Fuel and Maintenance Transaction prices for the Fuelman Fleet Card program depending on a variety of factors (e.g., product costs, purchase volume, market conditions). Transaction pricing can be Merchant Retail-Based, Merchant National Account-Based, Fuelman Cost-Based or a combination thereof. The pricing methodology can vary by product type and is disclosed to Client in the Application, Approval Letter, and/or subsequent written notification. Additional charges/fees and/or discounts may apply based on the Client's agreed-upon program.
9.2  Merchant Retail-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to the prevailing Merchant Location's retail price plus or minus a fixed adjustment factor but never below Fuelman cost. In the event there is no established retail price (e.g., unattended fueling sites, mobile refueling), the retail price will be established by Fuelman.
9.3  Merchant National Account-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to the Merchant's prevailing national account price.
9.4  Fuelman Cost-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to Fuelman's delivered cost plus a mark-up. Fuelman's cost is dependent on a variety of factors and can include any or all of the following components: wholesale cost; merchant freight; dealer adjustment; network operation costs, merchant commission; and applicable taxes. Under no circumstance will Client's price be below Fuelman's cost.
9.5  Special Network Pricing. Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or two dollars fifty cents ($2.50) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.
9.6  Universal Pricing. Client price for each Fuel or Maintenance Transaction is equal to an index price established by surveying a subset of transactions in the fueling area. This index price can vary from posted retail price and may include a mark-up, but will never be below Fuelman cost. The markup and index calculation basis may vary by region and can change at any time.
9.7  Level 2 Pricing. Fuelman may deem the Client to be High Credit Risk Account and reserves the right to invoke Level 2 Pricing in the event that the Client's Commercial and/or Consumer Credit Score as reported by a credit reporting agency utilized at Fuelman's discretion is below Fuelman's standard threshold for creditworthiness (this threshold is five hundred and twenty (520) for commercial credit scores and six hundred and sixty (660) for individual credit scores), or the score drops by fifty-one (51) points or more in any 3 month rolling period, or the Client incurs more than one late fee in any 12-month rolling period, or is 10 or 30 days or more delinquent in any 12-month rolling period, or makes a payment that is not honored by Customer's bank, or the Client operates in the trucking or transportation industry. Level 2 Pricing is an incremental charge above Client's current pricing and the maximum increase is twenty cents ($0.20) per gallon purchased. Level 2 Pricing remains in effect until such time that Client is no longer considered High Credit Risk Account. Fuelman will review each High Credit Risk Account at least once every three months for changes in creditworthiness. This decision is made solely by Fuelman based on information provided by the credit reporting agency along with the Account's payment history. The credit reporting agency does not participate in the decision. Client questions concerning their commercial and/or consumer credit scores should be directed to the applicable reporting agencies directly. D&B may be contacted at 800-234-3867 or by mail to Dun and Bradstreet Corporation, 103 JFK Parkway, Short Hills, NJ 07078. Equifax may be contacted at 800-727-8495 or at sbfe@equifax.com. Experian may be contacted at 888-397-3742 or online at www.experian.com/reportaccess.
9.8  Minimum Program Administration Fee. Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may charge a Minimum Program Administration Fee of up to 10 cents per gallon or $2 per transaction to cover ongoing program operation costs.
9.9  Rebate/Volume Discount. Fuelman may provide rebate or volume discount off retail price for fuel and nonfuel purchases under certain customer pricing. Such rebate or volume discount could be at transaction level or as separate credit. The rebate program, if applicable to the Client, is only available if the Account is open, in good standing, and is not in default of the payment terms provided within these card client agreement terms and conditions. Please refer to the account pricing documentation for specifics regarding the rebate program detail. Aviation purchases, bulk fuel purchases, international fuel purchases, transactions at non-qualified and no-show merchants, and any account in default of the payment terms provided within these card client agreement terms and conditions are excluded from the rebate program. Fuelman reserves the right to charge a Rebate Program Fee of up to ten dollars ($10.00) per card per billing cycle. Fuelman also reserves the right to change or terminate the rebate program at any time and in any manner with prior notice. Changes may include, among other things, changing the benefits, imposing additional restrictions, or terminating the program. In addition, reserve the right to remove any account from the rebate program in the event of any fraud or abuse. Participation in the rebate program will be suspended if the account is suspended. Under circumstances where the previous month's average fuel price (defined as the U.S. Regular Gasoline Price by the U.S. Energy Information Administration) is below $3.25 dollar per gallon, we may change, suspend, or terminate this rebate program without notice.

**10  Billing & Payments**
10.1  Billing. Billing cycle is agreed upon with the Client during the Application and Account setup process. Client shall be responsible for all credit extended on the Account. This is not a revolving credit account. The total amount shown on each Account Statement is due and payable in full by the Due Date shown on the Statement. Unless otherwise agreed upon, the standard Due Date is ten (10) days after the date the Account Statement is created, regardless of the delivery method. Regardless of the delivery method selected, it shall be the obligation of the Client to notify Fuelman within five (5) business days of the end of each Billing Cycle if Client does not receive a Statement. If the Client does not receive a Statement and thus payment is not completed by the Due Date, Client is responsible for any Late Fees or Finance Charges.
10.2  Extended Terms Programs. Upon Client's request and subject to Fuelman approval, terms can be extended at an additional charge.
10.3  Payment. Client hereby unconditionally promises to pay Fuelman, in lawful money of the United States of America and in accordance with this Agreement, all outstanding Obligations (as defined below) which may, from time to time, be owing to Fuelman by Client. As used herein, "Obligations" shall mean all outstanding sums owing to Fuelman by Client, including, without limitation, reimbursement for petroleum products obtained through Fuelman, payments for any products or services obtained using the Card(s), and late interest, penalties, fees, report delivery, reporting, account charges, service charges, costs and expenses (including attorneys' fees) and all other obligations under this Agreement or otherwise. Client must pay all outstanding Obligations on the statement by the Due Date to avoid Late Fees and Finance Charges. Failure by Client to pay all amounts by the Due Date shall be a breach of the Terms and Conditions of this Agreement. Conforming payments received by 7:00 a.m. Eastern Time on a business day (Monday through Friday of each week, excluding banking holidays) will be credited to your Account as of the date received. Otherwise, payments will be credited to your Account as of the next business day. In the event your billing statement reflects a Due Date which falls on a day which is not a business day, your payment must be received by 7:00 a.m. Eastern Time on the preceding business day. If we do not receive your payment for the Amount Due by the Due Date, you may not be able to make any further purchases until such time that you pay the entire outstanding balance on the Account. We may change our

10.4  Guaranty. Guarantor hereby unconditionally and irrevocably guarantees to Fuelman and its successors, endorsees, transferees and assigns, the punctual payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations, now or hereafter owing, whether for principal, late interest, premiums, fees, expenses or otherwise (collectively, the "Guaranteed Obligations"). All payments by the Guarantor hereunder shall be made free and clear of and without deduction for any set-off, counterclaim, or withholding. Guarantor acknowledges and agrees that this is a guaranty of payment when due, and not of collection, and Guarantor agrees that his obligations under this Agreement shall not be discharged until the payment and performance, in full, of the Guaranteed Obligations. Guarantor shall be required, and shall be in the same position, as Client with respect to the payment of the Guaranteed Obligations. Guarantor expressly waives all rights he may now or in the future have under any statute, or at common law, or at law or in equity, or otherwise, to compel Fuelman to proceed in respect of the Guaranteed Obligations against Client or any other party before proceeding against, or as a condition to proceeding against, Guarantor. Guarantor acknowledges and agrees that any delay or failure by Fuelman to take any action regarding the Guaranteed Obligations does not limit or prohibit Fuelman from enforcing its rights under this Agreement and further that Guarantor's liability under this Agreement shall not be eliminated or reduced by any such failure or delay on the part of Fuelman. Guarantor further expressly waives and agrees not to assert or take advantage of any defense based upon the failure of Fuelman in respect of the Guaranteed Obligations against Client or any other party for the payment and Guaranteed Obligations." Guarantor agrees that any notice or directive given at any time by any person to Fuelman which is inconsistent with the waivers in the preceding two sentences shall be null and void and may be ignored by Fuelman. Guarantor further hereby waives diligence, presentment and demand (whether for non-payment or protest) or notice of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations (including, without limitation, composition, the amount of, or the terms of, the Guaranteed Obligations), notice of material adverse change in Client's financial condition or any other fact which might materially increase the risk to Guarantor with respect to any of the Guaranteed Obligations or all other demands whatsoever and waives the benefit of all provisions of law which are or might be in conflict with the terms of this Agreement. Guarantor represents, warrants and agrees that Guarantor's obligations under this Agreement are not and shall not be subject to any counterclaims, offsets or defenses of any kind against Fuelman or Client now existing or which may arise in the future. The Guarantor further agrees that the Guaranteed Obligations may be amended, modified, increased, extended or renewed, in whole or in part, without notice to or further assent from Guarantor, and that, Guarantor will remain bound upon its guaranty notwithstanding any amendment, modification, increase, extension or renewal of any guaranteed Obligation. The foregoing waivers are of the essence of the transaction contemplated by this Agreement and, but for the guaranty contained herein and such waivers, Fuelman would decline to make the financial accommodations to Client under this Agreement. Each Guarantor is liable on a joint and several basis with Client and each other Guarantor.
10.4.1  Account Principal Responsibility. Each Principal for this Account, if any, as shown on the Application, is personally and unconditionally, jointly and severally liable with Client, as principal and not as surety or guarantor, for the payment and performance when due of all obligations owed on the Account, regardless of who made purchases using the Cards, and the Principal agrees to pay such amounts according to the terms of this Agreement. Principal is responsible under this Agreement for all use of all of the Cards issued on the Account to the fullest extent permitted by law.
10.5  Payment Methods. The following terms shall apply to each of following payment methods.
10.5.1  Client Check. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by valid check equal to the accumulated balance of the Account for the previous Billing Cycle. The client is required to note the Account number or Statement (BG) number on the check. If the matching Statement Remit To coupon is not included with payment, Fuelman reserves the right to charge an Exception Handling Fee of ten dollars ($10.00) for processing the payment. Fuelman reserves the right to charge a Check Processing Fee of fifteen dollars ($15.00) per check payment. If insufficient funds are available in the Account to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.
10.5.2  Client Initiated Online Payment. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by online method equal to the accumulated balance of the Account for the previous Billing Cycle. If insufficient funds are available on the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.
10.5.3  Pay by Phone. By the Due Date, Fuelman will initiate, at Client's request, payment by phone either through Customer Service Representative or Interactive Voice Response (IVR) system. Fuelman reserves the right to charge a fee up to thirty dollars ($30.00) for processing each Pay by Phone payment using either methods.
10.5.4  Fuelman Initiated Credit Card Charge. Prior to the Due Date specified on Fuelman's Statement to Client, Fuelman will initiate a charge to the Client's credit card on file to pay the accumulated balance of the Account from the previous Billing Cycle. Fuelman may also charge the credit card to pay the amount charged to the Account any time the balance of the Account reaches the Spend Limit. The exact time that the credit card will be charged for the amount due on the Account may vary, depending on the processing capabilities of the bank at which the Client's credit card exists. If insufficient funds are available on the credit card to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and debiting cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a credit card convenience fee up to three percent (3%) of the payment amount.
10.5.5  Fuelman Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment.
10.5.5.1  Debits to Bank Account. On the Due Date identified on the Client's Statement, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous Billing Cycle. For daily billed Client, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous business day. Fuelman may also debit the Bank Account to pay the amount charged to the Account any time the balance of the Account reaches the Spend Limit. The exact time that the Bank Account will be debited for the amount charged to the Account may vary, depending on the processing capabilities of the bank at which the Bank Account exists. If insufficient funds are available in the Bank Account to pay the Account balance at the time a debit is initiated, Fuelman may prevent the Client from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and debiting cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a bank handling fee of up to twenty five dollars ($25.00) per debit of the Client's Bank Account.
10.5.5.2  Change in Bank Account. To change the Bank Account, Client's Representative must provide a written request of such change to Fuelman. The request should include the following information for the new account: bank name (the bank must be a member of the National Automated Clearinghouse Association (NACHA); branch address; branch number; bank routing number; and account number. The request should also contain a voided check from the new account. It will take approximately ten or more days for Fuelman to change the account. During this time, Client agrees to cooperate with Fuelman to provide additional information necessary to make the change and to execute a test of the change.
10.5.6  Client Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment. Prior to the Due Date, Client will initiate a credit to Fuelman's bank account to pay the accumulated balance of the Client Account from the previous Billing Cycle after notifying and obtaining approval from a Fuelman Customer Service representative to do so. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) for processing each Client initiated EFT/ACH.
10.5.7  On Account. Fuelman may offer Client the ability to pay in advance for its Fuel purchases. The Account will be debited for each purchase. The Account will be replenished by EFT with the amount equal to the prior week's Statement amount. Fuelman may charge a fee up to twenty-five dollars ($25.00) for the Client's replenishing of the Account. A Dormancy Fee of thirty dollars ($30.00) per Billing Cycle will be charged after one hundred eighty days (180) days of inactivity, where allowed by applicable law. Residual Account credit balances will be returned upon written request. Escheatment laws, where applicable, will be followed.
10.6  Applying Payments. Fuelman uses a "balance-forward" accounting system. Therefore, all payments made by Client to Fuelman will be applied accordingly against the outstanding amount due at the time the payment is received. Subject to applicable law, we will apply and allocate payments and credits among balances owed by Client (whether for purchases, fees, late interest, or otherwise) in any order and manner determined by Fuelman in its sole discretion. Client agrees that Fuelman has the unconditional right to exercise this discretion in a way that is most favorable or convenient to Fuelman.
10.7  Late Payments. All payments made by Client to Fuelman that are not received by the Due Date are considered late. Fuelman reserves the right to charge 9.99% of the New Balance (defined below) with a minimum of seventy five dollars ($75.00) for each late payment, not to exceed the maximum rate allowable by applicable

law. To determine the New Balance for the purposes of late fees, Fuelman starts with the Amount Due on the statement for which the payment is late. Any purchases and other debits posted to the Account through the end date of the current (next succeeding) billing statement may be added to this. Appropriate finance charges or late interest charges and fees are added and other applicable adjustments made.

10.8  Annual Percentage Rate. The Annual Percentage Rate for purchases is thirty two percent (32%), which corresponds to the daily periodic rate of 0.0877%, or the maximum amount allowed by applicable law, whichever is less. The daily periodic rate is the annual percentage rate divided by three hundred sixty-five (365).

10.9  Finance Charges. If Client's Statement is paid in full every Billing Cycle by the applicable Due Date, the Account will not incur Finance Charges. Finance Charges begin to accrue for each purchase as of the date the purchase is added to the Account. If a purchase is paid in full on the Amount Due shown on the Statement for a Billing Cycle is credited to Client's Account by the Due Date shown on that respective Statement, then Finance Charges will not accrue for purchases from that date on which payment in full of that Amount Due is credited to Client's Account, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (late interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement). In addition, Finance Charges will not accrue for purchases during a Billing Cycle if the Amount Due shown on the Statement for the prior Billing Cycle is zero ($0) or a credit balance, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (late interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement).

10.9.1 Periodic Finance Charges are calculated in two steps as follows: First, for each day of the Billing Cycle, Fuelman multiplies the daily balance by the applicable daily periodic rate.

10.9.2 Second, for each day of the prior Billing Cycle, Fuelman multiplies the daily balance for purchases made in that Billing Cycle by the same daily periodic rate. However, Fuelman does not do this second step if it received payment in full of the Amount Due on Client's previous billing Statement by the date the payment was due or if a periodic finance charge was already billed on that balance.

10.9.3 For finance charge calculation purposes, the Billing Cycle begins on the day after the Closing Date of the Statement and includes the following Closing Date. The number of days in the Billing Cycle may vary.

10.9.4 The daily balance is calculated by taking the beginning balance every day (which may include unpaid Finance Charges from previous Billing Cycles), adding any new transactions and any new fees, subtracting any credits or payments posted as of that day, and any other adjustments. Daily Periodic Finance Charges will be rounded to the nearest cent. Unless Fuelman elects to treat a later date, a new Transaction is added to the balance as of the Transaction date shown on Client's billing report. A credit balance is treated as a balance of zero.

10.10 Returned Payment. If a check, credit card charge, or EFT/ACH is returned or denied, Fuelman reserves the right to charge the lesser of fifty dollars ($50.00) Returned Payment Fee or the maximum amount allowable by applicable law for each occurrence. At our option, we will assess this fee the first time your check or payment is not honored even it is honored upon resubmission. Fuelman may also charge the applicable Late Fees and Finance Charges incurred if balance is not received by the Due Date due to returned payment.

10.11 Reserve Amount. Fuelman will notify Client of any reserve amount (the "Reserve Amount") necessary to open the Client's Account. The Reserve Amount will be paid to Fuelman by Client prior to using the Cards. Client shall continue paying Fuelman any amounts on any periodic Fuelman Statement by the Due Date. This Reserve Amount will be held by Fuelman and may be used to offset any amounts owed to Fuelman by Client whenever Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and the Account has been closed. In the Event of Default (defined below), the Reserve Amount will be applied to the Account as a payment on the Account. Any interest earned on the reserve balance in the Account will accrue to Fuelman.

As part of our credit reviews, Client may be required to provide a Reserve Amount to Fuelman to secure the full and faithful performance of all of Client's obligations. If required, Client understands that the credit line will be equal to an amount that is up to 80% of the Reserve Amount. Client understands that the credit line will not be activated for use until Fuelman has received confirmation from its bank that the security deposit funds are available for use. In the event Client defaults or otherwise fails to perform any obligation owed to Fuelman, Client authorizes Fuelman to use, without notice or demand, the Reserve Amount to satisfy any such default or obligation. Client represents that the Reserve Amount is made in the ordinary course of Client's business, and that the Reserve Amount is not a transfer made on account of any antecedent debt. No trust relationship is created between Fuelman and Client as a result of the Client's payment and Fuelman's acceptance of the security deposit. Client authorizes Fuelman to commingle the Reserve Amount with other Fuelman funds. After receiving a written request from Client, Fuelman may, but is not obligated to, reevaluate the necessity and the amount of the Reserve Amount. Client will provide Fuelman financial information requested to conduct its evaluation. Upon evidence of satisfactory improvement in Client's financial condition, Fuelman may determine, in its sole discretion, to return the Reserve Amount. Fuelman may also require an increase in the Reserve Amount at any time from time to time in order to continue the credit relationship between the parties. Fuelman will return the Reserve Amount to Client upon termination of the Account only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and full performance by Client its obligations to Fuelman.

**11  Reporting.**

11.1 Statements. Fuelman shall furnish Client with a Statement at the end of each Billing Cycle:
11.1.1 Information. The Statement will include the following information:
11.1.1.1 The Account number and other relevant billing information.
11.1.1.2 The previous unpaid charges.
11.1.1.3 The previous statement balance.
11.1.1.4 Any payments posted to the Account.
11.1.1.5 New charges and adjustments.
11.1.1.6 Amount Due.

11.2 Standard Fleet Management Report. Fuelman shall produce a standard fleet management report at the end of each Billing Cycle.
11.2.1.1 Information. The standard fleet management report will include the following information: The applicable fleet customer number. A single Client's Account can have multiple fleets (customer numbers) within it.
11.2.1.2 Any rebates, discounts, report delivery, reporting, account charges, Finance Charges, late interest, fees, and other charges posted to the Account.
11.2.1.3 Detail on each Transaction posted to the Client's Account during the Billing Cycle, including date, Merchant Location, vehicle based on the Card used, employee/driver based on the Driver ID used, product description based on the product type, quantity purchased, total purchase amount, and total applicable taxes.

11.3 Delivery Methods. Fuelman offers several different methods for delivering Statements and the standard fleet management report:
11.3.1 Via US Mail. Fuelman reserves the right to charge up to ten dollars ($10.00) for each mail delivery of each report. Client with failed fax and email deliveries will be charged the mail delivery rate for any resubmission of the reports via mail, performed at Fuelman's discretion.
11.3.2 Via Facsimile. Fuelman reserves the right to charge up to five dollars ($5.00) for each fax delivery of each report. Mailed resubmissions will be charged at the mail delivery rate described in Section 11.3.1.
11.3.3 Via eMail. Mailed resubmissions will be charged at the mail delivery rate described in Section 11.3.1.

11.4 Optional Fleet Management Reports. Fuelman produces a variety of optional fleet management reports, including YTD summaries, Maintenance-specific reports, driver-specific reports, and tax reports. Fuelman reserves the right to charge Client a fee of up to fifteen dollars ($15.00) for delivering each of these optional reports or up to one hundred dollars ($100.00) per quarter.

11.5 Tax Exempt Processing & Reporting. Qualified tax exempt Clients may be eligible to purchase Fuel from Fuelman tax-free at the point-of-sale. Fuelman reserves the right to charge a processing fee of up to one percent (1%) of the total purchases for this service except where prohibited by applicable law.

11.6 Multiple Report Copies. Fuelman will provide multiple copies of mailed reports upon request. Fuelman may charge up to five dollars ($5.00) per report copy.

**12  Change In Terms And Conditions.** Fuelman may change the Terms and Conditions of this Agreement at any time by giving Client written notice of such amendment. Guarantor agrees to be bound by such changes, if written notice is given to Client. Such changes will go into effect as outlined in the change notice. If permitted by applicable law, such changes will apply to existing balances as well as future purchases and balances. Any modification of or amendment to this Agreement will be delivered to Client through U.S. mail at the address Client provided to us and by periodically provides updates to Fuelman. All initial amendment notifications will be sent to Client in advance of the effective date thereof or earlier as required by law. Client shall be deemed to have accepted such amendments if continued use, after the effective date of the amendment, of any of the Card(s) issued to Client. Notwithstanding any of the foregoing provisions of this Section, Fuelman retains the right to change Spend Limits for the Account or to suspend, cancel, or terminate the Account or any Card

without other notice to Client or Guarantor. Client and Guarantor agree that Fuelman's authority to take such actions is a material consideration for Fuelman entering into this Agreement with Client.

**13  Events Of Default.** The occurrence of any of the following shall constitute an "Event of Default" hereunder:
13.1.1 Client shall fail to pay any principal, late interest, or other amount payable in respect of any Obligation when due;
13.1.2 Client shall fail to observe or perform any other covenant contained in this Agreement;
13.1.3 Any representation or warranty made by Client or Guarantor herein or in the Application proves untrue in any material respect as of the date of the making or furnishing thereof;
13.1.4 Either Client or Guarantor shall (i) make an assignment for the benefit of its creditors; (ii) admit in writing its inability to pay its debts as they become due; (iii) file a petition under any applicable insolvency, debtor relief or reorganization statute, including without limitation, the United States Bankruptcy Code; (iv) be subject to an involuntary petition under any applicable insolvency, debtor relief, or reorganization statute; (v) consent or consent to the appointment of any receiver, conservator, liquidating agent, or committee in any insolvency, readjustment of debts, marshaling of assets or liabilities, or similar proceedings of, or relating to Client or Guarantor, or any substantial portion of their assets; or (vi) take any corporate action for the purpose of effecting any of the foregoing; or
13.1.5 Guarantor shall terminate or contest the validity or enforceability of Guarantor's guaranty hereunder or Guarantor's payment hereunder shall be determined to be invalid or unenforceable for any reason.

**14  Remedies Upon Event Of Default.** Without limiting any other rights or remedies of Fuelman provided for elsewhere in this Agreement, or by applicable law, or in equity, or otherwise, upon or at any time after the occurrence of any Event of Default, Fuelman shall have and may exercise, at its election, from time to time, any and all rights and remedies available at law, in equity, or otherwise, including, without limitation, (i) declaring the entire unpaid balance of the Obligations hereunder or any part thereof immediately due and payable, whereupon it shall be due and payable; and (ii) demanding payment from the Guarantor.

**15  Dispute Resolution.**

15.1 Disputed Transactions. To dispute any Transaction on Client's Statement, Client must notify Fuelman in writing as set forth below within fifteen (15) days of the date of Client's Statement. Fuelman will promptly investigate the matter and respond to Client within sixty (60) days after receiving written notice. Notice should be sent to: FUELMAN, P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service. Fuelman shall not be responsible for and Client shall waive any discrepancies or disputes that Client does not report to Fuelman in writing within fifteen (15) days after the date of Client's Statement.

15.2 Disputed Transaction Notices. Client may report any dispute to Fuelman by telephone. However, telephone notice will not preserve Client's rights or otherwise serve as effective notice under this Agreement. Client must put in writing any dispute regarding a Transaction on Client's Statement. Client's letter must include the following information: name; Account number; date of the Statement; dollar amount and identification of the Transaction(s) in question; and any possible explanation of the error.

15.3 Dispute Resolution. The parties agree that they will work in good faith to resolve any disputes arising under this Agreement. If the dispute cannot be resolved by the parties, then at Fuelman's sole discretion, the dispute will be resolved by binding arbitration in Atlanta, Georgia in compliance with the American Arbitration Association's commercial arbitration rules or by litigation in accordance with Section 25.1. The foregoing does not prohibit either party from seeking injunctive relief without first complying with this Section. Client will reimburse Fuelman for all of its costs and expenses (including collections and attorney's fees and costs) incurred in connection with enforcing any of Fuelman's rights under this Agreement. To accommodate the right to arbitrate, Client agrees that Client will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with Fuelman.

**16  Security, Loss, Theft Or Unauthorized Use Of Card.**

16.1 General Security. Each Card can be programmed to only allow Fuel or both Fuel & Maintenance services such as oil changes, vehicle washes, etc. Typically each Transaction is authorized with the Card number, product code, quantity and driver's Driver ID across the proprietary Fuelman network to ensure that the purchase is authorized and limited to the product and quantity (e.g. gallons of Fuel or dollars of Maintenance) that have been pre-approved. This system also helps prevent unauthorized Driver IDs and stolen Cards from being used to make purchases. The product and quantity controls are subject to each Merchant Location's POS Authorization Limitations described in Section 16.9.

16.2 Fuelman's Liability. In the event an unauthorized Transaction occurs, subject to the limitations and client responsibilities explained in this Section 16, and in the event that the Account has been issued fewer than ten (10) Cards, Fuelman will assume full responsibility for those purchases. If the Account has been issued ten (10) or more Cards, Client assumes all liability and responsibility for unauthorized Transactions or Account activity.

16.3 Client's Responsibility. It is the responsibility of Client to ensure proper security controls are kept in place to protect the Cards and Driver IDs and that only authorized employees or agents of Client use them to make purchases. It is also the Client's responsibility to lock any inactive, misplaced, or stolen Cards and Driver IDs immediately. Client should use the online account application to lock Cards and Driver IDs instantly. Alternatively, the Client can contact Fuelman Customer Service during regular business hours via phone call with the requested change, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. All Transactions with a valid/unlocked Card number was used in conjunction with a valid/active Driver ID will be considered to be authorized Transactions in which Client is fully responsible for payment. It is also the Client's responsibility to review the standard fleet management reports and optional eMail exception alerts to identify potential purchasing discrepancies. Client should instruct its Cardholders to keep any record of their Driver ID separate from the vehicle's Card.

16.4 Lost or Stolen Cards. Client shall report all lost or stolen Cards to Fuelman immediately via phone call to Fuelman Customer Service identifying the Card number and such other details concerning the loss or theft of the Cards as are known by Client, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. Client shall be liable for all Transactions made by lost or stolen Cards until 24 hours after the time Fuelman receives Client's notice of such lost or stolen Cards. Client and Guarantor(s) agree to and acknowledge full liability for any losses resulting from any failure to report the loss or theft of Card(s) in accordance with the terms hereof.

16.5 Terminated Drivers. It is the Client's responsibility to lock a terminated driver's Driver ID as explained in Section 16.3.

16.6 Miscellaneous Product Purchase Limitations. In addition to the vehicle-related product categories (Fuel, Maintenance supplies, and Maintenance services) a Card can be allowed to purchase non-vehicle related items under the Miscellaneous product category. If a Client does not want to allow non-vehicle related purchases, Client should set each Card's Miscellaneous product category spending limit to zero dollars ($0). Fuelman assumes no responsibility for any unauthorized Miscellaneous purchases.

16.7 Tax Reporting Limitations. Fuelman calculates applicable taxes for Fuel. Applicable taxes for Maintenance and other non-Fuel purchases are dependent on the information provided to Fuelman by the applicable Merchant Location.

16.8 Merchant Limitations. The personnel (if any) at a Merchant Location are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by any of the Merchants or any other liability or damage which arises from the action or negligence of the personnel of any of the Merchants, their agents or their employees.

16.9 POS Authorization Limitations. Authorization controls are provided as a convenience to the Client and are not guaranteed to prevent unauthorized purchases. Specifically, depending on the particular point-of-sale (POS) equipment and Fuel dispenser controls being used by a particular Merchant Location, the product type and spending limit may not be enforceable prior to completing the Transaction. In these situations the Transaction will still be considered to be authorized, but will be identified as an exception on the Client's standard fleet management report and reported via email if desired by Client.

16.10 Claims. All claims for defective Fuel or Maintenance must be made to the Merchant operating the Merchant Location where such Fuel or Maintenance was purchased. Any claim for defective Fuel or Maintenance is waived by Client unless made in writing to Merchant, with a copy to Fuelman, within fifteen (15) days from the date of the purchase of the alleged defective Fuel or Maintenance giving rise to the claim. Fuelman will not accept any claims for defective Miscellaneous.

**17  Term and Termination.**

17.1 Term. The term of the Account shall be one (1) year from the date the Cards are issued to Client unless either party terminates the Account as provided in this Agreement. Thereafter, Fuelman will automatically renew Client's Account for additional one (1) year periods unless either Fuelman or Client gives the other party notice of intent not to renew at least thirty (30) days before its scheduled expiration date. At the outset of any such one year renewal period, Fuelman, at its discretion, may issue replacement Cards to Client.

17.2 Termination by Client. Client may terminate this Agreement at any time if Client fulfills all of its obligations by providing Fuelman with thirty (30) days written notice. Regardless of Client's termination obligation to pay for any and all transactions, balances, fees, and other amounts incurred up until midnight of the day Fuelman receives notice of such termination.

17.3 Termination by Fuelman. Fuelman may terminate Client's Account and its use of the Cards for any reason, including but not limited to, inactivity, failure to promptly pay any amounts due Fuelman, failure to use the Cards exclusively for business purposes, or Fuelman's decision to terminate the Fuelman Program. Fuelman will notify Client's Representative at the time of termination that the Client's Account or Card(s) will be terminated along with the reason(s) for such termination.

**18  Change In Ownership.** Client must notify Fuelman immediately in the event of any sale of a majority ownership of its equity, any sale of a majority of its assets, any merger, reorganization or other transaction which results in a change of ownership of Client. Fuelman may terminate the Account in its sole discretion upon any change of ownership.

**19  Contacts And Notices.**

19.1 Fleet Contact. The "Fleet Contact" listed on the Application is authorized to provide Fuelman with the information necessary to establish Client's Account records and Cards, including, but not limited to vehicle, driver and card user related information. Fuelman is authorized to send all Account information and Client's Cards to the Fleet Contact's attention.

19.2 Accounts Payable Contact. The "Accounts Payable Contact" listed on the Application is authorized to provide Fuelman with payment information about the payments on the Account. This contact may be the same person as the Fleet Contact and will be Fuelman's primary contact in the event that the Account becomes delinquent or exceeds the assigned Spend Limit.

19.3 Notices. Except as specified otherwise in this Agreement, all notices, requests, demand, or other communications required to be made pursuant to this Agreement shall be in writing and shall be given by mail by first class, certified or registered mail, postage prepaid, or by the sending by facsimile (with confirmation by mail to be provided by the party giving notice) or by reputable overnight delivery service (such as FEDEX or UPS) or by personal delivery to the recipient party, to the address indicated below for Fuelman and in the Application for Client. Fuelman may provide any such notice to Client by including the notice in the Statement provided to Client. A notice will be deemed received on the actual date of receipt. Fuelman's address for notices is: FUELMAN , P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service.

**20  Maximum Lawful Rate.** In no event shall any Finance Charges or other rates payable under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Client and Fuelman, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Client is and shall be liable only for the payment of such maximum amount as allowed by law, and payment received from Client in excess of such legal maximum amount, whenever received, shall be applied to reduce the principal balance of the Obligations hereunder to the extent of such excess.

**21  Credit Reporting Agencies.** Client and Guarantor(s) authorize Fuelman to report to any commercial credit reporting agency, Client's or Guarantor's performance under this Agreement, including but not limited to Dunn & Bradstreet, Experian Business or Equifax Credit Information Services. If the Account is personally guaranteed, Fuelman reserves the right to report Account information to consumer credit reporting agencies, including but not limited to Equifax Credit Information Services, Experian and TransUnion. Client and Guarantor have the right to notify the consumer reporting agencies not to use its respective credit report in connection with a credit transaction if do not initiate. To do so, contact Equifax Credit Information Services, P.O. Box 740123, Atlanta, GA 30374-0123; Experian, P.O. Box 919 Allen, TX 75013; and TransUnion, P.O. Box 97328, Jackson, MS 39288-7328; or Client and Guarantor may notify all three agencies by calling 1-888-567-8688

**22  Limitation of Liability.** FUELMAN WILL HAVE NO LIABILITY FOR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR INCIDENTAL DAMAGES OF ANY KIND, INCLUDING CLAIMS FOR LOSS OF PROFITS, WHETHER RESULTING DIRECTLY OR INDIRECTLY TO CLIENT, GUARANTOR, OR THIRD PARTIES, AND WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, EVEN IF SUCH DAMAGES WERE FORESEEABLE OR RESULT FROM A BREACH OF THIS AGREEMENT. IN THE EVENT A COURT IN A FINAL, NON-APPEALABLE AWARD FINDS FUELMAN LIABLE FOR ANY DIRECT DAMAGES, FUELMAN'S LIABILITY IN THE AGGREGATE FOR SUCH DIRECT DAMAGES WILL NOT EXCEED THE AMOUNT PAID OR PAYABLE BY CLIENT TO FUELMAN FOR THE MONTH PRECEDING THE DATE ON WHICH THE CLAIM AROSE.

**23  Indemnification.** To the maximum extent allowed by law, Client (the "Indemnitor") will indemnify and hold harmless Fuelman and its affiliates, directors, officers, employees, and agents (the "Indemnitees") from and against any and all third party claims, losses, damages, suits, costs, and expenses (collectively referred to as "Claims"), including attorneys' fees incurred in responding to such Claims, that the Indemnitees may suffer or incur arising out of or in connection with (a) the Indemnitor's or its employees' or agents' negligence, willful misconduct, or breach of any representation, warranty or other obligation under this Agreement; or (b) any personal injury (including death), damage to property, or environmental clean-up and related costs, resulting from the Indemnitor's or its employees' or agent's acts or omissions. The Indemnitees will give prompt notice of any Claim to the Indemnitor, who will defend the Indemnitees at the Indemnitees' request.

**24  Nondisclosure.** Fuelman may provide to Client access to confidential and proprietary information regarding Fuelman's business, business plans, pricing and reimbursement policies, and other issues ("Confidential Information."). Client will keep all Confidential Information in strict confidence and not disclose or use the Confidential Information except as permitted herein. If any portion of the Confidential Information is deemed to be a "trade secret," Client shall protect and not disclose or use such Confidential Information for so long as such Confidential Information is not disclose its terms except as permitted by Fuelman. Client will inform its employees and agents as to the confidential and proprietary nature of the Confidential Information to which they may be exposed and take all necessary actions to ensure that such employees and agents keep such information strictly confidential. Client will return any Confidential Information upon request from Fuelman. Client agrees that any disclosure of Confidential Information would cause irreparable harm for which monetary damages may not be a sufficient remedy, so Fuelman will be entitled to seek all remedies and damages available at law and in equity, including but not limited to injunctive relief, without the posting of a bond.

**25  Miscellaneous Provisions.**

25.1 Governing Law; Waiver of Jury Trial; Binding Arbitration. This Agreement will be governed by Louisiana law, without regard to its conflicts of laws principles. Many Account maintenance, treasury and accounting functions are performed by Fuelman in Louisiana, where it has a substantial presence.

Arbitration. Client or FleetCor may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between or among such parties relating to the Cards or Account, a prior related account, or the relationship of such parties, including without limitation claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision, and no matter what legal theory such claims are based on or what remedy (damages, or injunctive or declaratory relief) such claims seek (a "Claim"). To accommodate the right to arbitrate, Client agrees that it will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with FleetCor. The party filing for arbitration must choose one of the following arbitration firms and follow its rules and procedures for initiating (including paying the filing fee) and pursuing arbitration before a single neutral arbitrator: American Arbitration Association, National Arbitration Forum or JAMS. All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis.

Claims Covered

What Claims are subject to arbitration? All Claims relating to your Cards or Account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims. A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding

by any other party. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

Whose Claims are subject to arbitration? Not only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy.

What time frame applies to Claims subject to arbitration? Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration.

Broadest interpretation. Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the "FAA").

What about Claims filed in Small Claims Court? Claims filed in a small claims court are not subject to arbitration, so long as the matter remains in such court and advances only an individual (non-class, non-representative) Claim.

How Arbitration Works

How does a party initiate arbitration? The party filing an arbitration must choose one of the following three arbitration firms and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association, JAMS, and National Arbitration Forum. Any arbitration hearing that you attend will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to your then current billing address, or at some other place to which you and we agree in writing. You may obtain copies of the current rules of each of the three arbitration firms and forms and instructions for initiating arbitration by contacting them as follows:

American Arbitration Association, 335 Madison Avenue, Floor 10, New York, NY 10017-4605 Web site: www.adr.org

JAMS, 1920 Main Street, Suite 300, Irvine, CA 92610 Web site: www.jamsadr.com

National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405 Web site: www.arbitration-forum.com

At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Even if a party fails to exercise these rights at any particular time, or in connection with any particular Claims, that party can still require arbitration at a later time or in connection with any other Claims.

What procedures and law apply in arbitration? A single, neutral arbitrator will resolve Claims. The arbitrator will be either a lawyer with at least ten years of experience or a retired or former judge, selected in accordance with the rules of the arbitration firm. The arbitration will follow procedures and rules of the arbitration firm in effect on the date the arbitration is filed unless those procedures and rules are inconsistent with this Agreement, in which case this Agreement will prevail. These procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect Client account information and other confidential information if requested to do so by you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, will honor claims of privilege recognized at law, and will have the power to award to a party any damages or other relief provided for under applicable law. You or we may choose to have a hearing and be represented by counsel. The arbitrator will make any award in writing and, if requested by you or us, will provide a brief statement of the reasons for the award. An award at arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute.

Who pays? Whoever files the arbitration pays the initial filing fee. If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm. If you have paid the initial filing fee and you prevail, we will reimburse you for that fee. All fees will be allocated as provided by the rules of the arbitration firm and applicable law. However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for requiring us to do so, or if you ask us and we determine there is good reason for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

Who can be a party? Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court. Claims, including assigned Claims, of two or more persons may not be joined or consolidated in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

When is an arbitrator award final? The arbitrator's award is final and binding on the parties unless a party appeals it in writing to the arbitration firm within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration firm. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is final and binding on the parties after fifteen days has passed. A final and binding award is subject to judicial review and enforcement as provided by the FAA or other applicable law.

Survival and Severability of Terms

This arbitration provision shall survive: (i) termination or changes in the Agreement, the account, or the relationship between you and us concerning the account; (ii) the bankruptcy of any party; and (iii) any transfer, sale or assignment of your account, or any amounts owed on your account, to any other person or entity. If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. Any different agreement regarding arbitration must be agreed to in writing.

25.2 Assignment. Client will not assign, including by operation of law, this Agreement or any right or obligation under this Agreement without the prior written consent of Fuelman. This Agreement, and any and all rights and obligations associated with the Agreement, may be assigned by Fuelman without Client's consent. All of Fuelman's rights under this Agreement and subsequent amendments shall also apply to any assignee of this Agreement. This Agreement is binding on the parties to this Agreement and their respective successors and permitted assigns.

25.3 Relationship of Parties. Nothing in this Agreement will be construed to create a joint venture, partnership, employment, or agency relationship between the parties for any purpose.

25.4 Force Majeure. Except for payment obligations, neither party is liable for delays or failures in performance of any obligations under this Agreement due to a cause beyond its reasonable control.

25.5 No Waiver. No delay or omission by either party to exercise any right under this Agreement will impair or be construed as a waiver of such right. A waiver by any party of any breach or obligation will not be construed to be a waiver of any other breach or obligation. The party waiving its rights must sign all waivers. No waiver of any default, expressed or implied, made by either party hereto shall be binding upon the party making such waiver in the event of a subsequent default.

25.6 Severability. If any provision of this Agreement is declared invalid, illegal, or unenforceable, the validity of the remaining provisions will not be affected. Where possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of this Agreement.

25.7 Interpretation. This Agreement will not be presumptively interpreted for or against any party by reason of this Agreement. The captions and headings included in this Agreement have been inserted for convenience only and may not be used in connection with the interpretation of this Agreement. Each party intends that this Agreement will not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the parties to this Agreement.

(05232016)

FC3044

# EXHIBIT D



**FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC**
**FUELMAN FLEET CARD CLIENT AGREEMENT**
**TERMS AND CONDITIONS**

**1  Definitions.**

1.1  Account. "Account" shall mean the internal Fuelman account established for Client.

1.2  Agreement. "Agreement" shall mean this agreement comprised of the Application (if any), the Approval Letter (if any) and this document containing the Terms and Conditions.

1.3  Agreement Date. "Agreement Date" shall mean the date on which Fuelman accepts the Client's Application and issues one or more Cards for Client's Account.

1.4  Application. "Application" shall mean the application completed by Client in applying for the Account through Fuelman.

1.5  Approval Letter. "Approval Letter" shall mean the letter, if any, sent by Fuelman to Client that approves the Application and establishes the Account under these Terms and Conditions.

1.6  Bank Account. "Bank Account" shall mean any bank account that Client has designated on the Application or by written notice to Fuelman for electronic funds transfer, automated clearinghouse or other electronic transfer of money to pay amounts due for Client's Account.

1.7  Billing Cycle. "Billing Cycle" shall mean the period of time set forth in the Approval Letter or any subsequent notification for which Transactions will be accepted and a Statement for the Account will be provided.

1.8  Card or Cards. "Card" or "Cards" shall mean the Fuelman fleet card or cards issued to Client.

1.9  Cardholder. "Cardholder" shall mean the person presenting the Card to the Merchant to be used to purchase Fuel and/or Maintenance.

1.10  Client. "Client" shall mean the business entity identified in the Application.

1.11  Client's Representative. "Client's Representative" shall mean the person(s) identified as Client's representative on the Application.

1.12  Driver ID. "Driver ID" shall mean the personal identification number issued to the Client by Fuelman for use with a Card to authorize a particular Transaction.

1.13  Due Date. "Due Date" shall mean the date upon which payment from Client is due to Fuelman as stated on Fuelman's Statement to Client.

1.14  FleetCor. "FleetCor" shall mean FleetCor Technologies Operating Company, LLC, the company which owns the Accounts and in whose favor all Obligations, as defined in Section 10.3, of Client under this Agreement flow.

1.15  Fuelman. "Fuelman" shall mean Fuelman, the division of FleetCor administering the Card(s) and Account.

1.16  Fuel. "Fuel" shall mean any combustible material dispensed by volume that is purchased with a Card.

1.17  Guaranteed Obligations. "Guaranteed Obligations" shall have the meaning set forth in Section 10.4.

1.18  Guarantor(s). "Guarantor" shall mean the person(s) identified on the Application or a separate guaranty document, if any, that guarantees Client will comply with this Agreement and pay all amounts owed to Fuelman.

1.19  Maintenance. "Maintenance" shall mean any non-Fuel product or service for a vehicle that is purchased with a Card (e.g., oil, wiper blades, fluids, towing, roadside assistance, parts, supplies, tires, oil changes, brakes, glass, exhaust systems, transmissions, and repair services).

1.20  Merchant. "Merchant" shall mean a third party that operates retail locations providing Fuel and/or Maintenance in the Fuelman network.

1.21  Merchant Location. "Merchant Location" shall mean a Merchant's Fuel and/or Maintenance site that is participating in the Fuelman network, such that a Card may be used to purchase Fuel and/or Maintenance at such site.

1.22  Miscellaneous. "Miscellaneous" shall mean any non-vehicle related product or service that is purchased with a Card (e.g., food, drink, magazines, cigarettes, lottery tickets).

1.23  Principal. "Principal" shall mean the person identified on the Application, if any, who applies for the Account as a co-maker with the Client

1.24  Reporting. "Reporting" shall mean related products or services that are purchased to manage the vehicle fleet (e.g., paper report delivery, fax report delivery).

1.25  Statement. "Statement" shall mean the billing statement provided at the end of each Billing Cycle.

1.26  Terms and Conditions. "Terms and Conditions" shall mean the terms and conditions contained in the Agreement and any other electronic or paper document presented to the Client by or on behalf of Fuelman in connection with this Agreement (e.g. the physical card, driver instructions, site guides, reports, billing/statement inserts, Application, and web site). In the event of a conflict between any such other document and this Agreement, this Agreement will control unless specifically provided otherwise in the other document.

1.27  Transaction. "Transaction" shall mean any individual purchase with a Card.

**2  General.**

2.1  Agreement for Account and Services. Client and, if applicable, Principal or Guarantor, shall submit an Application to signify Client's application for an Account with Fuelman. If Fuelman accepts such Application, Fuelman shall send an Approval Letter until these Terms and Conditions, along with Cards and Driver IDs issued for the Account. Upon Client's first use of a Card, Client will be deemed to have accepted the Approval Letter and these Terms and Conditions and Client and Fuelman shall be deemed to have entered into this Agreement. If a Guarantor also submits the Application or a separate guaranty then Client and Guarantor shall both be responsible for all payments owed by Client hereunder and for compliance by Client with these Terms and Conditions. If a Principal jointly submits the Application with Client, then Client and Principal are jointly and severally responsible for all payments owed by Client hereunder and for compliance with these Terms and Conditions

2.2  Entire Agreement. These Terms and Conditions, together with the Application (if any) and the Approval Letter (if any), are the exclusive statement of the terms and conditions with respect to their subject matter as of the Agreement Date and supersede all prior agreements, negotiations, representations and proposals, whether written or oral. Deviations from the Agreement are not valid unless confirmed in writing by an authorized representative of Fuelman.

**3  Account Administration and Card Issuance.**

3.1  Establishment of Client Account. Upon issuance of the Cards, Fuelman will establish an Account for Client that will be used to pay for Fuel, Maintenance and Miscellaneous items purchased through the use of the Cards at Merchant Locations. For purpose of determining Client's domicile, Client acknowledges and agrees that its domicile shall be the state reflected in the Client's mailing address as reflected on the Client's Statement.

3.2  Government Regulation. Neither Client nor any Guarantor of the Account shall (a) be or become at any time, and are not currently, subject to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Fuelman from making any advance or extension of credit to Client or any Guarantor of the Account or from otherwise conducting business with Client or any Guarantor of the Account, or (b) fail to provide documentary and other evidence of Client's identity or the identity of any Guarantor of the Account or person to whom Client gives a Card, as may be requested by Fuelman at any time to enable Fuelman to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

3.3  Spend Limit. Upon Fuelman's approval of the Client's Application, Fuelman will establish an aggregate spending limit for all the Cards issued to Client under the Account (the "Spend Limit") based on Fuelman's evaluation of the Client's creditworthiness. Fuelman reserves the right to increase or decrease this Spend Limit at any time with or without providing notice to Client. Fuelman may decide, at its own discretion, to decline or approve any transactions made after the Client exceeds the Account Spend Limit, or to lock the Account until the balance due is paid in full.

3.4  Initial Cards. Upon Fuelman's approval of Client's Application, Fuelman will issue one or more Cards and Driver ID numbers to Client. Client shall be responsible for distributing the Cards and Driver IDs to its employees or agents.

3.5  Additional Cards. If, at some time after the initial issuance of Cards to Client, Client desires one or more additional Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service.

3.6  Replacement Cards. If Client desires one or more replacement Cards, including, but not limited to replacing lost or damaged Cards, Client must notify Fuelman via the online application or in writing or by calling Fuelman Customer Service.

3.7  Administration of Cards. Client shall be solely responsible for the use, maintenance, administration, and security of the Cards and any personal identification numbers, vehicle identification numbers, employee identification numbers or other information necessary to access your Account or to use any card issued on your Account, including, but not limited to, within your business or distributing cards to, and collecting cards from, your employees and agents. Client shall be solely responsible for monitoring transactions, statement balances, and receipts as well as reviewing and replying to any fraud alert notifications. Notwithstanding any other provision in this Agreement, Client shall be responsible for any loss or misuse of cards by your employees and agents or others who obtain possession or use of cards issued to you. See Section 16 for more information regarding Client responsibilities.

3.8  Account Administration Fee. Fuelman shall be responsible for collecting and reporting all Transactions by date, vehicle, Merchant location, and driver based upon data received by Fuelman. In addition, Fuelman shall be responsible for maintaining the database for the Client with all Card numbers, vehicle data, driver data, and purchase control data. Fuelman reserves the right to charge up to 10c per gallon or two dollars ($2.00) per transaction Minimum Program Administration Fee for ongoing program operation costs.

3.9  Card Fees. Fuelman reserves the right to charge a card fee of up to ten dollars ($10.00) per Card per month to support the use of the Card.

3.10  Property. All Cards remain the property of Fuelman and shall be surrendered immediately by Client to Fuelman upon Fuelman's request or if Client or Fuelman cancels the Card or Account as permitted herein.

3.11  Cancellation of Cards. If, at any time, for any reason, Client desires to cancel any particular Card, but not the Account, Client's Representative must notify Fuelman via the online application or in writing of such cancellation. Client's liability for purchases made using the canceled Card shall end at midnight of the day that Fuelman receives such notice and cancels the Card.

3.12  Suspension of Cards. Fuelman, at its sole discretion, may suspend or terminate the use of any Card at any time for any reason, including, but not limited to, inactivity, unusual activity, or suspected loss, theft, fraud, or in compliance with the USA Patriot Act. However, nothing in this Agreement shall obligate Fuelman to monitor the use of any Card, and, as described in this Agreement, Client is solely responsible for the use of any outstanding Cards.

3.13  Suspension of Account. Fuelman, at its sole discretion, may suspend or terminate the use of an Account at any time for any reason, including, but not limited to, inactivity, unusual activity, change in creditworthiness, late payment (excessive days beyond terms), aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) over the Spend Limit or in compliance with the USA Patriot Act.

3.14  Non-Transferability; Revocability. All Cards and any and all rights and privileges to which its holders are entitled are not transferable and may be revoked for any reason, including but not limited to, a breach of any of the Terms and Conditions of this Agreement, without prior notice at any time and with no liability to Fuelman, at which time any credit extended hereunder shall be revoked and all sums owed by Client to Fuelman pursuant hereto shall become immediately due and payable.

**4  Services Provided.**

4.1  General Services. Fuelman shall provide the following services to Client under this Agreement:

4.1.1  Issue to Client the Cards upon Fuelman's approval of the Application.

4.1.2  Maintain a network of Merchant Locations for Fuel and Maintenance where Client may make purchases with Cards pursuant to this Agreement.

4.1.3  Provide an online directory to identify accepting Merchant Locations.

4.1.4  Maintain an authorization control system to verify that a Card being presented for payment is valid/active and that the Driver ID being used is valid/active for that particular Card. In addition, individual Card-level spending limits can be established by the Client for each product category (e.g., Fuel, Maintenance supplies, Maintenance services, Miscellaneous).

4.1.5  Issue management reports and billing Statements to Client showing details of all posted Card Transactions (as detailed in Section 11.2) during the Billing Cycle.

4.2  Referrals. Fuelman reserves the right to deliver informational material in reference to ancillary fleet management related products and services provided by other vendors to the Client. In no case is Fuelman making any representation about the quality or value of any particular product or service.

4.3  Ancillary Products and Services. Fuelman reserves the right to make certain ancillary fleet management related products and services (e.g., emergency roadside assistance) that are delivered by other vendors/companies available to the Client for purchase on Cards. For the purpose of reporting the Transactions, these ancillary products and services are considered Maintenance. The act of requesting the ancillary product or service with a valid Card and Driver ID, establishes approval for Fuelman to charge and collect the corresponding balance incurred by these ancillary products and services.

4.3.1  Roadside Assistance for Unattended Vehicles. Through an association with a third party, Fuelman may offer roadside assistance for vehicles, including towing services. The services may not be available for unattended vehicles. The personnel of any such third party provider are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by such third party, or for any other liability or damage which arises from the action or negligence of the personnel of the third party, its agents or its employees.

4.3.2  Additional Services. Client may be eligible for additional services from time to time. If Client is eligible for an additional service, Fuelman may enroll Account in the service. The terms and fees applicable to such service will be disclosed prior to enrollment. Client will have the opportunity to opt-out of enrollment in such service.

4.4  Inability to Operate. Fuelman shall have no responsibility for any person(s) or machine(s) rejection of or refusal to honor a Card. Client agrees there shall be no liability to Fuelman or any other company or entity, if for any reason any Merchant or Merchant Location should fail to allow the purchase of Fuel or Maintenance, fail to authorize Transaction(s) or fail to operate in any other manner, even though a Card is valid.

4.5  WARRANTY DISCLAIMER. FUELMAN DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. ALL FUELMAN ACCOUNTS, PRODUCTS, AND SERVICES ARE PROVIDED ON AN AS-IS BASIS.

**5  Purchases.**

5.1  Use of Cards. Client may use the Cards at any participating Merchant Location for the purchase of Fuel, Maintenance, or Miscellaneous items. To use a Card, the Client should follow the directions for purchase established at the particular Merchant Location.

5.2  Title. As between Client and Fuelman, title to Fuel purchased with the Card passes from Fuelman to Client when the Cardholder dispenses Fuel (when fuel leaves the fuel dispensing nozzle), except as otherwise provided by applicable law. Title to any non-Fuel product or service purchased with the Card passes directly from the Merchant to Client when the Cardholder receives such non-Fuel product and/or service. Fuelman takes no title to Maintenance or Miscellaneous items.

5.3  Verification of Merchant Locations. Client acknowledges that not all retail locations selling Fuel and Maintenance accept Fuelman's Cards. If Client is uncertain as to whether a location is able to accept the Cards, Client should visit the online site locator at www.fuelman.com or contact Fuelman's 24x365 Authorization Center at 800-877-9013.

**6  Safety.**

6.1  Safe Fueling Operation. Client shall instruct all persons to whom Client provides a Card for purchasing Fuel in safe and proper fueling procedures. Client will ensure that everyone using a Card issued in the name of Client is instructed in applicable safety measures.

6.2  Safety Laws and Notices. Client shall comply, and Client shall cause its employees and agents to comply, with all applicable local, state, and federal laws and regulations pertaining to the dispensing and use of Fuel at Merchant Locations as well as all safety notices posted by Merchants.

**7  Representations and Warranties.** Client represents and warrants to Fuelman as of the date of the Application and on the date of each extension of credit under this Agreement that:

7.1.1  Client is duly organized, validly existing and in good standing under the laws of the state of its formation. Client has the power and authority to own its properties and to carry on its business as presently conducted and to execute and deliver, enter and perform its obligations under this Agreement.

7.1.2  The execution, delivery and performance of this Agreement have been duly authorized by all necessary organizational action. This Agreement has been duly executed and delivered by Client and Guarantor, and constitutes the legal, valid and binding obligations of each such party, enforceable against such parties in accordance with this Agreement, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

7.1.3  The execution, delivery and performance of this Agreement by Client and Guarantor will not violate any applicable law, rule or regulation or the charter, by-laws or other organizational documents of such parties or any judgment, order or ruling of any governmental authority.

7.1.4  The financial and other information furnished by Client and Guarantor to Fuelman in the Application, or otherwise, is true, correct and complete in all material respects.

7.1.5  Cards issued to Client will be used only by Client's employees and agents will not be distributed or resold to other companies without the express written consent of Fuelman.

7.1.6  CLIENT WILL USE THE CARDS SOLELY FOR COMMERCIAL PURPOSES AND SHALL STRICTLY PROHIBIT ANY PERSONAL USE BY THE USERS OF ITS CARDS.

**8  Conditions To Extension Of Credit.** Any extension of credit under this Agreement shall be subject to, and conditioned upon, satisfaction of the following requirements:

8.1.1  Fuelman's receipt of a duly executed counterpart of the Application by Client and, if requested, the Guarantor, in form and substance acceptable to Fuelman in its sole discretion;

8.1.2  All representations and warranties set forth in this Agreement are true and correct;

8.1.3  No event shall have occurred and be continuing, or would result from the extension of credit hereunder, that constitutes or would constitute (with notice or the lapse of time or both) an Event of Default (defined below);

8.1.4  Outstanding amounts due, including any applicable fees as described in this Agreement, are paid by Due Date. Any amount not paid by the Due Date is subject to Late Fees (Section 10.7) and Finance Charges (Section 10.9).

8.1.5  After giving effect to any requested extension of credit, the aggregate outstanding balance owing on the Account (outstanding Account balance and unbilled Transactions) shall not exceed Client's Spend Limit, as determined by Fuelman from time to time in its sole discretion; and,

8.1.6  Receipt of any required Reserve Amount (as defined below) necessary to open the Client's Account.

**9  Pricing.**

9.1  Methodology. Fuelman establishes competitive local market Fuel and Maintenance Transaction prices for the Fuelman Fleet Card program depending on a variety of factors (e.g., product costs, purchase volume, market conditions). Transaction pricing can be Merchant Retail-Based, Merchant National Account-Based, Fuelman Cost-Based or a combination thereof. The pricing methodology can vary by product type and is disclosed to Client in the Application, Approval Letter, and/or subsequent written notification. Additional charges/fees and/or discounts may apply based on the Client's agreed-upon program.

9.2  Merchant Retail-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to the prevailing Merchant Location's retail price plus or minus a fixed adjustment factor but never below Fuelman cost. In the event there is no established retail price (e.g., unattended fueling sites, mobile refueling), the retail price will be established by Fuelman.

9.3  Merchant National Account-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to the Merchant's prevailing national account

price.

9.4 Fuelman Cost-Based Pricing. Client price for each Fuel or Maintenance Transaction is equal to Fuelman's delivered cost plus a mark-up. Fuelman's cost is dependent on a variety of factors and can include any or all of the following components: wholesale cost; merchant freight; dealer adjustment; network operation costs, merchant commission; and applicable taxes. Under no circumstance will Client's price be below Fuelman's cost.

9.5 Special Network Pricing. Fuelman reserves the right to charge for the use of select sites/merchants. The added charge to use these sites will not exceed the greater of ten cents ($0.10) per gallon or three dollars ($3.00) per transaction. The list of select sites/merchants is available upon request by calling Fuelman Customer Service.

9.6 Universal Pricing. Client price for each Fuel or Maintenance Transaction is equal to an index price established by surveying a subset of transactions in the fueling area. This index can vary from posted retail price and may include a mark-up, but will never be below Fuelman cost. The markup and index calculation basis may vary by region and can change at any time.

9.7 High Credit Risk Account (Level 2 Pricing). Fuelman may deem the Client to be High Credit Risk Account and reserves the right to invoke Level 2 Pricing in the event that the Client's Commercial and/or Consumer Credit Score as reported by a credit reporting agency utilized at Fuelman's discretion is below Fuelman's standard threshold for creditworthiness (this threshold is five hundred and twenty (520) for commercial credit scores and six hundred and sixty (660) for individual credit scores), or the score drops by fifty-one (51) points or more in any 3 month rolling period, or the Client incurs more than one late fee in any 12-month rolling period, or is 30 days or more delinquent in any 12-month rolling period, or makes a payment that is not honored by Customer's bank. Level 2 Pricing is an incremental charge above Client's current pricing and the maximum increase is twenty cents ($0.20) per gallon purchased. Level 2 Pricing remains in effect until such time that Client is no longer considered High Credit Risk Account. Fuelman will review each High Credit Risk Account at least once every three months for changes in creditworthiness. This decision is made solely by Fuelman based on information provided by the credit reporting agency along with the Account's payment history. The credit reporting agency does not participate in the decision. Client questions concerning their commercial and/or consumer credit scores should be directed to the applicable reporting agencies directly. D&B may be contacted at 800-234-3867 or by mail to Dun and Bradstreet Corporation, 103 JFK Parkway, Short Hills, NJ 07078. Equifax may be contacted at 800-727-8495 or at sbfe@equifax.com. Experian may be contacted at 888-397-3742 or online at www.experian.com/reportaccess.

9.8 Rebate/Volume Discount. Fuelman may provide rebate or volume discount off retail price for fuel and nonfuel purchases under certain customer pricing. Such rebate or volume discount could be at transaction level or as separate credit. The rebate program, if applicable to the Client, is only available if the Account is open, in good standing, and is not in default of the payment terms provided within these card client agreement terms and conditions. Please refer to the account pricing documentation for specifics regarding the rebate program detail. Aviation purchases, bulk fuel purchases, international fuel purchases, transactions at non-qualifying gasoline merchants, and any account in default of the payment terms provided within these card client agreement terms and conditions are excluded from the rebate program. Fuelman also reserve the right to change or terminate the rebate program at any time and in any manner with prior notice. Changes may include, among other things, changing the benefits, imposing additional restrictions, or terminating the program. In addition, reserve the right to remove any account from the rebate program in the event of any fraud or abuse. Participation in the rebate program will be suspended if the account is suspended.

## 10 Billing & Payments.

10.1 Billing. Billing cycle is agreed upon with the Client during the Application and Account setup process. Client shall be responsible for all credit extended on the Account. This is not a revolving credit account. The total amount shown on each Account Statement is due and payable in full by the Due Date shown on the Statement. Unless otherwise agreed upon, the standard Due Date is ten (10) days after the date the Account Statement is created, regardless of the delivery method. Regardless of the delivery method selected, it shall be the obligation of the Client to notify Fuelman within five (5) business days of the end of each Billing Cycle if Client does not receive a Statement. If the Client does not receive a Statement and thus payment is not completed by the Due Date, Client is responsible for any Late Fees or Finance Charges.

10.2 Extended Terms Programs. Upon Client's request and subject to Fuelman approval, terms can be extended at an additional charge.

10.3 Payment. Client hereby unconditionally promises to pay Fuelman, in lawful money of the United States of America and in accordance with this Agreement, all outstanding Obligations (as defined below) which may, from time to time, be owing to Fuelman by Client. As used herein, "Obligations" shall mean all outstanding sums owing to Fuelman by Client, including, without limitation, reimbursement for petroleum products obtained through Fuelman, payments for any products or services obtained using the Card(s), and late interest, penalties, fees, report delivery, reporting, account charges, service charges, costs and expenses (including attorneys' fees) and all other obligations under this Agreement or otherwise. Client may not offset any outstanding Obligations against statement by the Due Date to avoid Late Fees and Finance Charges. Failure by Client to pay all amounts by the Due Date shall be a breach of the Terms and Conditions of this Agreement. Conforming payments received at lockbox facility address as displayed on Statement by 4:00 p.m. Eastern Time on a business day (Monday through Friday of each week, excluding banking holidays) will be credited to your Account as of the date received. To be considered a conforming payment, it must be recognized by the lockbox facility as "conforming" which includes, but is not limited to, the following criteria: a single check without check skirt; sent in the envelope provided by Fuelman with remittance coupon in the lower portion of the statement summary; one check per Account per Statement. Non-conforming payments will be credited to your Account as of the next business day. In the event your billing statement reflects a Due Date which falls on a day which is not a business day, your payment must be received by 4:00 p.m. Eastern Time on the preceding business day. If we do not receive your payment for the Amount Due by the Due Date, you may not be able to make any further purchases until such time that you pay the entire outstanding balance on the Account. We may change our billing and debiting cycle at any time by reflecting the change on your billing statement.

10.4 Guaranty. Guarantor hereby unconditionally and irrevocably guarantees to Fuelman and its successors, endorsees, transferees and assigns, the punctual payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations, now or hereafter owing, whether for principal, late interest, premiums, fees, expenses or otherwise (collectively, the "Guaranteed Obligations"). Any and all payments by the Guarantor hereunder shall be made free and clear of and without deduction for any set-off, counterclaim, or withholding. Guarantor acknowledges and agrees that this is a guaranty of payment when due, and not of collection, and Guarantor agrees that his obligations under this Agreement shall not be discharged until the payment and performance, in full, of the Guaranteed Obligations. Guarantor shall be regarded, and shall be in the same position, as Client with respect to the Guaranteed Obligations. Guarantor expressly waives all rights he may now or in the future have under any statute, or at common law, or at law or in equity, or otherwise, to compel Fuelman to proceed in respect of the Guaranteed Obligations against Client or any other party before proceeding against, or as a condition to proceeding against, Guarantor. Guarantor acknowledges and agrees that any delay or failure by Fuelman to take any action regarding the Guaranteed Obligations does not limit or prohibit Fuelman from enforcing its rights under this Agreement and further that Guarantor's liability under this Agreement shall not be eliminated or reduced by any such failure or delay on the part of Fuelman. Guarantor further expressly waives and agrees not to assert or take advantage of any defense based upon the failure of Fuelman in respect of the Guaranteed Obligations against Client or any other party for the payment and Guaranteed Obligations. Guarantor agrees that any notice or directive given at any time by any person to Fuelman which is inconsistent with the waivers in the preceding two sentences shall be null and void and may be ignored by Fuelman. Guarantor further hereby waives diligence, presentment and demand (whether for non-payment or protest) or notice of acceptance, maturity, extension of time, change in nature or form of the Guaranteed Obligations (including, without limitation, composition, the amount of, or the terms of, the Guaranteed Obligations), notice of material adverse change in Client's financial condition or any other fact which might materially increase the risk to Guarantor with respect to any of the Guaranteed Obligations or all other demands whatsoever and waives the benefit of all provisions of law which are or might be in conflict with the terms of this Agreement. Guarantor represents, warrants and agrees that Guarantor's obligations under this Agreement are and shall not be subject to any counterclaims, offsets or defenses of any kind against Fuelman or Client now existing or which may arise in the future. The Guarantor further agrees that the Guaranteed Obligations may be amended, modified, increased, extended or renewed, in whole or in part, without notice to or further assent from Guarantor, and that Guarantor will remain bound upon its guaranty notwithstanding any amendment, modification, increase, extension or renewal of any guaranteed Obligation. The foregoing waivers are of the essence of the transaction contemplated by this Agreement and, but for the guaranty contained herein and such waivers, Fuelman would decline to make the financial accommodations to Client under this Agreement. Each Guarantor is liable on a joint and several basis with Client and each other Guarantor.

10.4.1 Account Principal Responsibility. Each Principal for this Account, if any, as shown on the Application, is personally and unconditionally, jointly and severally liable with Client, as principal and not as surety or guarantor, for the payment and performance when due of all obligations owed on the Account, regardless of who made purchases using the Cards, and the Principal agrees to pay such amounts according to the terms of this Agreement. Principal is responsible under this Agreement for all use of all of the Cards issued on the Account to the fullest extent permitted by law.

10.5 Payment Methods. The following terms shall apply to each of following payment methods.

10.5.1 Client Check. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by valid check equal to the accumulated balance of the Account. Otherwise, Client must submit outstanding obligations. Fuelman reserves the right to charge an Exception Handling Fee of fifty dollars ($50.00) per occurrence for payments sent to any address other than the lockbox facility address as displayed on Statement. If insufficient funds are available in the Account to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account.

10.5.2 Client Initiated Online Payment. Prior to the Due Date specified on Fuelman's Statement to Client, Client will submit payment by online method equal to the accumulated balance of the Account for the previous Billing Cycle. If insufficient funds are available on the Account balance at the time a debit is initiated, at Fuelman's option, Client will not be able to make any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Payments made on FleetNet.net via CheckFree before 5:00 p.m. Eastern Time on a business day will be credited to Client's Account the next business day. Payment received on iFleet.com before 3:00 p.m. Eastern time on a business day will be credited to Client's Account as of the date received. Otherwise, online payments will be credited to Client's Account within the next 2 business days.

10.5.3 Pay by Phone. By the Due Date, Fuelman will initiate, at Client's request, payment by phone either through Customer Service Representative or Interactive Voice Response (IVR) system. Fuelman reserves the right to charge a fee of fifteen dollars ($15.00) for processing each Pay by Phone payment through IVR system and twenty-five dollars ($25.00) for processing each Pay by Phone Payment through Customer Service Representative. Payment by phone received by 2:00 p.m. Eastern Time on a business day will be credited to your Account as of the date received, otherwise pay by phone payments will be credited to Client's Account within the next 2 business days.

10.5.4 Fuelman Initiated Credit Card Charge. Prior to the Due Date specified on Fuelman's Statement to Client, Fuelman will initiate a charge to the Client's credit card on file to pay the accumulated balance of the Account from the previous Billing Cycle. Fuelman may also charge the credit card to pay the amount charged to the Account any time the balance of the Account reaches the Spend Limit. The exact time that the credit card will be charged for the amount due on the Account may vary, depending on the processing cycle. If insufficient funds are available on the credit card to pay the Account balance at the time a debit is initiated, at Fuelman's option, Client will be prevented from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and charge cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a credit card convenience fee up to three percent (3%) of the payment amount.

10.5.5 Fuelman Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH) Payment.

10.5.5.1 Debits to Bank Account. On the Due Date identified on the Client's Statement, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous Billing Cycle. For daily billed Client, Fuelman will initiate a debit to the Bank Account to pay the accumulated balance of the Account from the previous business day. Fuelman may also debit the Bank Account to pay the amount charged to the Account any time the balance of the Account reaches the Spend Limit. The exact time that the Bank Account will be debited for the amount charged to the Account may vary, depending on the processing capabilities of the bank at which the Bank Account exists. If insufficient funds are available in the Bank Account to pay the Account balance at the time a debit is initiated, Fuelman may prevent the Client from making any further purchases using the Cards until such time that the Client pays the outstanding balance in the Account. Fuelman may change its billing and debiting cycle at any time by providing written notice to Client. Fuelman reserves the right to charge a one-time set up fee up to fifty dollars ($50.00) per Account and a EFT/ACH bank handling fee of up to five dollars ($5.00) per debit of the Client's Bank Account.

10.5.5.2 Change in Bank Account. To change the Bank Account, Client's Representative must provide a written request of such change to Fuelman. The request should include the following information for the new account: bank name (the bank must be a member of the National Automated Clearinghouse Association (NACHA); branch address; branch number; bank routing number; and account number. The request should also contain a voided check from the new account. It will take approximately ten or more days for Fuelman to change the account. During this time, Client agrees to cooperate with Fuelman to provide additional information necessary to make the change and to execute a test of the change.

10.5.6 Client Initiated Electronic Funds Transfer / Automated Clearinghouse (EFT/ACH/Wire) Payment. Prior to the Due Date, Client will initiate a credit to Fuelman's bank account to pay the accumulated balance of the Client Account from the previous Billing Cycle after notifying and obtaining approval from a Fuelman Customer Service representative to do so. Fuelman reserves the right to charge a fee of up to fifty dollars ($50.00) for processing each Client initiated EFT/ACH/Wire payment.

10.5.7 On Account. Fuelman may offer Client the ability to pay in advance for its Fuel purchases. The Account will be debited for each purchase. The Account will be replenished by EFT with the amount equal to the prior week's Statement amount. Residual Account credit balances will be returned upon written request. Escheatment laws, where applicable, will be followed.

10.6 Applying Payments. Fuelman uses a "balance-forward" based accounting system. Therefore, all payments made by Client to Fuelman will be applied accordingly against the outstanding amount due at the time the payment is received. Subject to applicable law, we will apply and allocate payments and credits among balances owed by Client (whether for purchases, fees, late interest, or otherwise) in any order and manner determined by Fuelman in its sole discretion. Client agrees that Fuelman has the unconditional right to exercise this discretion in a way that is most favorable or convenient to Fuelman.

10.7 Late Payments. All payments made by Client to Fuelman that are not received by the Due Date are considered late. Fuelman reserves the right to charge 9.99% of the New Balance (defined below) with a minimum of seventy-five dollars ($75.00) for each late payment, not to exceed the maximum rate allowable by applicable law. To determine the New Balance for the purposes of late fees, Fuelman starts with the Amount Due on the statement for which the payment is late. Any purchases and other debits posted to the Account through the end date of the current (next succeeding) billing statement may be added to this. Appropriate finance charges or late interest charges and fees are added and other applicable adjustments made.

10.8 Annual Percentage Rate. The Annual Percentage Rate for purchases is thirty-two percent (32%), which corresponds to the daily periodic rate of 0.0877%, or the maximum amount allowed by applicable law, whichever is less. The daily periodic rate is the annual percentage rate divided by three hundred sixty-five (365).

10.9 Finance Charges. If Client's Statement is paid in full every Billing Cycle by the applicable Due Date, the Account will not incur Finance Charges. Finance Charges begin to accrue for each purchase as of the date the purchase is added to the Account. If payment in full of the Amount Due shown on the Statement for a Billing Cycle is credited to Client's Account by the Due Date shown on that respective Statement, then Finance Charges will not accrue for purchases from the date on which payment in full of that Amount Due is credited to Client's Account, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (late interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement). In addition, Finance Charges will not accrue for purchases during a Billing Cycle if the Amount Due shown on the Statement for the prior Billing Cycle is zero ($0) or a credit balance, provided the Amount Due of the next Statement attributable to such purchases is paid by the Due Date reflected in such next Statement (late interest due because Client does not pay in full the Amount Due of the next Statement will be reflected in the following Statement).

10.9.1 Periodic Finance Charges are calculated in two steps as follows: First, for each day of the Billing Cycle, Fuelman multiplies the daily balance by the applicable daily periodic rate.

10.9.2 Second, for each day of the prior Billing Cycle, Fuelman multiplies the daily balance for purchases made in that Billing Cycle by the same daily periodic rate. However, Fuelman does not do this second step if it received payment in full of the Amount Due on Client's previous billing Statement by the date the payment was due or if a periodic finance charge was already billed on that balance.

10.9.3 For finance charge calculation purposes, the Billing Cycle begins on the day after the Closing Date of the Statement and includes the following Closing Date. The number of days in the Billing Cycle may vary.

10.9.4 The daily balance is calculated by taking the beginning balance every day (which may include unpaid Finance Charges from previous Billing Cycles), adding any new transactions and any new fees, subtracting any credits or payments posted as of that day, and any other adjustments. Daily Periodic Finance Charges will be rounded to the nearest cent. Unless Fuelman elects to use a later date, a new Transaction is added to the balance as of the Transaction date shown on Client's billing report. A credit balance is treated as a balance of zero.

10.10 Returned Payment. If a check, credit card charge, or EFT/ACH is returned or denied, Fuelman reserves the right to charge the lesser of fifty dollars ($50.00) Returned Payment Fee or the maximum amount allowable by applicable law for each occurrence. At our option, we will assess this fee the first time your check or payment is not honored even it is honored upon resubmission. Fuelman may also charge the applicable Late Fees and Finance Charges incurred if balance is not received by Due Date due to returned payment.

10.11 Reserve Amount. Fuelman will notify Client of any reserve amount (the "Reserve Amount") necessary to open the Client's Account. The Reserve Amount will be paid to Fuelman by Client prior to using the Cards. Client shall continue paying Fuelman any amounts on any periodic Fuelman Statement by the Due Date. This Reserve Amount will be held by Fuelman and may be returned to Client only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and the Account has been closed. In the Event of Default (defined below), the Reserve Amount will be applied to the Account as a payment on the Account. Any interest earned on the reserve balance in the Account will accrue to Fuelman.

As part of our credit reviews, Client may be required to provide a Reserve Amount to Fuelman to secure the full and faithful performance of all of Client's

obligations. If required, Client understands that the credit line will be equal to an amount that is up to 80% of the Reserve Amount. Client understands that the credit line will not be activated for use until Fuelman has received confirmation from its bank that the security deposit funds are available for use. In the event Client defaults or otherwise fails to perform any obligation owed to Fuelman, Client authorizes Fuelman to use, without notice or demand, the Reserve Amount to satisfy any such default or obligation. Client represents that the Reserve Amount is made in the ordinary course of Client's business, and that the Reserve Amount is not a transfer made on account of any antecedent debt. No trust relationship is created between Fuelman and Client as a result of the Client's payment and Fuelman's acceptance of the security deposit. Client authorizes Fuelman to commingle the Reserve Amount with other Fuelman funds. After receiving a written request from Client, Fuelman may, but is not obligated to, reevaluate the necessity and the amount of the Reserve Amount. Client will provide Fuelman financial information requested to conduct its evaluation. Upon evidence of satisfactory improvement in Client's financial condition, Fuelman may determine, in its sole discretion, to return the Reserve Amount. Fuelman may also require an increase in the Reserve Amount at any time from time to time in order to continue the credit relationship between the parties. Fuelman will return the Reserve Amount to Client upon termination of the Account only after Client has satisfied all Obligations of the Account, the Card(s) have been returned to Fuelman and full performance by Client its obligations to Fuelman.

**11  Reporting.**
11.1 Statements. Fuelman shall furnish Client with a Statement at the end of each Billing Cycle.
11.1.1 Information. The Statement will include the following information:
11.1.1.1 The Account number and other relevant billing information.
11.1.1.2 The previous unpaid charges.
11.1.1.3 The previous statement balance.
11.1.1.4 Any payments posted to the Account.
11.1.1.5 New charges and adjustments.
11.1.1.6 Amount Due.
11.2 Standard Fleet Management Report. Fuelman shall produce a standard fleet management report at the end of each Billing Cycle.
11.2.1.1 Information. The standard fleet management report will include the following information: The applicable fleet customer number. A single Client's Account can have multiple fleets (customer numbers) within it.
11.2.1.2 Any rebates, discounts, report delivery, reporting, account charges, Finance Charges, late interest, fees, and other charges posted to the Account.
11.2.1.3 Detail on each Transaction posted to the Client's Account during the Billing Cycle, including date, Merchant Location, vehicle based on the Card used, employee/driver based on the Driver ID used, product description based on the product type, quantity purchased, total purchase amount, and total applicable taxes.
11.3 Delivery Methods. Fuelman offers several different methods for delivering Statements and the standard fleet management report: Via US Mail: Fuelman reserves the right to charge up to ten dollars ($10.00) for each mail delivery of each report. Client with failed fax and email deliveries will be charged the mail delivery rate for any resubmission of the reports via mail, performed at Fuelman's discretion. Via eMail: Mailed resubmissions will be charged at the mail delivery rate described above.
11.4 Optional Fleet Management Reports. Fuelman produces a variety of optional fleet management reports, including YTD summaries, Maintenance-specific reports, driver-specific reports, and tax reports. Fuelman reserves the right to charge Client a fee of up to fifteen dollars ($15.00) per report or up to one hundred dollars ($100.00) per quarter for delivering each of these optional reports.
11.5 Tax Exempt Processing & Reporting. Qualified tax exempt Clients may be eligible to purchase Fuel from Fuelman tax-free at the point-of-sale. Fuelman reserves the right to charge a processing fee of up to one percent (1%) of the total purchases for this service except where prohibited by applicable law.
11.6 Multiple Report Copies. Fuelman will provide multiple copies of mailed reports upon request.
**12 Change In Terms And Conditions.** Fuelman may change the Terms and Conditions of this Agreement at any time by giving Client written notice of such amendment. Guarantor agrees to be bound by any such changes, if written notice is given to Client. Such changes will go into effect as outlined in the change notice. If permitted by applicable law, such changes will apply to existing balances as well as future purchases and balances. Any modification of or amendment to this Agreement will be delivered to Client through U.S. mail at the address Client provided to and periodically provides updates to Fuelman. All initial amendment notifications will be sent to Client in advance of the effective date thereof or earlier as required by law. Client shall be deemed to have accepted such amendments by continued use, after the effective date of the amendment, of any of the Card(s) issued to Client. Notwithstanding any of the foregoing provisions of this Section, Fuelman retains the right to change Spend Limits for the Account or to suspend, cancel, or terminate the Account or any Card without prior written notice and Client and Guarantor acknowledge and agree that Fuelman may take such actions without notice.
**13 Events Of Default.** The occurrence of any of the following shall constitute an "Event of Default" hereunder:
13.1.1 Client shall fail to pay any principal, late interest, or other amount payable in respect of any Obligation when due;
13.1.2 Client shall fail to observe or perform any other covenant contained in this Agreement;
13.1.3 Any representation or warranty made by Client or Guarantor herein or in the Application proves untrue in any material respect as of the date of the making or furnishing thereof;
13.1.4 Either Client or Guarantor shall (i) make an assignment for the benefit of its creditors; (ii) admit in writing its inability to pay its debts as they become due; (iii) file a petition under any applicable insolvency, debtor relief or reorganization statute, including without limitation, the United States Bankruptcy Code; (iv) be subject to an involuntary petition under any applicable insolvency, debtor relief, or reorganization statute; (v) appoint or consent to the appointment of any receiver, conservator, liquidating agent, or committee in any insolvency, readjustment of debts, marshaling of assets or liabilities, or similar proceedings of, or relating to Client or Guarantor, or any substantial portion of their assets; or (vi) take any corporate action for the purpose of effecting any of the foregoing; or
13.1.5 Guarantor shall terminate or contest the validity or enforceability of Guarantor's guaranty hereunder or Guarantor's guaranty hereunder shall be determined to be invalid or unenforceable for any reason.
**14 Remedies Upon Event Of Default.** Without limiting any other rights or remedies of Fuelman provided for elsewhere in this Agreement, or by applicable law, or in equity, or otherwise, upon or at any time after the occurrence of any Event of Default, Fuelman shall have and may exercise, at its election, from time to time, any and all rights and remedies available at law, in equity, or otherwise, including, without limitation, (i) declaring the entire unpaid balance of the Obligations hereunder or any part thereof immediately due and payable, whereupon it shall be due and payable; and (ii) demanding payment from the Guarantor.
**15 Dispute Resolution.**
15.1 Disputed Transactions. To dispute any Transaction on Client's Statement, Client must notify Fuelman in writing as set forth below within fifteen (15) days of the date of Client's Statement. Fuelman will promptly investigate the matter and respond to Client within sixty (60) days after receiving written notice. Notice should be sent to: FUELMAN, P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service. Fuelman shall not be responsible for and Client shall waive any discrepancies or disputes that Client does not report to Fuelman in writing within fifteen (15) days after the date of Client's Statement.
15.2 Disputed Transaction Notices. Client may report any dispute to Fuelman by telephone. However, telephone notice will not preserve Client's rights or otherwise serve as effective notice under this Agreement. Client must put in writing any dispute regarding a Transaction on Client's Statement. Client's letter must include the following information: name; Account number; date of the Statement; dollar amount and identification of the Transaction(s) in question; and any possible explanation of the error.
15.3 Dispute Resolution. The parties agree that they will work in good faith to resolve any disputes arising under this Agreement. If the dispute cannot be resolved by the parties, then at Fuelman's sole discretion, the dispute will be resolved by binding arbitration in Atlanta, Georgia in compliance with the American Arbitration Association's commercial arbitration rules or by litigation in accordance with Section 25.1. The foregoing does not prohibit either party from seeking injunctive relief without first complying with this Section. Client will reimburse Fuelman for all of its costs and expenses (including collections and attorney's fees and costs) incurred in connection with enforcing any of Fuelman's rights under this Agreement. To accommodate the right to arbitrate, Client agrees that Client will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with Fuelman.
**16 Security, Loss, Theft Or Unauthorized Use Of Card.**
16.1 General Security. Each Card can be programmed to only allow Fuel or both Fuel & Maintenance services such as oil changes, vehicle washes, etc. Typically, each Transaction is authorized with the Card number, product code, quantity and driver's Driver ID across the proprietary Fuelman network to ensure that the purchase is authorized and limited to the product and quantity (e.g. gallons of Fuel or dollars of Maintenance) that have been pre-approved. This system also helps prevent unauthorized Driver IDs and stolen Cards from being used to make purchases. The product and quantity controls are subject to each Merchant Location's POS Authorization Limitations described in Section 16.9.
16.2 Fuelman's Liability. In the event an unauthorized Transaction occurs, subject to the limitations and client responsibilities explained in this Section 16, and in the event that the Account has been issued fewer than ten (10) Cards, Fuelman will assume full responsibility for those purchases. If the Account has been issued ten (10) or more Cards, Client assumes all liability and responsibility for unauthorized Transactions or Account activity.
16.3 Client's Responsibility. It is the responsibility of Client to ensure proper security controls are kept in place to protect the Cards and Driver IDs and that only authorized employees or agents of Client use them to make purchases. It is also the Client's responsibility to lock any inactive, misplaced, or stolen Cards and Driver IDs immediately. Fuelman is not responsible for fraudulent Transactions made with a lost or stolen Card and/or Driver ID. Client should use the online account application to lock Cards and Driver IDs instantly. Alternatively, the Client can contact Fuelman Customer Service during regular business hours via phone call with the requested change, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. All Transactions in which a valid/unlocked Card number was used in conjunction with a valid/active Driver ID will be considered to be authorized Transactions in which Client is fully responsible for payment. It is also the Client's responsibility to review the standard fleet management reports and optional eMail exception alerts to identify potential purchasing discrepancies. Client should instruct its Cardholders to keep any record of their Driver ID separate from the vehicle's Card.
16.4 Lost or Stolen Cards. Client shall report all lost or stolen Cards to Fuelman immediately via phone call to Fuelman Customer Service identifying the Card number and such other details concerning the loss or theft of the Cards as are known by Client, in which case Fuelman will make the requested changes within 24 hours and assume responsibility for any unauthorized purchases at that point. Client shall be liable for all Transactions made by lost or stolen Cards until 24 hours after the time Fuelman receives Client's notice of such lost or stolen Cards. Client and Guarantor(s) agree to and acknowledge full liability for any losses resulting from any failure to report the loss or theft of Card(s) in accordance with the terms hereof.
16.5 Terminated Drivers. It is the Client's responsibility to lock a terminated driver's Driver ID as explained in Section 16.3.
16.6 Card Purchasing Controls. Cards may be configured to attempt to limit acceptance and transaction amounts, for example, by limiting Card authorization to: specific merchant category codes (MCCs), maximum transaction dollar amounts, maximum number of transactions in a given time period, certain days of the week, and times of day, etc. Cards may also be configured to prompt for a valid driver or vehicle identification number (ID) and odometer at most fueling locations prior to turning on the pump. While Merchants may limit the amount of fuel dispensed per transaction, fuel pumps typically do not automatically shut off at a Card's transaction dollar limit. Operator establishes these standard parameter controls as a means of assisting Client in limiting purchase abuse and fraud. While Operator attempts to control the use of the Card to the parameters selected, Client agrees to pay for all transactions on the Account ("Charges") regardless of whether such charges are within or outside the parameters established for each Card.
16.7 Miscellaneous Product Purchase Limitations. In addition to the vehicle-related product categories (Fuel, Maintenance supplies, and Maintenance services) a Card can be allowed to purchase non-vehicle related items under the Miscellaneous product category. If a Client does not want to allow non-vehicle related purchases, Client should set each Card's Miscellaneous product category spending limit to zero dollars ($0). Fuelman assumes no responsibility for any unauthorized Miscellaneous purchases.
16.8 Tax Reporting Limitations. Fuelman calculates applicable taxes for Fuel. Applicable taxes for Maintenance and other non-Fuel purchases are dependent on the information provided to Fuelman by the applicable Merchant Location.
16.9 Merchant Limitations. The personnel (if any) at a Merchant Location are not the agents or employees of Fuelman and Fuelman shall not be responsible for the products or services rendered by any of the Merchants or any other liability or damage which arises from the action or negligence of the personnel of any of the Merchants, their agents or their employees.
16.10 POS Authorization Limitations. Authorization controls are provided as a convenience to the Client and are not guaranteed to prevent unauthorized purchases. Specifically, depending on the particular point-of-sale (POS) equipment and Fuel dispenser controls being used by a particular Merchant Location, the product type and spending limit may not be enforceable prior to completing the Transaction. In these situations, the Transaction will still be considered to be authorized, but will be identified as an exception on the Client's standard fleet management report and reported via email if desired by Client.
16.11 Claims. All claims for defective Fuel or Maintenance must be made to the Merchant operating the Merchant Location where such Fuel or Maintenance was purchased. Any claim for defective Fuel or Maintenance is waived by Client unless made in writing to Merchant, with a copy to Fuelman, within fifteen (15) days from the date of the purchase of the alleged defective Fuel or Maintenance giving rise to the claim. Fuelman will not accept any claims for defective Miscellaneous.
**17 Term and Termination.**
17.1 Term. The term of the Account shall be one (1) year from the date the Cards are issued to Client unless either party terminates the Account as provided in this Agreement. Thereafter, Fuelman will automatically renew Client's Account for additional one (1) year periods unless either Fuelman or Client gives the other party notice of intent not to renew at least thirty (30) days before its scheduled expiration date. At the outset of any such one-year renewal period, Fuelman, at its discretion, may issue replacement Cards to Client.
17.2 Termination by Client. Client may terminate Client's Account and its use of the Cards for any reason by providing written notice of such termination to Fuelman. Client remains obligated to pay for any and all transactions, balances, fees, and other amounts incurred up until midnight of the day Fuelman receives notice of such termination.
17.3 Termination by Fuelman. Fuelman may terminate Client's Account and its use of the Cards for any reason, including but not limited to, inactivity, failure to promptly pay any amounts due Fuelman, failure to use the Cards exclusively for business purposes, or Fuelman's decision to terminate the Fuelman Program. Fuelman will notify Client's Representative at the time of termination that the Client's Account or Card(s) will be terminated along with the reason(s) for such termination.
**18 Change In Ownership.** Client must notify Fuelman immediately in the event of any sale of a majority ownership of its equity, any sale of a majority of its assets, any merger, reorganization or other transaction which results in a change of ownership of Client. Fuelman may terminate the Account in its sole discretion upon any change of ownership.
**19 Contacts And Notices.**
19.1 Fleet Contact. The "Fleet Contact" listed on the Application is authorized to provide Fuelman with the information necessary to establish Client's Account records and Cards, including, but not limited to vehicle, driver and card user related information. Fuelman is authorized to send all Account information and Client's Cards to the Fleet Contact's attention.
19.2 Accounts Payable Contact. The "Accounts Payable Contact" listed on the Application is authorized to provide Fuelman with payment information about payments on the Account. This contact may be the same person as the Fleet Contact and will be Fuelman's primary contact in the event that the Account becomes delinquent or exceeds the assigned Spend Limit.
19.3 Notices. Except as specified otherwise in this Agreement, all notices, requests, demand, or other communications required to be made pursuant to this Agreement shall be in writing and shall be given by mail by first class, certified or registered mail, postage prepaid, or by the sending by facsimile (with confirmation by mail to be provided by the party giving notice) or by reputable overnight delivery service (such as FEDEX or UPS) or by personal delivery to the recipient party, to the address provided above for Fuelman and in the Application for Client. Fuelman may provide any such notice to Client by including the notice in the Statement provided to Client. A notice will be deemed received on the actual date of receipt. Fuelman's address for notices is: FUELMAN , P. O. Box 924138, Norcross, GA 30010, Attention: Customer Service.
**20 Maximum Lawful Rate.** In no event shall any Finance Charges or other rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Client and Fuelman, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Client is and shall be liable only for the payment of such maximum amount as allowed by law, and payment received from Client in excess of such legal maximum amount, whenever received, shall be applied to reduce the principal balance of the Obligations hereunder to the extent of such excess.
**21 Credit Reporting Agencies.** Client and Guarantor(s) authorize Fuelman to report to any commercial credit reporting agency, Client's or Guarantor's performance under this Agreement, including but not limited to Dunn & Bradstreet, Experian Business or Equifax Credit Information Services. If the Account is personally guaranteed, Fuelman reserves the right to report Account information to consumer credit reporting agencies, including but not limited to Equifax Credit Information Services, Experian and TransUnion. Client and Guarantor have the right to notify the consumer reporting agencies not to use its respective credit report in connection with a credit transaction it did not initiate. To do so, contact Equifax Credit Information Services, P.O. Box 740123, Atlanta, GA 30374-0123; Experian, P.O. Box 919 Allen, TX 75013; and TransUnion, P.O. Box 97328, Jackson, MS 39288-7328; or Client and Guarantor may notify all three agencies by calling 1-888-567-8688
**22 Limitation of Liability.** FUELMAN WILL HAVE NO LIABILITY FOR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR INCIDENTAL DAMAGES OF ANY KIND, INCLUDING CLAIMS FOR LOSS OF PROFITS, WHETHER RESULTING DIRECTLY OR INDIRECTLY TO CLIENT, GUARANTOR, OR THIRD PARTIES, AND WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, EVEN IF SUCH DAMAGES WERE FORESEEABLE OR RESULT FROM A BREACH OF THIS AGREEMENT. IN THE EVENT A COURT IN A FINAL, NON-APPEALABLE AWARD FINDS FUELMAN LIABLE FOR ANY DIRECT DAMAGES, FUELMAN'S LIABILITY IN THE AGGREGATE FOR SUCH DIRECT DAMAGES WILL NOT EXCEED THE AMOUNT PAID OR PAYABLE BY CLIENT TO FUELMAN FOR THE MONTH PRECEDING THE DATE ON WHICH THE CLAIM AROSE.
**23 Indemnification.** To the maximum extent allowed by law, Client (the "Indemnitor") will indemnify and hold harmless Fuelman and its affiliates, directors, officers, employees, and agents (the "Indemnitees") from and against any and all third party claims, losses, damages, suits, fees, judgments, costs, and

expenses (collectively referred to as "Claims"), including attorneys' fees incurred in responding to such Claims, that the Indemnitees may suffer or incur arising out of or in connection with (a) the Indemnitor's (or its employees' or agents') negligence, willful misconduct, or breach of any representation, warranty or other obligation under this Agreement; or (b) any personal injury (including death), damage to property, or environmental clean-up and related costs, resulting from the Indemnitor's or its employees' or agent's acts or omissions. The Indemnitees will give prompt notice of any Claim to the Indemnitor, who will defend the Indemnitees at the Indemnitees' request.

**24** **Nondisclosure.** Fuelman may provide to Client access to confidential and proprietary information regarding Fuelman's business, business plans, pricing and reimbursement policies, and other issues ("Confidential Information."). Client will keep all Confidential Information in strict confidence and not disclose or use the Confidential Information during the term of this Agreement and for five (5) years thereafter, provided that for any Confidential Information deemed to be a "trade secret," Client shall protect and not disclose or use such Confidential Information for so long as such Confidential Information is will not disclose its terms except as permitted by Fuelman. Client will inform its employees and agents as to the confidential and proprietary nature of the Confidential Information to which they may be exposed and take all necessary actions to ensure that such employees and agents keep such information strictly confidential. Client will return any Confidential Information upon request from Fuelman. Client agrees that any disclosure of Confidential Information would cause irreparable harm for which monetary damages may not be a sufficient remedy, so Fuelman will be entitled to seek all remedies and damages available at law and in equity, including but not limited to injunctive relief, without the posting of a bond.

**25** **Miscellaneous Provisions.**
25.1 Governing Law; Waiver of Jury Trial; Binding Arbitration. This Agreement will be governed by Louisiana law, without regard to its conflicts of laws principles. Many Account maintenance, treasury and accounting functions are performed by Fuelman in Louisiana, where it has a substantial presence.

Arbitration Client or FleetCor may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute, or controversy between or among such parties relating to the Cards or Account, a prior related account, or the relationship of such parties, including without limitation claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision, and no matter what legal theory such claims are based on or what remedy (damages, or injunctive or declaratory relief) such claims seek (a "Claim"). To accommodate the right to arbitrate, Client agrees that it will neither assert, nor participate in, a class action or other representative action or proceeding related to this Agreement, the Account, the Cards or any other aspect of Client's relationship with FleetCor. The party filing for arbitration must choose one of the following arbitration firms and follow its rules and procedures for initiating (including paying the filing fee) and pursuing arbitration before a single neutral arbitrator: American Arbitration Association, National Arbitration Forum or JAMS. All other fees will be allocated as provided by the rules of the arbitration firm and applicable law. Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis.

Claims Covered

What Claims are subject to arbitration? All Claims relating to your Cards or Account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; and Claims made independently or with other claims. A party who initiates a proceeding in court may elect arbitration with respect to any Claim advanced in that proceeding by any other party. Claims and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis, and the arbitrator may award relief only on an individual (non-class, non-representative) basis.

Whose Claims are subject to arbitration? Not only ours and yours, but also Claims made by or against anyone connected with us or you or claiming through us or you, such as a co-applicant or authorized user of your account, an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, or trustee in bankruptcy.

What time frame applies to Claims subject to arbitration? Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration.

Broadest interpretation. Any questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced. This arbitration provision is governed by the Federal Arbitration Act (the "FAA").

What about Claims filed in small claims court? Claims filed in a small claims court are not subject to arbitration, so long as the matter remains in such court and advances only an individual (non-class, non-representative) Claim.

How Arbitration Works

How does a party initiate arbitration? The party filing an arbitration must choose one of the following three arbitration firms and follow its rules and procedures for initiating and pursuing arbitration: American Arbitration Association, JAMS, and National Arbitration Forum. Any arbitration hearing that you attend will be held at a place chosen by the arbitration firm in the same city as the U.S. District Court closest to your then current billing address, or at some other place to which you and we agree in writing. You may obtain copies of the current rules of each of the three arbitration firms and forms and instructions for initiating arbitration by contacting them as follows:
American Arbitration Association, 335 Madison Avenue, Floor 10, New York, NY 10017-4605 Web site: www.adr.org
JAMS, 1920 Main Street, Suite 300, Irvine, CA 92610 Web site: www.jamsadr.com
National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405 Web site: www.arbitration-forum.com

At any time you or we may ask an appropriate court to compel arbitration of Claims, or to stay the litigation of Claims pending arbitration, even if such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Even if a party fails to exercise these rights at any particular time, or in connection with any particular Claims, that party can still require arbitration at a later time or in connection with any other Claims.

What procedures and law are applicable in arbitration? A single, neutral arbitrator will resolve Claims. The arbitrator will be either a lawyer with at least ten years of experience or a retired or former judge, selected in accordance with the rules of the arbitration firm. The arbitration will follow procedures and rules of the arbitration firm in effect on the date the arbitration is filed unless those procedures and rules are inconsistent with this Agreement, in which case this Agreement will prevail. Those procedures and rules may limit the discovery available to you or us. The arbitrator will take reasonable steps to protect Client account information and other confidential information if requested to do so by you or us. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, will honor claims of privilege recognized at law, and will have the power to award to a party any damages or other relief provided for under applicable law. You or we may choose to have a hearing and be represented by counsel. The arbitrator will make any award in writing and, if requested by you or us, will provide a brief statement of the reasons for the award. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, or on the resolution of any other dispute.

Who pays? Whoever files the arbitration pays the initial filing fee. If we file, we pay; if you file, you pay, unless you get a fee waiver under the applicable rules of the arbitration firm. If you have paid the initial filing fee and you prevail, we will reimburse you for that fee. All fees will be allocated as provided by the rules of the arbitration firm and applicable law. However, we will advance or reimburse your fees if the arbitration firm or arbitrator determines there is good reason for requiring us to do so, or if you ask us and we determine there is good reason for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, but a party may recover any or all expenses from another party if the arbitrator, applying applicable law, so determines.

Who can be a party? Claims must be brought in the name of an individual person or entity and must proceed on an individual (non-class, non-representative) basis. The arbitrator will not award relief for or against anyone who is not a party. If you or we require arbitration of a Claim, neither you, we, nor any other person may pursue the Claim in arbitration as a class action, private attorney general action or other representative action, nor may such Claim be pursued on your or our behalf in any litigation in any court. Claims, including assigned Claims, of two or more persons may not be joined or consolidated in the same arbitration. However, applicants, co-applicants, authorized users on a single account and/or related accounts, or corporate affiliates are here considered as one person.

When is an arbitration award final? The arbitrator's award is final and binding on the parties unless a party appeals it in writing to the arbitration firm within fifteen days of notice of the award. The appeal must request a new arbitration before a panel of three neutral arbitrators designated by the same arbitration firm. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is final and binding on the parties after fifteen days has passed. A final and binding award is subject to judicial review and enforcement as provided by the FAA or other applicable law.

Survival and Severability of Terms
This arbitration provision shall survive: (i) termination or changes in the Agreement, the account, or the relationship between you and us concerning the account, or any amounts owed on your account, to any other person or entity. If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. Any different agreement regarding arbitration must be agreed to in writing.

25.2 Assignment. Client will not assign, including by operation of law, this Agreement or any right or obligation under this Agreement without the prior written consent of Fuelman. This Agreement, and any and all rights and obligations associated with the Agreement, may be assigned by Fuelman upon notice to Client. All of Fuelman's rights under this Agreement and subsequent amendments shall also apply to any assignee of this Agreement. This Agreement is binding on the parties to this Agreement and their respective successors and permitted assigns.

25.3 Relationship of Parties. Nothing in this Agreement will be construed to create a joint venture, partnership, employment, or agency relationship between the parties for any purpose.

25.4 Force Majeure. Except for payment obligations, neither party is liable for delays or failures in performance of any obligations under this Agreement due to a cause beyond its reasonable control.

25.5 No Waiver. No delay or omission by either party to exercise any right under this Agreement will impair or be construed as a waiver of such right. A waiver by any party of any breach or obligation will not be construed to be a waiver of any other breach or obligation. The party waiving its rights must sign all waivers. No waiver of any default, expressed or implied, made by either party hereto shall be binding upon the party making such waiver in the event of a subsequent default.

25.6 Severability. If any provision of this Agreement is declared invalid, illegal, or unenforceable, the validity of the remaining provisions will not be affected. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of this Agreement.

25.7 Interpretation. This Agreement will not be presumptively interpreted for or against any party by reason of that party having drafted or negotiated, or failed to draft or negotiate, all or any portion of any provision of this Agreement. The captions and headings included in this Agreement have been inserted for convenience only and may not be used in connection with the interpretation of this Agreement. Each party intends that this Agreement will not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the parties to this Agreement.

**Summary of Certain Fees[1,2,3]**

| Late Fee | Greater of 9.99% or $75 for each late payment |
|---|---|
| Finance Charges | 32% APR or maximum allowed by applicable law |
| High Credit Risk Account (Level 2 Pricing) | Incremental charge of up to 20¢ per gallon above current pricing if Account is deemed High Credit Risk based on credit score and payment history |
| Special Network Pricing | Greater of 10¢ per gallon or $3.0 per transaction at select sites/merchants |
| Minimum Program Administration Fee* | Up to 10 cents per gallon or $2 per transaction |
| Monthly Card Fee | Up to $10 per card per month |
| Optional Fleet Management Report | Up to $15 for each optional report or up to $100 per quarter |
| Non-standard Payment Option | One time set up fee up to $50 and up to $5 Bank Handling Fee per debit for Operator initiated EFT/ACH; Up to $50 per payment for Client initiated ACH/Wire or Checks sent to different payment address displayed on statement; $15 per payment for Pay by Phone through IVR and $25 through Customer Service Representative; |
| Returned Payment Fee | Up to $50 per occurrence |

[1] Listed charges/fees not applicable to all Clients.
[2] Additional charges/fees may apply based on the Client's agreed-upon program, please refer to the full Client Agreement Terms and Conditions for complete details.
[3] Charges/fees for additional products/services is available upon request.
*Certain exclusions apply, please consult with your sales representative for more details.

012018                                                                                   FMPLT01